UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

**FILED**

APR 0 5 2016



EDWARD J.S. PICARDI, M.D.,

Movant,

vs.

UNITED STATES OF AMERICA,

Respondent.

5:15-CV-05050-JLV

REPORT AND RECOMMENDATION

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

FACTS ............................................................................................................... 1

A. Pretrial Proceedings................................................................................. 1

B. The Jury Trial ......................................................................................... 4

C. Post-Trial ............................................................................................... 13

D. Appeals................................................................................................... 14

E. Section 2255 Motion .............................................................................. 16

DISCUSSION ................................................................................................. 18

A. Scope & Procedure Applicable to a § 2255 Motion................................. 18

B. Government's Motion to Exclude ............................................................ 20

C. Procedural Default –The Void-for-Vagueness Issue ................................ 23

    1. Cause and Prejudice ....................................................................... 25

    2. Actual Innocence ............................................................................. 26

D. Ineffective Assistance of Counsel........................................................... 27

1. Failure to Raise the Constitutional Void-for-Vagueness Issue ........... 29

    a. 26 U.S.C. § 7201 ..................................................................... 32

i

b. 26 U.S.C. § 7206(1) ................................................................ 37

c. 31 U.S.C. §§ 5314 and 5322 ................................................ 38

d. 31 C.F.R. §§ 103.24 and 103.27(c) ......................................... 40

2. Failure to Limit the Testimony of and to Properly Cross-Examine IRS Agent Marie Allen .............................................................................. 41

a. State of Mind ......................................................................... 41

b. Constructive Receipt ............................................................. 46

c. Legal Conclusions on Material Matters ..................................... 53

d. Failure to Make a Motion *in Limine* as to Allen's Testimony .... 61

e. Failure to Competently Cross-Examine Allen ........................... 63

3. Proposal of an Incorrect, Prejudicial Jury Instruction ....................... 69

4. Ineffective Presentation of Direct Testimony from Chatzky ............... 72

5. Failure to Present Evidence of Lack Control ..................................... 75

6. Ineffective Advice Regarding Plea Offers .......................................... 81

a. Rejected Plea Offers Made by the Government ......................... 81

b. Failure to Seek a Mistrial ....................................................... 88

7. Ineffective Presentation of Expert Accounting Testimony .................. 91

8. Failure to Object to Testimony of Randy Brodnik ............................. 93

E. No Evidentiary Hearing is Warranted .................................................... 94

**CONCLUSION** ............................................................................................... 95

**NOTICE TO PARTIES** ................................................................................... 95

## INTRODUCTION

Pending before the court is movant Edward Picardi's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. See Docket No. 1.[1] This matter has been referred to this magistrate judge pursuant to 28 U.S.C. § 636(b)(1) and the October 16, 2014, standing order of the Honorable Jeffrey L. Viken, Chief United States District Judge. This opinion addresses two motions by the United States of America (government): (1) a motion to dismiss Mr. Picardi's motion for failure to state a claim, Docket No. 23; and (2) a motion to strike or exclude the expert opinion submitted by Mr. Picardi in support of his motion, Docket No. 14. Both are discussed below.

## FACTS

### A. Pretrial Proceedings

On September 21, 2010, the government indicted Mr. Picardi[2] on five counts of tax evasion in violation of 26 U.S.C. § 7201. See United States v. Picardi, 5:10-CR-50092-JLV (hereinafter "CR"), Docket No. 1 (D.S.D.). Initially the court appointed the Federal Public Defender to represent Mr. Picardi, but in a matter of days Mr. Picardi privately retained Robert W. Van Norman, local

---

[1] Filings in this civil habeas matter will simply be referred to by the docket number assigned to that filing in the court's docket. Pleadings in Mr. Picardi's underlying criminal case will be designated "CR" and then the court's docket number for that pleading in the criminal case.

[2] At the time of the criminal proceedings in the underlying case, Edward Picardi was a physician licensed to practice medicine in South Dakota. All the references in the underlying criminal matter therefore refer to "Dr." Picardi. However, Dr. Picardi's medical license was revoked by the South Dakota Board of Medical and Osteopathic Examiners on April 3, 2013. Accordingly, he is referred to in this opinion as "Mr." Picardi.

1

counsel, and Jennifer Hinkebein Culotta, who appeared *pro hac vice* from New Albany, Indiana. Mr. Van Norman and Ms. Culotta represented Mr. Picardi through his jury trial in district court.

A year after his original indictment, the government obtained a 13-count superseding indictment against Mr. Picardi. See CR Docket No. 75. Then approximately 10 months later, it obtained a second superseding indictment, also containing 13 counts. See CR Docket No. 141. Counts 1-5 of the second superseding indictment charged Mr. Picardi with income tax evasion (as in the original indictment), for each year from 1999 through and including 2003; counts 6-10 charged Mr. Picardi with filing false returns or statements in violation of 26 U.S.C. § 7206(1) for the years 2005 through and including 2009 for filing Form 1040 Schedule B which falsely stated he had no financial interest in, or authority over, any foreign financial account; and counts 11-13 charged Mr. Picardi with failing to file reports with the Internal Revenue Service ("IRS") in 2007, 2008, and 2009 disclosing a financial interest in and authority over financial accounts in foreign countries with an aggregate value of more than $10,000, in violation of 31 U.S.C. §§ 5314 and 5322, and 31 C.F.R. §§ 103.24 and 103.27(c). Id.

The allegations in the second superseding indictment, in condensed form, were that for 14 years—from 1997 to 2010—Mr. Picardi entered into a fraudulent "employee-leasing" scheme that enabled him to avoid more than $800,000 in taxes on his income. Id. Generally, the government alleged this was accomplished by routing Mr. Picardi's income through numerous

2

companies, ultimately settling in a trust named E & S International, Ltd., which was controlled by Mr. Picardi.  Id.  The first of these companies would "hire" Mr. Picardi as their employee, receive the total amount of his earnings, pay him a small fraction of his total earnings as wages, and then pass the bulk of the earnings to the next company in the line.  Id.  Some money was paid out in bogus lease payments to the co-creator of this scheme, Anthony Kritt.  Id. The rest of the money would be circulated through companies variously located in Guernsey, the Channel Islands; London, England; the Isle of Man, United Kingdom; Cyprus; and Hungary, each company retaining a small percentage of Mr. Picardi's earnings, and passing the bulk of those earnings on to their ultimate destination in the E & S trust.  Id.  The government alleged that Mr. Picardi's remaining income, located in the offshore account of E & S, was then made available to him through phony loans and fraudulent debt instruments.  Id.

The government filed a notice indicating it would call IRS Agent Marie Allen from Sacramento, California, as an expert at trial.  See CR Docket No. 77. Ms. Allen was identified as an expert in offshore employee leasing arrangements.  Id.  The government stated she would offer testimony on the following subjects:  legitimate employee leasing arrangements and those that were not legitimate, how to tell if a transaction has economic substance, whether a transaction has business reality, what a taxable event is, what constructive receipt is, what legitimate deferred compensation is, what a legitimate trust is, the five factors of true debt, what are the reporting

requirements for United States citizens owning financial interests in foreign banks, and the computation of taxes owed by Mr. Picardi.  Id.

**B.    The Jury Trial**

Mr. Picardi availed himself of his right to a jury trial on all counts, which trial began on September 17, 2012.  See CR Docket Entry immediately following Docket No. 175.  At trial, the government's evidence conformed to the allegations in its superseding indictment.  See generally, Jury Trial Transcript ("JT"), CR Docket No. 220 at pp. 143-59, 164-203 (testimony of IRS Case Agent Chris Wright).  The evidence at trial is described generally here, and more specifically in the DISCUSSION section of this opinion along with each relevant issue.

The actual written documents establishing the employee leasing program stated that Mr. Picardi would have no access to the money placed in the trust until he reached age 70 or retired.  Id. at p. 151 (discussing Exhibit 75, p. 2, Appendix A, ¶ 10).  The written documents specifically stated that Mr. Picardi would not have access to the funds in the E & S trust through any type of loan. Id.  However, the government's evidence showed that, in practice, Mr. Picardi did have access to the funds through loans and outright transfers.  See JT, CR Docket No. 220 at pp. 164-203.

The loans from E & S to Mr. Picardi were in the form of a line of credit offered by Associated Enterprises, Limited ("AEL"), with the funds for the line of credit coming from the trust, E & S.  See JT, CR Docket No. 220 at pp. 164-203.  There were two lines of credit totaling $1.2 million.  Id.  Mr. Picardi was

4

ostensibly required to pay interest payments to AEL on the loan, but the few payments Mr. Picardi actually made went back into the account of E & S, save for a 1% fee to AEL. Id. The E & S trust was controlled by Mr. Picardi. See id. at 184-85 (discussing Exhibit 313).

The loan agreement for the "line of credit" made available to Mr. Picardi by AEL did not exist at the time Mr. Picardi was allowed to take withdrawals. Id. at pp. 203-08. Instead, the contract for one of the lines of credit was drafted some five years *after* the advances from the line of credit had already been made. Id. The subsequently-created agreement was drafted after Mr. Picardi had been notified by the IRS that he was being audited. Id.; see also id. at p. 73. Also, although the loan agreement initially recited an interest rate of 9%, Mr. Picardi was able reset the interest rate at 5% long after the money had already been paid out to him. Id. at p. 196, 201.

Money was even transferred out of the E & S trust at Mr. Picardi's request without any pretense of a loan being made. The government showed evidence that, in the spring of 2000, Mr. Picardi requested that $200,000 be transferred out of the trust and deposited with a company in South Africa so that he could bid on a piece of real estate that was being auctioned there. See CR Docket No. 221 at pp. 247-59. Mr. Picardi ultimately did not purchase the property in question, and the entire funds were then transferred back into the E & S Trust. Id.

Exhibit 151 played a major part in the government's case. That was a letter written by Mr. Picardi to Anthony Kritt spelling out in no uncertain terms

5

Mr. Picardi's position that he entered into the employee leasing program with the specific expectation that the money he contributed would be available to him immediately. The full text of Exhibit 151 is reproduced below at pages 42-43.

Mr. Picardi's defense at trial was two-fold: (1) to point out that the documents creating Mr. Picardi's employee leasing program did not allow him control over or access to the money in the program and (2) to argue that Mr. Picardi relied in good faith on Anthony Kritt as his lawyer and CPA in entering into the program. Along these lines, Mr. Picardi presented the testimony of a private investigator who was previously a Scotland Yard detective, John Brennan. See Docket No. 227, at pp. 1000-25; Docket No. 228, pp. 1056-1138. Mr. Brennan testified that he read all of the 58,000 documents produced by the government in discovery and that he contacted each of the principals for each of the companies in the employee leasing program and interviewed them, some of them several times. Id. His conclusion after this investigation was that the program worked in practice as it was described on paper and that Mr. Picardi at no time had access to or control over the funds once they were sent overseas by him. Id.

Michael Chatzky testified as a defense expert. See JT, Docket No. 227, at pp. 864-942. Mr. Chatzky had previously testified before the United States Senate subcommittee on investigations dealing with international taxation matters. Id. at p. 868. Generally, Mr. Chatzky testified about the terms of the employee leasing program and application of tax law to that program. He

6

testified that Mr. Picardi was subject to a non-compete clause which, if violated by him, would result in his forfeiture of all money he contributed to the program. Id. at p. 885-86. Also, Mr. Chatzky testified that Mr. Picardi's employer, Montrain, had the right to adjust the balance in Mr. Picardi's account at any time up to the time Mr. Picardi either retired or turned 70 years old. Id. at pp. 886-87. Mr. Chatzky testified that Mr. Picardi had no ownership interest or directorial authority over the program or the companies involved in the program. Id. at p. 892. Mr. Chatzky testified that Mr. Picardi had no obligation under the tax laws to fill out an IRS form declaring an interest in foreign bank accounts because he had no such interest. Id. at pp. 918-23.

The government's cross-examination of Mr. Chatzky consisted in establishing that Mr. Chatzky had reviewed Mr. Picardi's foreign deferred compensation agreement in July, 1997, at the request of Mr. Kritt on behalf of Blenheim, one of the companies in the chain of companies in the employee leasing scheme. Id. at pp. 928-35. For that service, Mr. Chatzky's firm billed Blenheim $240. Id. at p. 932. The government then described the transaction where Mr. Picardi requested that funds from E & S be wired over to South Africa so he could bid on some real estate that was being auctioned. Id. at pp. 940-41. Government counsel asked Mr. Chatzky, "If that happened [the South Africa transaction], do you agree with me that [Mr. Picardi] had access to his funds?" Id. at p. 940, lines 24-25. Mr. Chatzky replied, "Define what the word 'if' means, when you say if that happened. I don't understand you at all." Id. at p. 941, lines 1-2.

7

Jeannine Egan Lecy testified as a fraud investigator with over 12 years' experience investigating fraud for law enforcement and local governmental agencies. See JT, Docket No. 228, at pp. 1139-1212. Mr. Picardi hired Lecy to provide an accounting of what happened to Mr. Picardi's money once he sent it to the employee leasing program. Id. at p. 1158. She testified that PLS, Mr. Kritt's company and the first in the chain of companies to receive Mr. Picardi's contributions, did not forward on all the money it should have. Id. at pp. 1173-75. Lecy originally calculated the discrepancy attributable to PLS to be $1.4 million, but later concluded that figure was in error. Id. at pp. 1192-93. On cross-examination, Lecy was asked whether she had included in her calculations the 3-4% fee PLS was allowed to deduct and whether she had figured payroll deductions into her analysis—she had not. Id. Nevertheless, she continued to maintain that between $800,000 and $1 million was missing and unaccounted for, and that this could not be attributed to PLS's legitimate fee or to payroll taxes. Id. at 1210-11.

Dr. Randy Brodnik also testified for Mr. Picardi. See JT, Docket No. 229, at pp. 1238-55. Dr. Brodnik was engaged in an identical employee leasing program. Both he and Anthony Kritt, the program's architect, were indicted in federal court in West Virginia. They were tried there and acquitted.

Prior to Dr. Brodnik's testimony, a bench conference took place pursuant to the government's objection on relevancy grounds. Id. at pp. 1240-45. The court overruled the objection, but indicated that Brodnik's testimony would be very narrow—defense would not be allowed to elicit testimony that Brodnik

8

entered into the same program, so it was acceptable for Mr. Picardi to enter the
program also. Id. at pp. 1240-45. The court cautioned defense counsel that if
she was not careful in her direct examination of Brodnik, the court would hold
the entirety of his testimony inadmissible. Id.

Dr. Brodnik testified to meeting Mr. Picardi and Kritt at a conference on
foreign employee leasing programs. Id. at pp. 1246-54. He testified that Kritt
set his program up and filed all his tax returns for him. Id. He testified that he
never declared an interest in foreign accounts. Id. He stated he also obtained
loans from his overseas accounts through AEL. Id. He testified that Kritt
became more than just a professional acquaintance, but also his friend. Id.

On cross-examination, the first testimony elicited by the government was
that Brodnik had amended his tax returns in 2007 and paid back taxes for the
years 1998-2003. Id. at p. 1254. Brodnik admitted to paying around $2
million in back taxes. Id. Government counsel also elicited testimony that
Brodnik was aware that Mr. Picardi had never amended his tax returns and
paid back taxes. Id. Brodnik testified that he obtained the money necessary to
pay his back taxes through having his lawyer negotiate with his "employer" for
the return of the money from the overseas accounts. Id. at 1254-55.

After this exchange, another bench conference was held at which defense
counsel argued that government counsel had opened the door and it was now
acceptable to present evidence to the jury that Brodnik had been indicted,
tried, and acquitted of tax evasion charges in West Virginia. Id. at pp. 1256-
57. Culotta made an offer of proof to the effect that, if asked, Brodnik would

9

testify that he called Mr. Picardi and asked him if he was going to pay his back taxes and Mr. Picardi responded "no," because Kritt had so advised him. Id. at p. 1257. The court overruled Culotta and stated they were not going to relitigate Brodnik's case in Mr. Picardi's trial. Id. at 1257-59.

Van Norman then moved to strike Brodnik's testimony that he had paid his taxes and obtained the money to do so from his overseas accounts. Id. at 1259. The court refused to strike the testimony because it came in without objection. Id. at pp. 1259-60.

Finally, Mr. Picardi also testified in his own defense. See JT, Docket No. 228, at pp. 1213-35; Docket No. 229, at pp. 1263-1336. He testified to meeting Mr. Kritt at a conference about employee leasing programs at which IRS agents were present. See JT, Docket No. 228, at pp. 1270-89. Mr. Picardi testified he thought at all times the program was legitimate. Id. Mr. Picardi testified to a so-called "malpractice crisis" in which physicians could be sued and lose everything; he stated this was a big reason why he entered the employee leasing program. Id. Mr. Picardi testified he believed he had no interest in the overseas accounts associated with his deferred compensation program and so he did not declare an interest in those accounts on his income tax forms filed with the IRS. See JT, Docket No. 229 at 1273. Mr. Picardi testified he made payments on his loans from AEL and even paid one loan off completely. Id. at 1276-66. He testified that Mr. Kritt was the one who set up these loans. Id. at 1275-76.

10

As to the money sent to South Africa, Mr. Picardi testified he contacted Mr. Kritt and explained he wanted to bid on the property but conceal his identity for the bid. Id. at 1283-87. He testified that wiring the money to South Africa from the E & S trust was Mr. Kritt's plan. Id.

As to Exhibit 151, which figured prominently in the government's case-in-chief, Mr. Picardi explained the context in which he drafted that document: he was a couple of weeks from a malpractice trial, he just took a test for recertification that he thought he failed, he was involved in a lawsuit regarding a break-in at his house, he had been drinking that night, and he "freaked out." Id. at 1292-94, 1299. He testified that he never sent the letter to Kritt. Id. at 1292-94. Instead, he held the letter, called Kritt the next morning and discussed his concerns. Id. He later delivered the letter to Kritt in person at Kritt's request. Id. Mr. Picardi testified he is an excitable person and was just under enormous stress at the time. Id. at 1295. Other stressors were that he and his wife could not have children and planned to adopt, but his wife's cancer returned around this time and their names were removed from the adoption list. Id. at 1299-1300.

In 2003, Kritt informed Mr. Picardi of an IRS rule change requiring the reporting of deferred compensation programs. Id. at 1268. Kritt recommended that Mr. Picardi cease sending money overseas at this time, and Mr. Picardi followed the advice. Id. Kritt never told Mr. Picardi that the IRS had set up an amnesty program for foreign deferred compensation programs. Id.

11

Mr. Picardi testified in 2007 he received a notice from Blenheim, one of the companies in the string of companies involved in his employee leasing program. Id. at 1279-80. He contacted Kritt and asked if he should take all his money out of the overseas accounts at this time. Id. Kritt said he need not do that, nor did Mr. Picardi need to respond in writing to the notice. Id. Mr. Picardi asked Kritt about hiring a lawyer to write a response to the notice, but Kritt dissuaded him from doing this, stating the lawyer would charge Mr. Picardi $50,000 to write the letter. Id. at 1280.

Mr. Picardi nevertheless took his program documents and the Blenheim notice to an accountant. Id. at 1280-81. Mr. Picardi testified the accountant told him the program was highly specialized and outside of the accountant's expertise. Id. He recommended Mr. Picardi keep Kritt as his advisor. Id.

Mr. Picardi testified the IRS never sent him a notice of back taxes due until he was charged criminally. Id. at 1298. He testified if he had received a notice of taxes due, he would have paid it. Id. at 1299.

Mr. Picardi testified he never suspected Kritt of embezzling from him. Id. at p. 1281. When his defense lawyers uncovered the theft, Mr. Picardi cut his ties with Kritt. Id. at 1281-82.

On cross-examination, Mr. Picardi testified he knew the money funding his loans would come from the E & S trust and, when he repaid the loans, all but 1% of the repayments would go back into E & S. Id. at pp. 1331-32. As to Exhibit 151, Mr. Picardi testified that "sine qua non" means "without which not," in other words, Mr. Picardi was writing that he would not have entered

12

into the deferred compensation program without the possibility of loans out to him. Id. at p. 1332. Government counsel pointed out that, although Mr. Picardi testified at trial that he entered the program to protect his assets from the "malpractice crisis," he wrote in Exhibit 151 that his main interest in the program was reducing his tax burden. Id. at pp. 1335-36.

The government presented rebuttal testimony from its case agent, Chris Wright. See JT, Docket No. 229, at pp. 1343-49. The sole subject of Agent Wright's rebuttal was Lecy's testimony. Id. Agent Wright testified that, after accounting for PLS's legitimate fees, payroll taxes, and a banking error on one bank statement, he found only $59,272.46 in funds contributed by Mr. Picardi that were unaccounted for. Id.

Mr. Picardi moved for a judgment of acquittal, which motion was denied. See CR Docket Nos. 181 & 183. The jury returned a guilty verdict on all 13 counts on October 5, 2012. See CR Docket No. 196.

**C.    Post-Trial**

On October 12, 2012, Ms. Culotta moved to withdraw as Mr. Picardi's counsel at Mr. Picard's request for financial reasons. See CR Docket Nos. 202 & 203. Mr. Van Norman continued as counsel. Id. On October 31, 2012, Mr. John R. Murphy, current counsel for Mr. Picardi on his § 2255 motion, appeared on Mr. Picardi's behalf. See CR Docket No. 206.

Mr. Picardi was sentenced on May 7, 2013. See CR Docket No. 250. He was sentenced to 60 months' imprisonment on each of the first five counts, 36 months' imprisonment for counts 6-10, and 60 months' imprisonment on

13

counts 11-13 counts, all sentences to run concurrently.  Id.  Mr. Picardi

pursued a direct appeal of his conviction and sentence.  See CR Docket No.

249.

## D.    Appeals

On appeal to the Eighth Circuit, Mr. Picardi raised four issues:

(1) whether the district court erred in dismissing two jurors; (2) whether the

district court erred in refusing to admit exhibit 621, an email Anthony Kritt

forwarded to another client, Randy Brodnik, about an IRS amnesty program,

but which email was not sent to Picardi; (3) whether the court erred in limiting

the scope of Brodnik's testimony when Mr. Picardi called him as a witness; and

(4) whether the court erred in refusing Mr. Picardi's proposed instruction

number 9.  United States v. Picardi, 739 F.3d 1118, 1120 (8th Cir. 2014).  The

Eighth Circuit affirmed in all respects on January 10, 2014.  Id. at 1127.

Requests for rehearing and rehearing en banc were denied.

As to the issue of the jurors, the Eighth Circuit held the district court

committed no error in dismissing them, and Mr. Picardi's substantial rights

were not affected by the dismissals.  Id. at 1121-23.  Regarding the Kritt email

to Brodnik, the Eighth Circuit held the district court had not abused its

discretion in excluding the exhibit under FED. R. EVID. 403.  Id. at 1124.

After testifying for Mr. Picardi on direct, Randy Brodnik testified on

cross-examination by government counsel that Brodnik had amended his

1998-2003 federal income tax returns to include income that had been omitted

from his original returns pursuant to the employee-leasing scheme and, that

14

when he amended his returns, he paid additional back taxes on the previously unreported income. Id. at 1125. Brodnik also testified on cross-examination that he was aware Mr. Picardi had not taken these steps with regard to his own federal income tax returns and back taxes. Id. Mr. Picardi then sought to elicit testimony from Brodnik on re-direct that Picardi told Brodnik the reason he never amended his 1997-2003 tax returns and paid back taxes was because Anthony Kritt told him not to. Id. The district court sustained the government's objection to this testimony. Id. The Eighth Circuit affirmed, noting that the evidence was impermissible hearsay and Mr. Picardi had not identified any applicable exception to the hearsay rule that would have resulted in the admission of the testimony. Id. at 1126.

Finally, the court addressed the district court's rejection of defense proposed jury instruction number 9. Id. at 1126-27. That instruction read as follows:

Where the tax law is vague or highly debatable, a defendant lacks the requisite intent to violate it. Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal.

A defendant cannot be guilty of willfully evading and defeating income tax when the law surrounding the deductibility of certain expenses is unsettled and there is no direct authority pointing to a ready answer. The tax law is "unsettled" where individuals could plausibly reach directly opposing, reasonable and well-supported, conclusions regarding the law's interpretation.

Id. at 1126 n.5; see also CR Docket No. 154 at p. 15. The Eighth Circuit affirmed on this issue too, holding whether a law is void for vagueness is a question of law for the court to decide, not the jury. Id. at 1126-27. Therefore,

15

it would have been improper to ask the jury to determine an issue of law that was reserved for the court.  Id.

Following the Eighth Circuit's decision, Mr. Picardi timely petitioned the United States Supreme Court for a writ of certiorari.  The Court denied that petition on June 23, 2014.  United States v. Picardi, 134 S. Ct. 2852 (2014).

## E.    Section 2255 Motion

Mr. Picardi timely filed his motion pursuant to § 2255 in this court on June 22, 2015.[3]  See Docket No. 1.  In his motion, he raises nine grounds for relief:

I.    The laws Mr. Picardi was convicted of violating were constitutionally void for vagueness in violation of the Due Process clause of the Fifth Amendment;

II.    Mr. Picardi's Sixth Amendment right to counsel was violated by ineffective assistance from his lawyers in the following respects:

    1.    counsel failed to raise the void-for-vagueness issue as a legal constitutional challenge to the law before the district court;

    2.    counsel failed to limit the government's evidence introduced through IRS Agent Marie Allen and failed to properly cross-examine Allen;

---

[3] Motions under § 2255 are subject to a one-year statute of limitation that runs from the *latest* of four specified dates, including "the date on which the judgment of conviction becomes final."  See 28 U.S.C. § 2255(f).  A judgment is deemed final "where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari ha[s] elapsed [or a petition for certiorari finally denied...]."  United States v. Johnson, 457 U.S. 537, 543, n. 8 (1982) (citation omitted); Clay v. United States, 537 U.S. 522, 527 (2003).  Here, the petition for cert was denied June 23, 2014, so Mr. Picardi had until June 23, 2015, to file his § 2255 motion.  He did so one day before the statute expired.

       3.      counsel proposed a jury instruction that contained a statement of the law that was incorrect and prejudicial to Mr. Picardi;

       4.      counsel was ineffective in presenting the direct testimony of Mr. Picardi's expert, Michael Chatzky;

       5.      counsel failed to present evidence available to counsel that would have shown Mr. Picardi lacked control over the funds in his overseas accounts;

       6.      counsel misadvised Mr. Picardi regarding plea agreement offers made by the government;

       7.      counsel was ineffective in presenting expert accounting testimony; and

       8.      counsel failed to object to testimony of Randy Brodnik during cross-examination by government counsel.

See Docket No. 1.

The government has now filed a motion to dismiss Mr. Picardi's § 2255 motion without holding an evidentiary hearing. See Docket No. 23. The record before the court (in addition to the record from the underlying criminal case), consists of Mr. Picardi's detailed motion; affidavits from Mr. Picardi's trial counsel, Mr. Van Norman and Ms. Culotta; and an affidavit from attorney John Colvin of Seattle, Washington, submitted by Mr. Picardi along with his motion and to which the government objects. See Docket Nos. 1, 1-1, 11 and 12. Rather than set forth the factual details of these documents in this section of the opinion, the court will discuss pertinent facts from each document in the discussion of each issue below.

## DISCUSSION

### A.  Scope and Procedure Applicable to a § 2255 Motion

Section 2255 of Title 28 of the United States Code provides, in relevant

part, as follows:

(a)  A prisoner in custody under sentence of a court established by
Act of Congress claiming the right to be released upon the ground
that the sentence was imposed in violation of the Constitution or
laws of the United States, or that the court was without
jurisdiction to impose such sentence, or that the sentence was in
excess of the maximum authority authorized by law, or is
otherwise subject to collateral attack, may move the court which
imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

Section 2255 of Title 28 of the United States Code was enacted to

supersede habeas corpus practice for federal prisoners. Davis v. United States,

417 U.S. 333, 343-44 (1974).  Prior to the enactment of § 2255, habeas claims

had to be brought in the district where the prisoner was confined, resulting in

overburdening those districts where federal correctional institutions were

located and presenting logistical issues because the record in the underlying

criminal case was often in a distant location. United States v. Hayman, 342

U.S. 205, 212-16 (1952).  The enactment of § 2255 resolved these issues by

requiring that the motion be filed in the sentencing court. Id.

The scope of a § 2255 motion is seemingly broader than the scope of a

habeas petition, the latter of which is typically limited to allegations of a

constitutional dimension.  Section 2255 allows a federal prisoner to "vacate, set

aside or correct" a federal sentence on the ground that "the sentence was

imposed in violation of the Constitution or laws of the United States, or that

18

the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." See 28 U.S.C. § 2255. Where the allegation for relief is *not* based on a violation of a Constitutional right or an assertion that the court was without jurisdiction, the Supreme Court has read a "fundamentality" requirement into § 2255--relief is available for only those errors which constitute a "fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure." Hill v. United States, 368 U.S. 424, 428 (1962); see Peguero v. United States, 526 U.S. 23, 27-30 (1999).

Generally, petitioners are precluded from asserting claims pursuant to § 2255 that they failed to raise on direct appeal. United States v. Frady, 456 U.S. 152, 167-68 (1982); McNeal v. United States, 249 F.3d 747, 749 (8th Cir. 2001). When a § 2255 petitioner asserts a claim that is procedurally defaulted because it was not raised on direct appeal, the claim can only proceed after the petitioner has shown either: (1) actual innocence or (2) that the procedural default should be excused because there was both cause for the default and actual prejudice to the petitioner. Bousley v. United States, 523 U.S. 614, 621-22 (1998); McNeal, 249 F.3d at 749. Therefore, barring a claim of actual innocence, a petitioner must show both cause for why he failed to raise an issue on direct appeal as well as actual prejudice caused by the alleged errors.

Appellate courts generally refuse to review claims of ineffective assistance of counsel on direct appeal; such claims are, therefore, properly addressed for

19

the first time in a § 2255 motion such as the one here. See United States v.
Lee, 374 F.3d 637, 654 (8th Cir. 2004) (ineffective assistance of counsel claims
are not generally cognizable on direct appeal and will be heard only to prevent
a miscarriage of justice or in cases where the district court has developed a
record on the issue). Therefore, no procedural default analysis is required
before examining petitioner's claims of constitutionally-deficient counsel.

## B. Government's Motion to Exclude

Mr. Picardi submitted with his motion an exhibit in the form of a "report"
by a lawyer, John Colvin. See Docket No. 1-1. In his report, Mr. Colvin
discussed the law and facts applicable to several of Mr. Picardi's claims for
relief contained in the motion to vacate, set aside or correct. Id. Mr. Picardi
incorporated by reference Mr. Colvin's report into his motion to vacate. See
Docket No. 1 at p. 3. Mr. Picardi anticipates that if he is accorded an
evidentiary hearing on any of his claims, Mr. Colvin would be called as his
expert witness at that hearing. Id.

The government characterizes Mr. Colvin's report as a "Strickland expert"
report. See Docket No. 14. The government moves to strike this court's
consideration of Mr. Colvin's report. Id. The government argues that, by
submitting the exhibit, Mr. Picardi is impermissibly seeking to expand the
record pursuant to Rule 7 of the Rules Governing Section 2255 Proceedings
(hereinafter "2255 Rules"), without court permission to do so. Mr. Picardi
counters that 2255 Rule 4 specifically contemplates that a movant's motion

may be accompanied by exhibits such as Mr. Colvin's report and that the court

may permissibly consider the report at this stage of the proceedings.

2255 Rule 4(b) provides:

> (b) **Initial Consideration by Judge**. The judge who receives the
> motion must promptly examine it. If it plainly appears from the
> motion, any attached exhibits, and the record of prior proceedings
> that the moving party is not entitled to relief, the judge must
> dismiss the motion and direct the clerk to notify the moving party.
> If the motion is not dismissed, the judge must order the United
> States attorney to file an answer, motion, or other response within
> a fixed time, or to take other action the judge may order.

See 2255 Rule 4(b). Because Rule 4(b) allows the court to consider exhibits

attached to a 2255 motion, Mr. Picardi argues it was permissible for him to

include Mr. Colvin's report as an exhibit to his motion and it is permissible for

the court to consider that exhibit, both for purposes of the court's initial review

and for purposes of the government's pending motion to dismiss.

Under 2255 Rule 7, the judge may direct the parties to expand the record

by submitting additional materials relating to the motion. See 2255 Rule 7(a).

Those materials may include letters predating the motion, exhibits, documents,

and sworn written testimony or answers. See 2255 Rule 7(b). Because this

court has not "directed" Mr. Picardi to file materials in addition to his motion,

the government argues that Mr. Colvin's report should be stricken from the

record.

The form provided by the federal courts for federal prisoners to use in

filing § 2255 motions directs the movant to "[a]ttach additional pages [to the

form] if you have more than four grounds [for relief]." See Form at p. 6,

question 12. Furthermore, the form directs the movant to attach a copy of the

21

court's opinion resolving any prior habeas petitions filed by the movant. See e.g. form at p. 7, question 12(c)(2) and (c)(6). It is entirely plausible that the "attached exhibits" referred to by 2255 Rule 4 contemplates these types of exhibits—i.e. copies of related court opinions and additional pages needed to set forth claims in excess of the space allowed on the form itself.

This court will not rule on whether Mr. Colvin's report would be admissible at an evidentiary hearing, nor whether Mr. Colvin might be allowed to testify (as an expert or otherwise) at an evidentiary hearing. That is a matter which will be addressed if and when it is determined an evidentiary hearing will be held in this case. The following discussion, then, relates *only* to whether this magistrate judge will consider Mr. Colvin's report in ruling on the government's motion to dismiss.

The court believes Mr. Picardi's reading of 2255 Rule 4(b) is correct: that rule contemplates that exhibits may be submitted with a 2255 motion *to explain the movant's claims for relief* and the court may consider those exhibits in its initial review of the motion. Mr. Picardi's motion itself contains only very general statements of the law and the facts he relies upon in support of his grounds asserted for relief. The particular law and facts in support of his grounds for relief are set forth primarily in Mr. Colvin's report. Compare Docket No. 1 with Docket No. 1-1. Rather than duplicate the detailed law and facts in support of his motion, Mr. Picardi instead incorporated the Colvin report by reference into his motion. See Docket No. 1 at p.3.

22

The court will not restrict its review of Mr. Picardi's grounds for relief to the motion itself and dismiss for failure to articulate specific facts and law in support of those grounds when the court and the parties are all fully aware that the supporting facts and law are to be found in the Colvin document. This result is further buttressed by the fact that Mr. Picardi incorporated the Colvin report by reference in his motion. See Docket No. 1 at p. 3.

Therefore, the court will consider the Colvin report in order to give full expression to the claims Mr. Picardi is asserting and will not grant the government's motion to strike. However, the court clarifies that it does not rely upon the Colvin report as an exegesis of what the law is. That is the exclusive province of the court to determine. Rather, the court reads the Colvin report in the same vein as it would a brief from a lawyer representing a client—it merely sets forth the law and the facts upon which Mr. Picardi relies in support of his grounds for relief in his 2255 motion. As with any other lawyer's brief, the court may or may not agree with the statement of the law and facts contained in that document.

## C.    Procedural Default—the Void-for-Vagueness Issue

The government argues in its brief that Mr. Picardi has procedurally defaulted on "many" of his claims because he did not raise them on direct appeal. Later, the government specifically addresses Mr. Picardi's claim that the laws he was convicted of violating were void for vagueness under the Fifth Amendment Due Process Clause.

23

Eight of the nine grounds asserted by Mr. Picardi in his motion are based on alleged ineffective assistance of counsel. See Docket No. 1. As discussed above, such claims are not procedurally defaulted when they are not raised in the movant's direct appeal of his conviction. Lee, 374 F.3d at 654. Therefore, the affirmative defense of procedural default is inapplicable to these eight claims.

The only claim to which procedural default analysis applies, then, is Mr. Picardi's claim that the tax laws he was convicted under violated his Due Process rights under the Fifth Amendment because they were void for vagueness. Mr. Picardi did not raise this issue before the district court, nor did he raise it on direct appeal to the Eighth Circuit. He did raise the related issue of whether the jury should have been instructed on the void for vagueness theory, but that is different from affirmatively arguing that a law is unconstitutional because it is void for vagueness. Hence, Mr. Picardi procedurally defaulted this issue by not raising it in his direct appeal.

Section 2255 movants are generally precluded from asserting claims that they failed to raise on direct appeal. Frady, 456 U.S. at 167-68; McNeal, 249 F.3d at 749. When a § 2255 movant asserts a claim that is procedurally defaulted because it was not raised on direct appeal, the claim can only proceed after the movant has shown either actual innocence or that the procedural default should be excused because there was both cause for the default and prejudice to the petitioner. McNeal, 249 F.3d at 749. Therefore, Mr. Picardi must show both cause for why he failed to raise these issues on

24

direct appeal as well as actual prejudice caused by these errors. Alternatively, he must show actual innocence.

### 1.    Cause and Prejudice

The court begins by noting that Mr. Picardi has the burden to show both cause and prejudice. Meeks v. United States, 742 F.3d 841, 844 (8th Cir. 2014). If he cannot shoulder his burden of demonstrating one of the two prongs of the analysis, the court need not address the other. Wyldes v. Hundley, 69 F.3d 247, 253 (8th Cir. 1995); Maynard v. Lockhart, 981 F.2d 981, 985 (8th Cir. 1992). Here, the court concludes that Mr. Picardi cannot demonstrate cause. For that reason, prejudice need not be analyzed. Id.

A demonstration of the "cause" element of the cause and prejudice test "must be something external to the petitioner" that "impeded" the petitioner's efforts. Coleman v. Thompson, 501 U.S. 722, 753 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). "The requirement of cause . . . is based on the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief . . ." Cornman v. Armontrout, 959 F.2d 727, 729 (8th Cir. 1992).

Mr. Picardi never attempts to demonstrate cause, instead focusing on his related ineffective assistance claim. See Docket No. 25 at pp. 3-4. The court concludes Mr. Picardi procedurally defaulted this issue and has not established cause and prejudice excusing his default.

25

## 2.    Actual Innocence

Another avenue by which Mr. Picardi might succeed in obtaining court review on the merits of his void-for-vagueness Fifth Amendment claim would be to assert his actual innocence. "Actual innocence" is not an independent constitutional claim upon which habeas relief can be granted; instead, it is "a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred constitutional claim considered on the merits." Schlup v. Delo, 513 U.S. 298, 315 (1995). Actual innocence means factual innocence, it does not mean mere legal insufficiency. Bousley v. United States, 523 U.S. 614, 623 (1998). Actual innocence claims are rarely successful as they require the petitioner to carry an exacting burden. Schlup, 513 U.S. at 324.

In order to show actual innocence, Mr. Picardi must (1) produce "new reliable evidence" not presented previously; and (2) he must "show that, in light of all the evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt of the crime for which he ... was convicted." Schlup, 513 U.S. at 324; United States v. Apker, 174 F.3d 934, 938-39 (8th Cir. 1999).

Evidence is "new" only if it was not available at the time of the trial and if it could not have been discovered earlier through the exercise of due diligence. Johnson v. Norris, 170 F.3d 816, 818 (8th Cir. 1999). A petitioner can make the new evidence showing only where he demonstrates that the factual basis for the evidence did not exist at the time of the trial and could not have been

26

presented earlier. Id. The evidence must not only be "new" but it must also be "reliable." Schlup, 513 U.S. at 324.

Again, as with the cause and prejudice avenue, Mr. Picardi makes no effort to address a claim of actual innocence in connection with his Fifth Amendment void-for-vagueness claim and the government's argument that he has procedurally defaulted that issue. See Docket No. 25 at pp. 3-4. Mr. Picardi, then, has failed to carry his burden of demonstrating actual innocence. Accordingly, this court recommends dismissing Mr. Picardi's claim that his rights under the Due Process Clause were violated because the laws he was convicted of violating were void for vagueness. He procedurally defaulted and he failed to establish cause and prejudice or, in the alternative, actual innocence, to excuse his default.

## D.    Ineffective Assistance of Counsel

As discussed above, it was not necessary for Mr. Picardi to have presented his ineffective assistance of counsel claims on direct appeal before raising them in his § 2255 motion. Those claims are properly before the court and may be considered on the merits.

The Sixth Amendment of the Constitution of the United States affords a criminal defendant with the right to assistance of counsel. The Supreme Court "has recognized that 'the right to counsel is the right to effective assistance of counsel.' " Strickland v. Washington, 466 U.S. 668, 698 (1984) (citing McMann v. Richardson, 397 U.S. 759, 771, n.14 (1970)). Strickland is the benchmark case for determining if counsel's assistance was so defective as to violate a

27

criminal defendant's Sixth Amendment rights and require reversal of a
conviction. Id. at 687. "When a convicted defendant complains of the
ineffectiveness of counsel's assistance, the defendant must show that counsel's
representation fell below an objective standard of reasonableness." Id. at 687-
688. The defendant must also show that counsel's unreasonable errors or
deficiencies prejudiced the defense and affected the judgment. Id. at 691. The
defendant must show "there is a reasonable probability that, absent the errors,
the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.
In sum, a defendant must satisfy the following two-prong test. Id. at 687.

> First, the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors so
> serious that counsel was not functioning as the 'counsel'
> guaranteed the defendant by the Sixth Amendment. Second, the
> defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable. Unless a defendant makes both showings, it
> cannot be said that the conviction or death sentence resulted from
> a breakdown in the adversary process that renders the result
> unreliable.

Id.

"There is a presumption that any challenged action was sound trial
strategy and that counsel rendered adequate assistance and made all
significant decisions in the exercise of professional judgment." Hall v.
Luebbers, 296 F.3d 685, 692 (8th Cir. 2002). It is the petitioner's burden to
overcome this presumption, and a "petitioner cannot build a showing of
prejudice on a series of errors, none of which would by itself meet the prejudice
test." Id. Judicial scrutiny of attorney performance is highly deferential, with a

28

strong presumption that counsel's conduct falls within the range of reasonable professional conduct. Strickland, 466 U.S. at 698.

## 1.    Failure to Raise the Constitutional Void-for-Vagueness Claim

Mr. Picardi argues that Ms. Culotta and Mr. Van Norman were ineffective counsel because they did not argue before the district court that the tax laws Mr. Picardi was charged with violating were void for vagueness under the Due Process Clause of the Fifth Amendment.

As discussed above in the FACTS section of this opinion, Mr. Picardi was convicted of 13 separate felonies. Those thirteen counts alleged violations of the following laws:

(1) 26 U.S.C. § 7201,

(2) 26 U.S.C. § 7206(1),

(3) 31 U.S.C. §§ 5314 and 5322 and

(4) 31 C.F.R. §§ 103.24 and 103.27(c).

Painting with a broad brush, Mr. Picardi does not specify which of the above laws are unconstitutionally vague. Instead, he appears to assert his void-for-vagueness argument as to each of these laws: "Picardi was convicted of 13 felonies based on laws that are not clear and do not provide him fair notice." See Docket No. 1 at p. 6. His expert, Mr. Colvin, similarly does not provide statute-by-statute analysis. See Docket No. 1-1.

The government, for its part, wants to reargue the evidence, never spelling out what the law is on void-for-vagueness and how it applies to the statutes at issue. The government argues, correctly, that the vagueness of the

29

tax laws was beside the point in its prosecution of Mr. Picardi—the point being Mr. Picardi's actual conduct rather than whether the written contracts violated the law. This is an accurate statement of the government's theory of its case. But it side-steps the issue raised in Mr. Picardi's § 2255 motion. The court is left to wade through the thicket of the intersection of constitutional and tax law on its own. Before embarking on that journey, an aside is warranted.

Present counsel for Mr. Picardi, Mr. Murphy, began officially representing Mr. Picardi on October 31, 2012. CR Docket No. 206. Mr. Picardi was sentenced six months later, on May 7, 2013. CR Docket No. 250. Mr. Murphy continued to represent Mr. Picardi during this post-trial, pre-sentencing period as well as throughout his appeals.

In this 2255 motion, Mr. Picardi filed a statement indicating that none of his claims of ineffective assistance of counsel concern Mr. Murphy's handling of his direct appeal. See Docket No. 7. On appeal, Mr. Murphy had the opportunity to raise the constitutional void-for-vagueness issue. He did not do so. Although a less favorable standard of review would have applied had this issue been raised for the first time on appeal, Mr. Murphy was not precluded from raising it. See generally, FED. R. CRIM. P. 52(b) (plain errors affecting substantial rights may be considered even if not brought to the court's attention). See also United States v. Fast Horse, 747 F.3d 1040, 1042-44 (8th Cir. 2014) (applying plain error standard of review to legal issue not raised before the district court). It is questionable whether Mr. Picardi can have it both ways—faulting trial counsel for failing to raise the issue before the district

30

court, but absolving appellate counsel for failing to raise the issue on appeal.[4] Despite this anomalous position, the court considers Mr. Picardi's argument on its merits.

Trial counsel stated that they did not consider a substantial constitutional notice question, though both were aware of the void-for-vagueness doctrine and line of cases. See Docket No. 11, at p. 4; Docket No. 12 at p. 3. They stated that the government's prosecution was based primarily on allegations that Mr. Picardi manipulated the offshore program, exercising control over money that was ostensibly not his to control under the program. Id. They submitted the void-for-vagueness jury instruction, not really anticipating that the jury would receive that instruction. Id.

Counsel's testimony is that they did not consider raising the void-for-vagueness issue. Id. Therefore, unlike the vast majority of trial decisions, this court is unable to chalk this omission up to presumed trial strategy. Whether counsel was deficient, then, depends upon the likelihood that a void-for-vagueness argument would have succeeded. This requires examining the argument on its merits.

Just last year, the Supreme Court issued an opinion analyzing a void-for-vagueness argument. See Johnson v. United States, 576 U.S. ___, 135 S. Ct. 2551 (2015). The Due Process Clause of the Fifth Amendment prohibits the taking of life, liberty or property "without due process of law." Id. at 2556. The

---

[4] Mr. Murphy or Mr. Van Norman could also have raised the void-for-vagueness issue before the district court post-verdict during the six months that intervened between the conclusion of the jury trial and sentencing. They failed to do so.

government violates this clause if it takes "life, liberty or property under a
criminal law so vague that it fails to give ordinary people fair notice of the
conduct it punishes, or so standardless that it invites arbitrary enforcement."
Id. (citing Kolender v. Lawson, 461 U.S. 352, 357-58 (1983)). The Court held
that the prohibition against vagueness was a cornerstone of criminal law and
that a statute flouting the rule "violates the first essential of due process." Id.
at 2557 (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).

### a.   26 U.S.C. § 7201

Section 7201 of Title 26 of the United States Code provides as follows:

> Any person who willfully attempts in any manner to evade or
> defeat any tax imposed by this title or the payment thereof shall, in
> addition to other penalties provided by law, be guilty of a felony
> and, upon conviction thereof, shall be fined not more than
> $100,000 ($500,000 in the case of a corporation), or imprisoned
> not more than 5 years, or both, together with the costs of
> prosecution.

See 26 U.S.C. § 7201. To prove a violation of § 7201, the government must
prove willfulness, a substantial tax deficiency, and an affirmative act
constituting an attempted evasion of the tax. Sansone v. United States, 380
U.S. 343, 351 (1965). An affirmative act of evasion is one "the likely effect of
which would be to mislead or conceal." Spies v. United States, 317 U.S. 492,
499 (1943).

The Ninth, Second, and Seventh Circuits have been presented with
arguments that 26 U.S.C. § 7201 was void for vagueness. See United States v.
Chikata, 427 F.2d 385, 387 (9th Cir. 1970); United States v. Coppola, 425 F.2d
660, 661 (2d Cir. 1969) (per curiam); and United States v. Keig, 334 F.2d 823,

825 (7th Cir. 1964), overruled on other grounds, United States v. Cleveland, 477 F.2d 310 (7th Cir. 1973). See also United States v. Serubo, 460 F. Supp. 689, 702 (E.D. Pa. 1978). All of these courts rejected the argument. Chikata, 427 F.2d at 390; Coppola, 425 F.2d at 662; Keig, 334 F.2d at 826; and Serubo, 460 F. Supp. at 702.

Mr. Picardi, for his part, does not cite a single case that has found section 7201 unconstitutional. Rather, Mr. Picardi's approach is to argue that whether he owed a civil penalty was debatable (until Congress and the IRS clarified the law in 2003) and, when a civil penalty itself is debatable, criminal prosecution on the same basis is void for vagueness. See generally, Docket No. 1-1. Mr. Picardi cites Sargent v. Comm'r, 929 F.2d 1252 (8th Cir. 1991), in support of his argument.

Sargent was a case about whether two hockey players owed a civil penalty after submitting their wages to a personal service corporation. Id. at 1254-55. The Eighth Circuit ruled in favor of the hockey players, id. at 1261, although Judge Richard Arnold wrote a pithy dissenting opinion in which he stated:

> In my view, the finding [of the tax court] that the taxpayers were employed by the Minnesota North Stars Hockey Club, rather than by their respective personal-service corporations is not clearly erroneous. The coach of the North Stars had the right to control, and actually did control, the conduct of Sargent and Christoff on the ice. The idea that the coach issued orders to Sargent and Christoff in their capacity as corporate officers, which orders they then relayed to themselves as corporate employees, is fanciful.

33

Id. at 1261. Judge Arnold's view was borne out as later Eighth Circuit opinions limited the holding of Sargent to the facts of that case. Alford v. United States, 116 F.3d 334, 336 n.3 (8th Cir. 1997).

Dr. Randy Brodnik was charged criminally for engaging in the exact same employee-leasing scheme as Mr. Picardi. See United States v. Brodnik, 2010 WL 2267858 at *4 [Docket No. 112] (S.D. W. Va. Feb. 17, 2010). In fact, Anthony Kritt was the architect of both Dr. Brodnik's scheme and Mr. Picardi's scheme. Id. at *1-4. Dr. Brodnik argued pre-trial in his case that the tax laws he was being prosecuted under were ambiguous and could not constitutionally form the basis of his prosecution. Id. at *4, *6. Specifically, Dr. Brodnik argued that the law applicable to employee leasing and deferred compensation programs was unconstitutionally vague until 2003, when Congress and the IRS clarified the law. Id. at *6.

The magistrate judge who first evaluated this argument wrote that "[w]hen ambiguity of the law is raised in a tax evasion case, the question presented is whether by virtue of the statutes, regulations or their construction or by force of common sense, the defendant had fair warning that his alleged conduct constituted tax evasion." Id. The court stated this required focus on the "pertinent tenets of tax law—that earned income is taxable to those who earn it and that dominion and control over property, rather than documentary title, determines to whom the income from the property is taxable." Id. (quoting United States v. Schmidt, 935 F.2d 1440, 1448 (4th Cir. 1991), abrogated on other grounds, United States v. Delfino, 510 F.3d 468, 472 (4th

34

Cir. 2007)). Another tenet of tax law relevant to the inquiry is the "fundamental principle . . . that 'income is taxable as constructively received when it is first available for the free and unrestricted use of the designated recipient, and this power to dispose of income as he wishes results in income to the holder of the power." Id. (quoting Hickes v. United States, 314 F.2d 180, 185 (4th Cir. 1963)). Moreover, the magistrate judge wrote, where a taxpayer uses a corporation to minimize or avoid paying taxes, "the corporate form or structure and the contracts defining the relationships must have some substance." Id. (citing Lerman v. C.I.R., 939 F.2d 44, 54 (3d Cir. 1991)).

The Brodnik court then examined the allegations against Dr. Brodnik and found that they were clearly premised on fundamental principles of tax law. Id. at *7. The indictment alleged Dr. Brodnik engaged in "an elaborate 'employee leasing' scheme" which included entering into sham contracts, creating domestic and foreign shell corporations and using those corporations to funnel Dr. Brodnik's income into off-shore accounts. Id. The indictment further alleged that Dr. Brodnik exercised control over these off-shore accounts by taking loans against them. Id. These are, of course, the same allegations made against Mr. Picardi in his underlying criminal case. See CR Docket No. 141. Based on the government's allegations against Dr. Brodnik and the fundamental tenets of tax law, the magistrate judge held that the illegality of the conduct Dr. Brodnik engaged in was clear and well defined before he engaged in it. Brodnik, 2010 WL 2267858 at *6.

35

Further, the magistrate judge held that the IRS's notice 2006-33 and Congress' enactment of 26 U.S.C. § 409A did not change or clarify the law regarding employee leasing arrangements. Id. Accordingly, the court recommended denying Dr. Brodnik's motion to dismiss counts in the indictment as unconstitutionally vague. Id.

Defendants objected and the district judge adopted the magistrate judge's decision. See United States v. Brodnik, 710 F. Supp. 2d 526, 536-38 (S.D. W. Va. 2010). The district court held that the government's theory of prosecution was *not* that Dr. Brodnik's employee leasing arrangement was illegal on paper, but rather that Dr. Brodnik used the plan to fraudulently conceal income and assets. Id. The argument as to ambiguity of the law did *not* implicate the "misty realm" of nonqualified deferred compensation plans as addressed in IRS Notice 2006-33 and 26 U.S.C. § 409A, but rather, the government's allegations implicated well-established law of tax evasion and well-established tenants of tax law. Id. at 539.

So, too, did the government's prosecution of Mr. Picardi here. As the government explains at length in its motion to dismiss, the government's theory was never that the employee leasing arrangement Mr. Picardi devised *on paper* was illegal, but rather that Mr. Picardi did not comply with the written terms of the arrangement and that he used the arrangement to fraudulently conceal assets and income. See CR Docket Nos. 75 and 162. The government's theory was to show that, despite Mr. Picardi's lack of control over off-shore funds *on paper*, he nevertheless exercised control and had

36

constructive receipt of those funds in fact.[5] Id. See also Docket No. 11 at p. 4;

Docket Nos. 24-1, 24-2, 24-3, 24-6, and most especially 24-7.

In this § 2255 motion, it is Mr. Picardi's burden to show that his trial

counsel were ineffective in failing to raise the void-for-vagueness constitutional

issue before the district judge. To do so, he must show deficient conduct by

the attorneys and actual prejudice. Because Mr. Picardi has failed to show

that a void-for-vagueness argument enjoys support in the law, and therefore

had some chance of being successful if raised, Mr. Picardi has failed to

demonstrate the prejudice prong of the Strickland test.

### b.    26 U.S.C. § 7206(1)

Section 7206(1) of Title 26 of the United States Code provides as follows:

> Any person who—willfully makes and subscribes any return,
> statement, or other documents, which contains or is verified by a
> written declaration that is made under the penalties of perjury,
> and which he does not believe to be true and correct as to every
> material matter; . . . shall be guilty of a felony and, upon conviction
> thereof, shall be fined not more than $100,000 ($500,000 in the
> case of a corporation), or imprisoned not more than 3 years, or
> both, together with the costs of prosecution.

See 26 U.S.C. § 7206(1).

Again, as with § 7201, Mr. Picardi favors the court with no citations to

any cases finding that § 7206 is unconstitutional on vagueness grounds. The

---

[5] Mr. Picardi alleges the government switched its position between trial and
this § 2255 motion. He argues the government took the position at trial that
the written contracts themselves and the companies involved were shams and
illegal. See Docket No. 25 at pp. 5-7. This is not true. The government's focus
has always been on the illegality of Mr. Picardi's actual conduct, separate and
apart from the written terms of the contracts. See CR Docket Nos. 75, 162,
220 at pp. 51-54, and 230 at pp. 1413-32. The government neither conceded
the legality of the contracts nor set out to prove their illegality in either
proceeding. It simply bypassed what was a largely irrelevant issue.

37

court has found several cases upholding the constitutionality of § 7206, although not as to void-for-vagueness challenges.  See United States v. Fletcher, 322 F.3d 508, 515 (8th Cir. 2003) (upholding constitutionality of statute on First Amendment free speech grounds); United States v. Freeman, 761 F.2d 549 (9th Cir. 1985) (same); United States v. Daly, 756 F.2d 1076 (5th Cir. 1985); and United States v. Hensley, 257 F. Supp. 987 (D.N.M. 1966).  The court concludes that Mr. Picardi has failed to show that he was actually prejudiced by trial counsel's failure to raise the void-for-vagueness argument prior to his jury trial regarding § 7206 because he has not demonstrated such an argument had any chance of succeeding had it been raised.

### c.    31 U.S.C. §§ 5314 and 5322

Section 5314 of Title 31 of the United States Code identifies certain reports and records which persons engaged in foreign financial agency transactions must maintain:

> **(a)** Considering the need to avoid impeding or controlling the export or import of monetary instruments and the need to avoid burdening unreasonably a person making a transaction with a foreign financial agency, the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency. The records and reports shall contain the following information in the way and to the extent the Secretary prescribes:
>> **(1)** the identity and address of participants in a transaction or relationship.
>> **(2)** the legal capacity in which a participant is acting.

38

**(3)** the identity of real parties in interest.

**(4)** a description of the transaction.

**(b)** The Secretary may prescribe--

> **(1)** a reasonable classification of persons subject to or exempt from a requirement under this section or a regulation under this section;
>
> **(2)** a foreign country to which a requirement or a regulation under this section applies if the Secretary decides applying the requirement or regulation to all foreign countries is unnecessary or undesirable;
>
> **(3)** the magnitude of transactions subject to a requirement or a regulation under this section;
>
> **(4)** the kind of transaction subject to or exempt from a requirement or a regulation under this section; and
>
> **(5)** other matters the Secretary considers necessary to carry out this section or a regulation under this section.

**(c)** A person shall be required to disclose a record required to be kept under this section or under a regulation under this section only as required by law.

See 31 U.S.C. § 5314. Section 5322 of Title 31 sets forth the criminal penalties for a violation of, *inter alia*, § 5314. See 31 U.S.C. § 5322.

Given the level of detail contained in § 5314, it is hard to imagine a void-for-vagueness argument that could succeed. Indeed, Mr. Picardi cites to none. Arguments against the section's constitutionality on other grounds have been rejected. See California Bankers Ass'n. v. Shultz, 416 U.S. 21 (1974); In re Various Grand Jury Subpoenas, 924 F. Supp. 2d 549 (S.D.N.Y. 2013), aff'd 579 Fed. Appx. 37, 2014 WL 4851689 (2d Cir. 2014). The court concludes that Mr. Picardi has failed to show he was actually prejudiced by counsel's failure to argue that §§ 5314 and 5322 were void because they were unconstitutionally

vague. He has not demonstrated that such an argument, had it been made,

would have had any chance of success.

### d.    31 C.F.R. §§ 103.24 and 103.27(c).

Section 103.24 of Title 31 of the Code of Federal Regulations provides:

Each person subject to the jurisdiction of the United States (except
a foreign subsidiary of a U.S. person) having a financial interest in,
or signature or other authority over, a band, securities or other
financial account in a foreign country shall report such
relationship to the Commissioner of the Internal Revenue for each
year in which such relationship exists, and shall provide such
information as shall be specified in a reporting form prescribed by
the Secretary to be filed by such persons. Persons having a
financial interest in 25 or more foreign financial accounts need
only note that fact on the form. Such persons will be required to
provide detailed information concerning each account when so
requested by the Secretary or his delegate.

See 31 C.F.R. § 103.24.

Section 103.27 provides in pertinent part: "Reports required to be filed by

§ 103.24 shall be filed with the Commissioner of Internal Revenue on or before

June 30 of each calendar year with respect to foreign financial accounts

exceeding $10,000 maintained during the previous year." See 31 C.F.R.

§ 103.27(c). Section 103.27 goes on to state: "Reports required by . . .

§ 103.24 shall be filed on forms prescribed by the Secretary. All information

called for in such forms shall be furnished." See id. at subsection (d). Finally,

§ 103.27 even tells taxpayers where it can find the required forms: "Forms to

be used in making the reports required by . . . § 103.24 may be obtained from

the Internal Revenue Service." See id. at subsection (e).

Given the detail contained in §§ 103.24 and 103.27, it is hard to imagine

a void-for-vagueness argument that could succeed. Indeed, Mr. Picardi cites to

none. The court concludes that Mr. Picardi has failed to show he was actually prejudiced by counsel's failure to argue that these two regulations were void because they were unconstitutionally vague. He has not demonstrated that such an argument, had it been made, would have had any chance of success.

This court recommends denying Mr. Picardi's motion to vacate, set aside, or correct his sentence based on alleged ineffectiveness of counsel in failing to raise the void-for-vagueness constitutional argument regarding the tax laws he was prosecuted under. Neither in general terms, nor in specific arguments tied to each statute, has Mr. Picardi demonstrated that such an argument, had it been raised, could have been successful.

## 2.    Failure to Limit the Testimony of and to Properly Cross-Examine IRS Agent Marie Allen

Mr. Picardi assigns five errors to trial counsel regarding Agent Allen's testimony: (1) counsel should have objected to Agent Allen's testimony about Picardi's state of mind; (2) counsel should have objected to Agent Allen's testimony regarding the definition of constructive receipt; (3) counsel should have objected to Agent Allen's legal conclusions on material matters; (4) counsel should have filed a pretrial motion *in limine* to prevent Agent Allen's testimony on contested legal issues; and (5) counsel was ineffective in cross-examining Agent Allen. See Docket No. 1 at pp. 7-8.

### a.    State of Mind

Mr. Picardi argues that counsel was ineffective for allowing Agent Allen to testify, without objection, about Mr. Picardi's state of mind. See Docket No. 1 at p. 7; Docket No. 1-1 at p. 20 (citing JT, CR Docket No. 224 at p. 672). Agent

41

Allen's testimony at page 672 of the transcript concerned Exhibit 151. For

context, it helps to have the text of Exhibit 151 clearly in mind. That exhibit

was a letter written by Mr. Picardi, on his office letterhead, to Anthony Kritt,

architect of the employee leasing arrangement, and dated 21 November 2000.

The body of the letter read as follows:

CONFIDENTIAL CLIENT-ATTORNEY INFORMATION

I'm writing regarding the issue of these two overseas loans. I am
writing this to avoid any electronic record of this letter.

You made a suggestion last month which I found worrisome,
namely your suggestion that I obtain a loan in the US to pay off the
overseas loans.

In keeping with my desire to minimize my tax payments we set up
the deferred compensation program. In setting up the PLS, we
wanted me to obtain, by taxable salary, the minimum amount of
income upon which I could live. The remainder was to go though
[sic] PLS and be placed offshore, minus 9% fees.

We also agreed that the best option to bring back some of that
money was by loans. The loans prevent the money from being
declared as income, and the interest payment could be declared as
a business deduction. Although these were to have an arms-
length papertrail so that they were sniff-proof, payment for these
loans was to come from additional loans.

Your recent suggestion was that I either obtain a loan in the US to
pay for these loans, which creates an additional 9% cost or attempt
to pay off the loans from the minimal salary I receive from PLS.

None of this makes any sense as it would never be possible to pay
off these loans easily with the funds I receive from PLS. Obtaining
a loan in the US negates the value of the offshore loans and
increasing the amount I receive in salary would simply increase my
taxable income.

I am afraid that you and I have gotten into this without the
understanding of the costs involved to maintain these loans. I
would like to hear your opinion on this as it appears that the
concept that you and I advocate in believing these loans are easy

42

loans to myself may not be as valid a point as you and I have touted.

Please don't forget that my intermediate term plans are to build my house which may be around $500,000 and my long term plans are to spend all my money and die comfortably but poor. I have no dependents except for my wife so it does me no good to die with a few million dollars in an offshore account.

While you mull this all over, is there any advantage of E & S Trust purchasing my ranch. It would give me asset protection and would bring in enough money to pay off the two loans plus an opportunity of bringing in some more money into the USA not being declared as income.

I look forward to hearing from you and look forward to meeting up with you around the holidays.

Cordially,

Ed Picardi

There will be no record of this letter in my computer nor files.

See Docket No. 24-7, Exhibit 151.

The employee leasing scheme set up by Mr. Picardi generally involved him sending all his wages he earned as a surgeon to a series of banks and companies, ultimately coming to rest in an overseas trust, E & S International. See JT, Docket No. 220 pp. 99-114 (testimony of IRS Case Agent Chris Wright). The documents creating this scheme stated that Mr. Picardi did not have the right to borrow against the funds he sent to the trust. Id. at p. 126, discussing Exhibit 75, p. 2, Appendix A, ¶ 10; id. at p. 138. However, Mr. Picardi's money was in actual practice made available to Mr. Picardi through two lines of credit totaling $1.2 million. Id. at pp. 110-14, 138. Mr. Picardi drew upon these lines

43

of credit. Id. at 110-14. It is these loans that are the subject of Mr. Picardi's letter above, Exhibit 151. See Docket No. 24-7.

Government counsel first began questioning Agent Allen about Exhibit 151 at page 670. See JT, CR Docket No. 224 at p. 670. Counsel asked Agent Allen whether the $39,000 annual salary Montrain paid to Mr. Picardi under the employee leasing arrangement was a fair market value for an experienced surgeon like Mr. Picardi. Id. at p. 671. Agent Allen testified that it did not appear so, and that $39,000 was certainly substantially less than the income he had had in 1996 of $340,000 to $350,000. Id. at 668-69, 671.

Government counsel then asked Agent Allen about the passage in Exhibit 151 where Mr. Picardi asked about bringing some of his money back into the United States through loans. Id. at 671-72. Government counsel asked how the IRS viewed the loans. Id. at 672. Agent Allen answered:

Well, I would look at it that Dr. Picardi understands that the loans—let me rephrase that. I would understand that Dr. Picardi knows these transactions characterized as loans were not; that they were in fact income. . . . The transaction was in fact mischaracterized. This implies to me that Dr. Picardi knows that they were. I can't get into his head on all these other things. **This document appears to say that to me.**

Id. at p. 672, lines 3-6, 8-11 (emphasis added).

Courts have held that an IRS agent "may not testify about the defendant's state of mind when the challenged" conduct occurred. United States v. Stadtmauer, 620 F.3d 238, 269 (3d Cir. 2010) (citing United States v. Mikutowicz, 365 F.3d 65, 72 (1st Cir. 2004); United States v. Sabino, 274 F.3d 1053, 1067 (6th Cir. 2001), modified on other grounds, 307 F.3d 446 (6th Cir.

44

2002)). For example, an IRS agent may not testify that a defendant intentionally understated his income on a tax return. See United States v. Windfelder, 790 F.2d 576, 582 (7th Cir. 1986). See also FED. R. EVID. 704(b) (providing "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.").

Considering Exhibit 151 together with Agent Allen's testimony, she did not testify impermissibly about Mr. Picardi's state of mind. She testified to her understanding of what Mr. Picardi was communicating in his letter. If Agent Allen had testified, "Mr. Picardi intentionally evaded paying his taxes," that would clearly have been objectionable. But that is not what she said.

Mr. Picardi's letter fairly bristled with indignation at the apparent suggestion Kritt had made to him that he should *actually* pay off the loans he took out against his offshore accounts. See Exhibit 151, Docket No. 24-7. Mr. Picardi reminded Kritt in the letter that the whole idea of the employee leasing scheme was to place Mr. Picardi's money offshore and then bring it back to him, full circle, in the form of loans. Id. Mr. Picardi suggested that paying back the loans would defeat the whole purpose of the circular arrangement set up in the employee leasing scheme. Id.

For Agent Allen to testify, based on Mr. Picardi's own words, "that Dr. Picardi knows these transactions characterized as loans were not" is fair commentary on Exhibit 151. No objection would have been sustained to this answer, had one been made. Mr. Picardi's "state of mind" as expressed in

45

Exhibit 151 could not have been more clear—the loans were a sham and he
was reminding Kritt of that fact.

Even had trial counsel objected to Agent Allen's testimony as an
impermissible opinion about Mr. Picardi's state of mind, there is no prejudice.
Exhibit 151 (as well as numerous other exhibits) speaks for itself and told the
jury quite clearly what Mr. Picardi's "state of mind" was.  Mr. Picardi cannot
demonstrate prejudice under Strickland as a result of his counsel's failing to
object.

### b.   Constructive Receipt

Mr. Picardi also complains in issue 2 that counsel should have objected
to Agent Allen's testimony regarding constructive receipt.  Mr. Picardi
complains that the definition of "constructive receipt" was a legal issue
inappropriate as a subject of expert testimony.  He also argues that Agent
Allen's definition was incomplete and incorrect.

Regarding constructive receipt, government counsel asked Agent Allen to
read a passage from a letter Anthony Kritt wrote to Mr. Picardi prior to the
inception of the employee-leasing arrangement:

> **Q:**    Going back to page 1511 . . . We didn't talk about this one
> paragraph there.  Can you read, "I caution you," starting there?
>
> **Allen:**    [reading from Kritt's letter to Picardi] "I caution you
> about referring to these funds as yours.  Because of tax laws, these
> funds are yours only when you are entitled to withdraw them
> according to your employment agreement with Montrain.  You will
> be able to borrow these funds prior to the withdrawal date
> contained in the employment contract, if you so desire.  If you
> recall, we discussed the portfolio loans during our meeting in
> Baltimore."

46

**Q:**     So this seems to indicate that Dr. Picardi has access to the funds through these portfolio loans?

**Allen:**     It indicates to me that as of this date, which is prior to the employment agreement, the ability to access the funds will be there, will be in the arrangement.

**Q:**     Right. Is this ability to access funds like this, does the term "use" in all this, is that called constructive receipt?

**Allen:**     Yes.

**Q:**     Can you explain that in laymen's terms?

**Allen:**     Constructive receipt is really nothing more than the ability to access money. You don't have to access it, you simply have to have the ability to access it. It doesn't matter if you do or not; and it doesn't matter if you do, that you repay it at some later point in time. It's simply and solely the ability to access, whether you do or not. That is constructive receipt.

**Q:**     I have a related question. If you have constructive receipt, is that income to the person?

**Allen:**     Yes it is. Constructive receipt is income and it is income when you receive it. So, for example, the mere ability to access funds is constructive receipt and the ability to access funds is income.

**Q:**     And as far as an individual taxpayer like Dr. Picardi, if it's income, what is the reporting requirement as far as the tax return is concerned?

**Allen:**     You have to report it.

**Q:**     In the year that you—

**Allen:**     In the year that you receive it. . . .

See JT, CR Docket No. 224 at pp. 657-58. Later, Agent Allen also testified:

It comes back to it's true that if Dr. Picardi borrowed all of the funds [in the offshore account], yes, that's constructive receipt, absolutely. If he borrowed only one dollar of those funds, he still had constructive receipt. What is also true is he didn't have to borrow a dollar, he didn't have to borrow all of it. His mere ability

47

to borrow, whether he did or not, gave him constructive receipt and
is income reportable in the year that he had access to the money.

Id. at p. 666.

Agent Allen's definition of "constructive receipt" certainly paralleled the

definition given by the district judge to the jury:

Money or property received from any source constitutes taxable
income when its recipient has such control over it that, as a
practical matter, he derives readily realizable economic value from
it, in other words, when he has freedom to dispose of it or use it at
will. It is the dominion and control over property, not
documentary title, that determines to whom the income from that
property is taxable. This concept is also known as constructive
receipt.

See CR Docket No. 191 at p. 20 (Final Jury Instruction No. 7). See also CR

Docket No. 191 at p. 22 (Final Jury Instruction No. 8 stating "Earned income is

taxable to those who earn it and that dominion and control over property—and

not documentary title—determine to whom the income from that property is

taxable).

Current counsel for Mr. Picardi could certainly have raised the issue on

appeal if he thought the above definition of "constructive receipt" was in error.

Current counsel did not do so. And Mr. Picardi has stated he has no issue as

to current counsel's handling of his direct appeal. So the situation is this: if

Agent Allen in fact gave a legally accurate definition of "constructive receipt"

that coincided with the district court's own definition, exactly how was

Mr. Picardi prejudiced by Agent Allen testifying to that definition?

In any case, the definition of "constructive receipt" given by both the

court and Agent Allen was correct under the law. The Eighth Circuit has

48

stated that "constructive receipt" occurs "for taxation purposes [when] income is received or realized when it is made subject to the will and control of the taxpayer and can be, except for his own action or inaction, reduced to actual possession." Walter v. United States, 148 F.3d 1027, 1029 (8th Cir. 1996). The court stated "it makes no difference why the taxpayer did not reduce to actual possession. The matter is in no wise dependent upon what he does or fails to do. It depends solely upon the existence of a situation where the income is fully available to him." Id. See also Moser v. C.I.R., 914 F.2d 1040, 1046-47, 1047 n.17 (8th. Cir. 1990).

Furthermore, it was not error for Agent Allen to testify to the definition of "constructive receipt." Rule 702 of the Federal Rules of Evidence allows expert testimony "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." See FED. R. EVID. 702. Expert opinions as to "ultimate issues" in a case are permissible. See FED. R. EVID. 704(a).

IRS agents, specifically, have been approved as expert witnesses. Stadtmauer, 620 F.3d at 269 (citing *inter alia* Mikutowicz, 365 F.3d at 72; United States v. Bedford, 536 F.3d 1148, 1158 (10th Cir. 2008); United States v. Duncan, 42 F.3d 97, 101-02 (2d Cir. 1994)); United States v. Pree, 408 F.3d 855, 869-70 (7th Cir. 2005); United States v. Moore, 997 F.2d 55, 58 (5th Cir. 1993) (citing *inter alia* United States v. Mohney, 949 F.2d 1397, 1406 (6th Cir. 1992); United States v. Bosch, 914 F.2d 1239 (9th Cir. 1990); United States v. Barnette, 800 F.2d 1558 (11th Cir. 1986) superseded by statute on other

49

grounds as stated in Blalik v. United States, 117 F.3d 1288, 1293 (11th Cir. 1997)). An IRS agent may permissibly testify about her analysis of a transaction and may also explain her analysis of the facts based on her special expertise. Stadtmauer, 620 F.3d at 269; Pree, 408 F.3d at 870; Moore, 997 F.2d at 58 (citing United States v. Dotson, 817 F.2d 1127, 1132, vacated in part on reh'g on other grounds, 821 F.2d 1034 (5th Cir. 1987)). IRS agent testimony as to whether a taxpayer did or did not constructively receive proceeds has specifically been given. United States v. Stevens, 2012 WL 1067860 at *9 (W.D. La. 2012).

Mr. Picardi, through Mr. Colvin, argues that in the Eighth Circuit, experts are not allowed to give opinion testimony on legal matters. See Docket No. 1-1 at p. 21. Mr. Colvin cites Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003). In that case, the court stated that it was improper to allow experts to testify as to whether the plaintiff had violated FAA regulations. Id. However, the Southern Pine case does not undermine the unanimous authority from the above cases, covering nearly every federal circuit court, to the effect that IRS agents may give expert testimony along the lines that Agent Allen testified to in Mr. Picardi's case.

Interestingly, defense counsel herself asked the government's case agent, Agent Chris Wright, to define "constructive receipt." See JT, Docket No. 223 at pp. 544-45. Agent Wright replied: "Generally constructive receipt gets to whether income has been set aside, put in an account, or generally made available to someone whether they choose to use it or not, or draw from it, or

50

whatever.  Generally that's the concept of constructive receipt as I relate it to income. . . . it just relates to whether income is constructively received."  Id. at p. 544, lines 23-25; p. 545, lines 1-2 and 9-10.  This was testimony that defense counsel herself elicited.  It corresponds nicely with the definition given by Agent Allen and by the district court in its jury instructions.  Mr. Picardi, in this § 2255 motion, takes no issue whatsoever with Agent Wright's testimony about "constructive receipt."  Since that testimony was admittedly not objectionable according to Mr. Picardi, the court is at a loss to understand how Mr. Picardi was prejudiced when Agent Allen later testified to almost the exact same definition.

Similarly, Mr. Picardi's expert on his § 2255 motion suggests that defense counsel should have elicited similar testimony about the application of legal doctrines to the facts.  See Docket No. 1-1 (stating defense counsel should have attempted "to elicit expert testimony from either its expert (Michael Chatzky) or the government expert (Marie Allen), to attempt to explain further when and how the judicial doctrines [of "economic substance/sham transaction"] applied, especially to bring out the notion that the economic substance/sham transaction doctrine should not apply because this transactions [sic] had some practical economic effect").  So Mr. Picardi suggests on the one hand that it was constitutionally ineffective for defense counsel to allow Agent Allen to testify to the application of legal tax doctrines to the facts in this case—because, according to Mr. Picardi, such expert testimony is not allowable.  But then he suggests defense counsel was also constitutionally

51

ineffective for failing to *introduce* the exact same type of testimony. The fact is,

defense counsel did introduce such testimony through Agent Wright and

Mr. Chatzky. Under the law, such testimony was admissible and not error.

A relevant colloquy took place prior to Agent Allen testifying. During

Agent Wright's testimony, government counsel asked him whether, in his

opinion, Mr. Picardi should have disclosed an interest in overseas accounts on

his tax return. See JT, CR Docket No. 224, at p. 782, lines 9-15. Agent Wright

was allowed to testify "yes," over defense counsel Van Norman's objection. Id.

After the jury left the room, the district court addressed Van Norman:

> Mr. Van Norman, if you read the government's trial brief filed
> September 7 of this year, there is a discussion and legal authority
> for an IRS agent or other qualified employee to state an opinion
> applying the internal revenue code as the witness understands it to
> the facts of the case as the witness understands it on matters of
> triggering events, that is, triggering an obligation on the part of a
> taxpayer to take some action, or pay some amount, or some other
> matter relevant to the case. No witness can testify in their opinion
> Dr. Picardi is guilty or not guilty, that's the province of the jury.
> But these opinions called for by [government counsel] responded to
> by Agent Wright based on the authority I have in front of me, those
> things are admissible. I expected to either see a motion in limine
> or a defense point brief on the matter if there's any disagreement
> about that body of law. That's my understanding of it. The
> question was whether triggering events and the filing of the
> document and the reporting of foreign accounts and for that
> reason I permitted the answer. Just so we are clear. If you have
> further record to make on that, I will hear you.

See JT, CR Docket No. 224, p. 783, lines 21-25; p. 784, lines 1-17.

Mr. Van Norman responded: "I do not, Your Honor." Id. at p. 784, line 18.

Probably the reason defense counsel Culotta did not object to Agent

Allen's testimony as to "constructive receipt" is because the district court had

52

clearly indicated to defense counsel—both of them—that objections along these lines would not be sustained.

Even if it was error for Agent Allen to testify to the definition of "constructive receipt," it did not prejudice Mr. Picardi as Agent Wright had already testified to the same definition and the district court subsequently instructed the jury exactly the same as Agent Allen's and Agent Wright's testimony when the court defined "constructive receipt" in the jury instructions. This court-given definition of "constructive receipt" was not appealed by current counsel, and Mr. Picardi has absolved current counsel of all claims of ineffectiveness for his handling of the appeal. Furthermore, each of the three definitions of "constructive receipt" are consistent with Eighth Circuit case law. The court recommends that Mr. Picardi's request to vacate, set aside, or correct his sentence based on Culotta's failure to object to Agent Allen's testimony defining the term "constructive receipt" be denied.

### c. Legal Conclusions on Material Matters

Mr. Picardi asserts Agent Allen impermissibly testified that the ability to replace a trustee constituted "control" under the law. See Docket No. 1 at p. 8; Docket No. 1-1 at 24. Mr. Colvin specifies in his report the following places in the jury trial transcript where Mr. Picardi believes trial counsel should have objected: pages 655-56, lines 8-20, and 18-23; page 666, lines 18-22; page 693, lines 13-17; and page 699-700, lines 24-25, and 1-5. See Docket No. 1-1 at p. 21. Those passages are discussed, as they appear in context, below.

At the jury trial, Agent Allen testified about communication from

Mr. Picardi to Anthony Kritt before the employee leasing program was set up.

See JT, CR Docket No. 224 at pp. 651-53 (discussing Exhibit 62). Specifically,

Mr. Picardi asked Kritt how his association with the IBC (international

business corporation—ultimately, E & S trust) was to be explained and how he

would be given access to the funds in the IBC. Id. at p. 652.

Agent Allen then gave Kritt's response to Mr. Picardi's inquiry as follows,

reading from the Kritt letter:

> Montrain will invest the money however you like within reason,
> including putting the funds in an IBC whose stock is owned by the
> E & S International Trust. . . . The IBC stock is owned by the E & S
> International Trust. You, of course, are the primary beneficiary of
> the E & S International Trust. You have the right to remove and
> replace its trustees and the power to appoint the property of the
> trust upon your death. Consequently, you have control of the
> trust and being in control of the trust, you have control of any
> corporation in which the trust owns the entity."

Id. at pp. 653-55 (discussing Exhibit 313). These words were the words of

Anthony Kritt, not Agent Allen, and the words were addressed to Mr. Picardi

some six months before he entered into the employee leasing program. Id.

After reading Kritt's words from his letter to Picardi, Agent Allen gave the

following testimony in response to questioning from government counsel:

**Q:**     There's a lot in there [referring to Kritt's letter—Exhibit 313].
Let's break this down into A equals B equals C analysis. It looks
like what you just read, those two paragraphs, says that
Dr. Picardi can remove the trustee of the trust?

**Allen:**     Yes.

**Q:**     And by so doing he controls the trust?

**Allen:**     He controls the trustee.

54

**Q:**   He controls the trustee.  But doesn't that mean he controls the trust if you can remove the trustee at will?

**Allen:**   Yes.

**Q:**   By controlling the trust he controls what's in the trust?

**Allen:**   Correct.

**Q:**   And the IBC is in the trust; the corporation is owned by the trust?

**Allen:**   That's what this [Kritt's letter] says.

**Q:**   And by controlling that, he controls the assets in the corporation, the funds in the corporation?

**Allen:**   Yes, he would.

**Q:**   And we saw from Agent Wright's testimony that that consists of the Montrain money that went down into the IBC?

**Allen:**   Correct.

**Q:**   Montrain is supposed to be the employer [of Mr. Picardi], according to those contracts?

**Allen:**   According to the employment contract, Dr. Picardi is the employee of Montrain.

**Q:**   What this really says is that Dr. Picardi ultimately controls his employer's money?

**Allen:**   Correct.

Id. at pp. 655-56.

Later, Agent Allen read into evidence the language from the trust

instrument that was actually drawn up for Mr. Picardi:

> Notwithstanding anything contained in this trust agreement to the contrary for so long as he is alive the named beneficiary, Edward J. Picardi, is empowered to remove and replace any trustee with or without cause at any time in his sole and absolute discretion

without the consent of the trustee, or of any court of law, or any
other person or entity.

Id. at p. 662 (reading from Exhibit 224, Bates stamped page 4472, ¶ 3).

After reading the above passage from the trust instrument, the following

testimony was elicited by government counsel:

> **Q:**    Now, if that happens, if the trustee can be removed like this,
> they would lose their fees, wouldn't they?
>
> **Allen:**    Absolutely.
>
> **Q:**    Does that indicate a lack of independence on the trustee's
> part to you?
>
> **Allen:**    It would to me.  Elfin [the trustee] is a company who
> [sic] in part makes its money by being a trustee, so they have an
> interest in making—in this instrument they have an interest in
> making Dr. Picardi happy.  Another way to say that is they have an
> interest in not making Dr. Picardi unhappy.  If he's unhappy, he
> has the ability to remove them; and if he removes them, they don't
> get their fees.  To me, that means that Dr. Picardi can control the
> trustee and that the trustee is dependent upon Dr. Picardi's
> happiness.

See JT, CR Docket No. 224 at pp. 663-64.

Next, government counsel had Agent Allen read the below passage from

page Bates stamped 1197 on Exhibit 68, a letter from Anthony Kritt to

Mr. Picardi dated December 24, 1996, responding to an earlier fax Picardi sent

to Kritt:

> There is one way other than portfolio loans to utilize the funds
> offshore.  That way is to have the IBC investment in your activity.
> For example, if you wanted to purchase land, as you mentioned, on
> which to build a log cabin, the IBC can invest in a corporation that
> we create in U.S. to purchase that land.  Consequently, you use
> the funds in the IBC without having to make a loan.  Whenever
> possible, you should utilize this method rather than portfolio
> loan. . . .  I hope you are not planning to borrow all the funds that
> you send offshore.  As we discussed before, we want to avoid

having the IRS charge that you retained dominion and control over
the funds that are going offshore.

See JT, CR Docket No. 224 at p. 664, lines 15-23; p. 666, lines 7-10 (emphasis

in original).  After reading Kritt's letter to Picardi, government counsel elicited

the following testimony from Agent Allen:

**Q:**    I see the word "all" is underlined there.  Does that have any
significance to you, reading this in context?

**Allen:**       As far as constructive receipt is concerned, no, it
makes no difference.  It comes back to it's true that if Dr. Picardi
borrowed all of the funds, yes, that's constructive receipt,
absolutely.  If he borrowed only one dollar of those funds, he still
had constructive receipt.  What is also true is he didn't have to
borrow a dollar, he didn't have to borrow all of it.  His mere ability
to borrow, whether he did or did not, gave him constructive receipt
and is income reportable in the year that he had access to the
money.

See JT, CR Docket No. 224 at p. 666, lines 11-22.

There was a lengthy exchange between government counsel and Agent

Allen in which Allen explained various exhibits to the jury showing that

Mr. Picardi had control over the funds in the trust account—he directed certain

investments to be made, he received confirmation of the purchase of those

investments, he received an accounting of funds withdrawn, he dictated the

terms of "loans" including cutting the interest rate roughly in half on a loan

after it was already in progress, and not paying the installment interest

payments on loans that were called for by the loan documents.  See JT, CR

Docket No. 224 at pp. 683-93.

On cross-examination, Agent Allen also admitted that Mr. Picardi had

expressed an interest in investing in Kuwait, but that his suggestion was never

57

implemented. Id. at pp. 715-16. Defense counsel asked Agent Allen on cross-examination whether the ability to view reports after the fact of an investment being made, to look at valuation for that investment, means the person has control. Id. at pp. 720-21. Agent Allen answered:

It does not. It does not mean that you have constructive receipt; it does not mean you have income, the ability to look at a document in and of itself, no.

See JT, CR Docket No. 224 at p. 721, lines 10-12.

An international banker who ostensibly held investments for the trust also met with Mr. Picardi in person in Rapid City, South Dakota, and provided Picardi information and documents. Id. at pp. 690-93. Anthony Kritt then directed the banker to provide Mr. Picardi with direct access online to information about the trust investments held by the bank and to email Mr. Picardi regular monthly or bimonthly updates without deviation. Id. at p. 692. Mr. Picardi, in another meeting with the banker who was handling the trust's investments, extracted an agreement from the bank to reduce or waive their fees for managing the investments for a year. Id. at pp. 695-96.

Asking about Mr. Picardi's direct access to banking information regarding the trust's investments, government counsel asked:

**Q:** Is this an example of control then?

**Allen:** Absolutely.

**Q:** How does control fit in when you are looking at it like you have control, then access, then constructive receipt; are they interrelated?

**Allen:** Absolutely. And the structure is you have control—if you have control over the money, then you have access. And that

58

kind of takes us back to control is access is constructive receipt is income. You get one to the other to the other down to income that's reportable at the time of constructive receipt.

**Q:**    So this is just another example of control by Dr. Picardi; access to the account is control?

**Allen:**    Whether it's control over the trustee or control over the account, that control gives Dr. Picardi the access, gives him constructive receipt, gives him the income.

See JT, CR Docket No. 224 at p. 693.

The last passage cited to as objection-worthy by Mr. Picardi occurred as

follows:

**Q:**    I just want to ask you, kind of to wrap up, now that we have looked through all these exhibits and e-mails and letters and faxes. Looking at this structure as a whole, this arrangement, the offshore leasing program set up in this case, and you have seen in all the exhibits, from the IRS's viewpoint, looking at all the factors, would you honor your arrangement as it is structured by Dr. Picardi with the deferral of income?

**Allen:**    If I was conducting this audit, I would not.

**Q:**    What are the main factors that you would not honor this arrangement? You talked about the constructive receipt issue.

**Allen:**    There is control by Dr. Picardi, there is access by Dr. Picardi. It does not matter that Dr. Picardi did or did not actually borrow the money; it does not matter that Dr. Picardi did or did not repay them the money; he had access, so there's control and it's access.

**Q:**    Leading to constructive receipt and income?

**Allen:**    Correct.

See JT, CR Docket No. 224 at p. 699, lines 12-25; p.700, lines 1-5.

Agent Allen did not, as Mr. Picardi asserts, "testify that Picardi's ability to

replace a trustee constituted control under the law." See Docket No. 1 at p. 8.

59

Instead, she testified that Mr. Picardi controlled "the trustee," a fact indisputable given the provision from the trust instrument quoted above. See JT, CR Docket No. 224 at p. 662 (Exhibit 224). She also admitted, on cross-examination, that most beneficiaries of most trust agreements have the right to remove the trustee, that it is a standard provision in most trusts. See JT, CR Docket No. 224 at p. 701. Agent Allen testified that the money given to Montrain, the ostensible employer of Mr. Picardi, was transferred into the IBC, and that the IBC was in turn owned by the trust. Id. at 662. Even then, after tracing the money path, Agent Allen was careful not to say that Mr. Picardi had control as a matter of law. Instead, she testified quite matter-of-factly that Mr. Picardi had control of his employer's money. Id.

Furthermore, even the nominal salary of \$39,000 that Mr. Picardi was paid by Montrain, his ostensible employer, was set entirely by Picardi. Id. at 675-77. In an employment context, Agent Allen testified that she found it odd that the ostensible employer, Montrain, never made an offer to Mr. Picardi that it would pay him a certain salary. Instead, the amount was set unilaterally by Picardi. Id. Even stranger, the employment arrangement between Picardi and Montrain had an effective date of January 1, 1997, but as of March 16, 1997, the amount of Mr. Picardi's salary was still undetermined (by him). Id.

Finally, even if it were impermissible for Agent Allen to testify about the legal concept of "control" over money, her testimony paralleled the definition of "control" and "constructive receipt" given by the district court to the jury in the instructions at the end of the trial. See CR Docket No. 191 at p. 20 (quoted

60

previously). Mr. Picardi and his current counsel did not appeal the district court's legal definition of "control." And Mr. Picardi has stated he has no issue with his current counsel's handling of his appeal. The court concludes that Agent Allen's testimony about "control" was legally correct, that it was mirrored in the district court's jury instructions, and that, therefore, Mr. Picardi cannot show prejudice stemming from trial counsel's failure to object to Agent Allen's testimony on the subject of "control."

### d. Failure to Make a Motion *in Limine* as to Allen's Testimony

Mr. Picardi alleges his trial counsel told him she never filed motions *in limine* because they were a waste of time. See Docket No. 1 at p.8. He argues that, since counsel had pretrial notice of Agent Allen's anticipated testimony, trial counsel should have filed a motion *in limine* to try to restrict her testimony at trial. Id.

Ms. Culotta denies that she ever told Mr. Picardi that motions *in limine* were a waste of time and that she never files them. See Docket No. 12 at p. 3. In fact, she points out, she and Mr. Van Norman filed a number of such motions before the trial. Id. See also CR Docket Nos. 48, 49, and 134.

The government's pretrial notice advised the court and Mr. Picardi that the government planned to elicit testimony from Agent Allen about the rules of legitimate offshore employee leasing programs, when a transaction lacks economic substance, when a party has control over his or her money, when a transaction lacks business reality, the concept of cash-basis taxpayers, the occurrence of a "taxable event," the concept of "constructive receipt," the

61

concept of deferred compensation and the rules applicable to reporting income when such a program is legitimate, the legal requirements of a proper trust, the five factors of "true debt," the reporting requirements on foreign banks and investment companies regarding accounts held by United States citizens, and the computation of the amount of taxes owed by Mr. Picardi. See CR Docket No. 77 at pp. 2-3.

The government also filed a pretrial brief explaining the legal admissibility of Agent Allen's testimony at trial under FED. R. EVID. 702. See CR Docket No. 162. That brief accurately set forth the applicable law. Compare CR. Docket No. 162 with Stadtmauer, 620 F.3d at 269 (citing *inter alia* Mikutowicz, 365 F.3d at 72; Bedford, 536 F.3d at 1158; Duncan, 42 F.3d at 101-02); Pree, 408 F.3d at 869-70; Moore, 997 F.2d at 58 (citing *inter alia* Mohney, 949 F.2d at 1406; Bosch, 914 F.2d 1239; Barnette, 800 F.2d 1558). In short, there was nothing to object to pretrial concerning the government's proposed use of Agent Allen at trial. During trial, when the district court gave Van Norman an opportunity to interject an objection, Van Norman responded he had none to make. See CR Docket No. 224 at p. 784, line 18.

None of the motions *in limine* filed by Mr. Picardi's trial counsel touched on the subject of Agent Allen's testimony. However, as discussed above, Agent Allen's testimony was not objectionable and, even if it were, it did not prejudice Mr. Picardi. Just as trial counsel's failure to object during Agent Allen's testimony was not ineffective representation, so also trial counsel's failure to object pretrial by filing a motion *in limine* as to that testimony was also not

62

ineffective representation. The court recommends denying this ground for
relief.

### e.    Failure to Competently Cross-Examine Allen

Mr. Picardi argues trial counsel was ineffective in its cross-examination
of Agent Allen. Specifically, he argues trial counsel should have established
that Agent Allen could not know Mr. Picardi's state of mind, that her definition
of constructive receipt was incorrect, what her understanding was of the civil
tax consequences of offshore deferral arrangements, and that her definition of
"control" was in error. See Docket No. 1-1 at p. 23.

In Johnson v. United States, 278 F.3d 839, 843 (8th Cir. 2002), Johnson
alleged his trial counsel was ineffective for failing to vigorously cross-examine
an eye witness with her prior inconsistent statements about having seen a gun.
Although the witness had consistently stated she saw a gun, the location and
circumstances were different in her various pretrial statements, and different
from her trial testimony. Id. The Eighth Circuit held failure to cross-examine
the witness about her previous statements did not rise to the level of a
Strickland violation because the discrepancies in the witness's testimony were
small and the result of the jury verdict would not have been different if defense
counsel had vigorously cross-examined the witness. Id.

In Hall v. Luebbers, 296 F.3d 685, 693-98 (8th Cir. 2002), the Eighth
Circuit held that none of the following actions by defense counsel constituted a
Strickland violation: counsel's failure to introduce evidence showing that a
critical witness was motivated to lie; counsel's failure to impeach a witness

with a prior inconsistent statement; and counsel's failure to cross-examine witness with information gained from her medical records. Hall had been convicted in Missouri state court of murder and was sentenced to death. Id. at 689-91. Hall claimed his trial counsel was ineffective in the guilt phase of his trial for failure to adequately cross-examine three government witnesses, his wife Donna, his friend Kim and Charles Ingram. Id. at 692. The court determined that counsel's actions conformed with sound trial strategy and that the impact of such evidence would have been minimal and non-prejudicial to the petitioner. Id. at 693-98.

As to Donna, trial counsel cross-examined her about her anger toward Hall for having an affair with another woman, Loveless. Id. at 693. He also called Donna and Hall's son, John, who testified his mother hated Loveless and that the affair may have motived her to testify against Hall. Id. Donna admitted on cross-examination she was angry with Hall over the affair, but denied that that motivated her to testify against Hall. Id. Hall argued his lawyer should also have called Loveless as a witness, should have introduced notes and evidence on Donna's motive to lie because of the affair, should have introduced Donna's medical records, should have obtained forensic testing of Hall's car, and should have impeached Donna with her own inconsistent statements. Id. The court held that trial counsel's decisions were strategic. Id. In any event, the court wrote, the evidence that was not introduced was merely cumulative of the evidence counsel did introduce and would have had only minimal impact. Id.

64

Charles Ingram testified at trial to having seen Hall in the vicinity of the murder at 10:30 a.m. Id. at 696. Hall's own testimony placed him at the scene of the murder; his theory of defense was self-defense and accident. Id. at 689-92. Ingram had earlier told police that he saw Hall near the store at 11:45 a.m. Id. at 696. Trial counsel did not cross-examine Ingram with his prior inconsistent statement as to time. Id. The court held this was not prejudicial; Ingram's testimony was not necessary to place Hall at the scene of the crime because Hall himself admitted to being present. Id. Furthermore, although trial counsel apparently failed to see the connection between Ingram's testimony and evidence of premeditation (i.e. that Hall was at the scene earlier scoping things out), it was merely cumulative of testimony from another witness, Slater, who also placed Hall in the vicinity of the crime at 10:30 a.m. Id.

Finally, Hall claimed trial counsel should have impeached his friend, Kim, by calling a cell-mate of Kim's who would have testified Kim said he could get out of his prison sentence by testifying against Hall. Id. The court held this was not prejudicial because trial counsel damaged Kim's credibility by showing that Kim had received a $1,000 reward for cooperating with police and he stood to gain leniency on his sentence in return for his testimony. Id.

In contrast to Hall and Johnson, in Steinkuehler v. Meschner, 176 F.3d 441, 444-45 (8th Cir. 1999), the Eighth Circuit held that trial counsel's performance was deficient when he failed to cross-examine a sheriff as to evidence that he pressured another witness (a jailer supervisor) to "forget"

65

petitioner's intoxicated state. The court also held that counsel's performance was deficient when he failed to cross-examine the sheriff about allegations that he himself often "forgot" facts favorable to criminal defendants. Id. Because petitioner's defense to the murder was his intoxication, the testimony of law enforcement personnel who saw petitioner directly after the shooting was critical to his defense. Id. at 445.

Only two witnesses testified as to petitioner's condition, the sheriff and the jailer supervisor, and their testimony was in direct conflict. Id. The court concluded that counsel's deficient performance in failing to attack the credibility of the sheriff prejudiced the petitioner and denied him a fair trial. Id. Petitioner faced a first-degree murder conviction unless he could convince the jury that he was intoxicated at the time of the shooting. Id. Cross-examining the sheriff would likely have produced evidence that would have led the jurors to have a reasonable doubt as to petitioner's guilt. Id. Thus, the court concluded that "a reasonable probability exists that the result of petitioner's first-degree murder conviction would have been different if trial counsel would have [cross-examined the sheriff]." Id. at 446.

Here, applying the above law to trial counsel's handling of Agent Allen's cross-examination, the court cannot conclude that trial counsel was ineffective. As to Mr. Picardi's state of mind, as discussed above, Agent Allen did not testify that she knew Mr. Picardi's state of mind. Rather, she testified to the meaning she derived from Exhibit 151, the letter Mr. Picardi wrote to Kritt protesting Kritt's suggestion that Mr. Picardi should really actually pay back the loans he

66

took out against the funds in the trust. She permissibly testified that her understanding of Mr. Picardi's letter was that he himself did not believe the loans were legitimate. Counsel certainly cannot be faulted for not wanting to delve back into Exhibit 151, which was perhaps the most damaging piece of evidence in the whole trial against Mr. Picardi.

The definition of constructive receipt given by Agent Allen, as discussed above, was legally accurate and paralleled that of the district court in its jury instructions. Failure to cross-examine Agent Allen about this was not error.

Mr. Picardi claims trial counsel should have asked Agent Allen about the civil tax cases involving offshore deferral arrangements. Presumably, Mr. Picardi believes that, by doing so, trial counsel would have established through such cross-examination his Due Process premise: that where civil tax consequences are uncertain, criminal prosecution cannot occur. This argument fails for a number of reasons. First, whether the law was unconstitutionally void for vagueness was an issue for the court, not the jury. Second, a discussion of civil tax cases in front of a jury would not have been relevant to the jury's job of determining the facts and defendant's guilt in a trial on criminal charges. Such a line of inquiry would undoubtedly have been cut off soon after it began.

Finally, Mr. Picardi claims trial counsel should have cross-examined Agent Allen about her "position" that the ability to replace a trustee equated to "control." As explained above, however, Agent Allen testified that Mr. Picardi controlled "the trustee," a fact indisputable given the provision from the trust

instrument quoted above. See JT, CR Docket No. 224 at p. 662 (Exhibit 224). She also readily admitted, on cross-examination, that *most* beneficiaries of *most* trust agreements have the right to remove the trustee, that it is a standard provision in most trusts. See JT, CR Docket No. 224 at p. 701. Counsel was not ineffective for failing to cross-examine Agent Allen on this subject—trial counsel *did* so cross-examine her.

Agent Allen was clearly an important witness for the government. Trial counsel for Mr. Picardi did not object once during her testimony, and the subsequent cross-examination of her was brief. However, much of Agent Allen's testimony concerned documents either written to Mr. Picardi or authored by him which showed a great deal of control over the money he placed into the offshore trust and a certain wink-and-a-nod attitude toward the entire arrangement. See, e.g. Exhibits 151 and 313. It is understandable that trial counsel would not want to give Agent Allen a chance to testify about these documents again. As to the matters trial counsel did cross Agent Allen on— especially the issue of replacement of the trustee--trial counsel scored defense points.

Furthermore, Agent Allen was by far not the most damaging government witness for Mr. Picardi. Agent Wright established much of the same ground as Agent Allen. And, in this § 2255 motion, Mr. Picardi assigns no error or incompetency to defense counsel's handling of Agent Wright's testimony. If Agent Allen had not testified at all, Agent Wright's testimony was overwhelmingly enough to convict Mr. Picardi.

68

This case is much more like <u>Hall</u> and <u>Johnson</u>, and distinguishable from <u>Steinkuehler</u>. Agent Allen's testimony was important, but not singular. Other government witnesses, especially Agent Wright, also established the elements of control and constructive receipt which arose out of how Mr. Picardi actually conducted the employee leasing arrangement (as opposed to how it was supposed to work on paper). The facts in this case were set forth in black and white on paper, unlike the intangible fact of the defendant's intoxication in <u>Steinkuehler</u>, which was not preserved for presentation before the jury so the jury could judge the intoxication with their own senses. And the district court's instructions clearly set forth the law, which confirmed Agent Allen's testimony. Although cross-examination of Agent Allen could have been more robust, it was not constitutionally deficient. The court recommends denying this ground for relief.

## 3. **Proposal of an Incorrect, Prejudicial Jury Instruction**

Mr. Picardi argues that trial counsel was ineffective for proposing Defense Proposed Jury Instruction No. 8. <u>See</u> CR Docket No. 154 at pp. 12-14. This three-page jury instruction proposed a definition of a "sham" transaction as opposed to a transaction which has economic substance. <u>Id.</u> Mr. Picardi maintains this instruction, allegedly taken from the government's proposed instructions in the Randy Brodnik case, is an inaccurate statement of the law and is biased in favor of the government.[6]

---

[6] The mere fact an instruction was proposed by the government is not in itself evidence that the instruction is biased or incorrect.

Mr. Picardi's proposed instruction number 8 was refused by the district court. See CR Docket Nos. 190 & 191. So even if the instruction was erroneous and biased, it did not prejudice Mr. Picardi because it was never given to the jury. Id.

Mr. Picardi claims, correctly, that some elements of the instruction proposed by his trial counsel were nevertheless incorporated partially into other instructions that *were* given by the district court and, in this way, prejudiced him. He points especially to Instruction No. 8 given by the district court and the language in that instruction which read: "Even if you find a contract or agreement was legitimate, you can still consider whether this contract or agreement was used by the defendant to avoid his lawful tax obligations such that the entire transaction can be considered a 'sham' transaction." See Docket No. 1-1 at p. 29 (citing to CR Docket No. 191 at pp. 23).

Mr. Picardi's argument is a wolf in sheep's clothing. Having failed to raise the issue in his direct appeal that the district court's jury instruction was wrong (and having, therefore, procedurally defaulted this issue), Mr. Picardi now clothes the argument in the garb of "ineffective assistance" and attempts to raise it in that form. But Mr. Picardi cannot show Strickland prejudice because the instruction proposed by trial counsel was never given. As for the asserted error in the district court's own jury instructions, none of which exactly mirror the refused defense instruction (compare CR Docket No. 154 at pp. 12-14, with CR Docket No. 191), that is an issue which should have been

70

raised on direct appeal. Having failed to do so, Mr. Picardi is foreclosed from

raising the issue now because he has procedurally defaulted that issue.

Frady, 456 U.S. at 167-68; McNeal, 249 F.3d at 749.

Examining the district court's instruction, CR Docket No. 191 at p. 23,

and comparing it with defense proposed instruction number 8, CR Docket No.

154 at pp. 12-13, the exact infirmity Mr. Picardi claims exists in his trial

counsel's proposed instruction was largely adopted by the district court in the

instruction that was actually given. The exact passage Mr. Picardi points out

in trial counsel's proposed instruction that he claims to have been most

prejudicial is this:

> Even if you find a contract or agreement was not a "sham" by itself,
> you can still consider whether this contract or agreement was used
> by the defendant for tax evasion purposes, such that the entire
> transaction can be considered a "sham" transaction. You must
> make a factual determination whether the contracts and/or
> agreements described in the indictment were used by the
> defendant to further the tax crimes charged in the indictment,
> whether or not the underlying contract and/or agreement was
> itself a "sham."

See CR Docket No. 154 at pp. 12-13. The problem with this passage, according

to Mr. Picardi, is that it states the law "exactly backwards." See Docket No. 1-1

at p. 29. The law, according to Mr. Picardi, is that a legitimate agreement ("not

a sham" in the words of the proposed instruction), is *respected* for income tax

purposes *even if* the defendant believed he was violating tax law. Id.

The district court instructed the jury, in part, as follows:

> Even if you find a contract or agreement was legitimate, you can
> still consider whether this contract or agreement was used by the
> defendant to avoid his lawful tax obligations such that the entire
> transaction can be considered a "sham" transaction.

A transaction is not necessarily a "sham" simply because it is
motivated by some tax-savings considerations.

See CR Docket No. 191 at p. 23. Both instructions stated that even if an
arrangement was legitimate "on paper" (i.e. according to the written terms of
the contract), the jury could still convict Mr. Picardi if the jury found that he
used the arrangement to avoid paying taxes he legitimately owed.

Mr. Picardi construes the two instructions to say that even if a contract
was legitimate, the jury could convict him if the jury nevertheless found he had
a subjective criminal state of mind. That, of course, is not the law. But that is
also not what the two jury instructions say. The instructions say that just
because a written instrument establishing some arrangement is legitimate
according to its written terms, the jury must still examine the *substance* of the
arrangement—how the arrangement was executed by the defendant in fact—to
determine if the arrangement was legitimate or sham. This is a correct
statement of the law. Walter, 148 F.3d at 1029; Moser, 914 F.2d at 1046-47,
1047 n.17. There was no error in the jury instruction proposed, or in the one
given by the court. This court recommends denying Mr. Picardi's request for
relief based on trial counsel's proposal of defense instruction number 8.

## 4.   Ineffective Presentation of Direct Testimony from Chatzky

Mr. Picardi asserts trial counsel was ineffective for selecting Michael
Chatzky, a California attorney, as Mr. Picardi's expert. See Docket No. 1-1 at
p. 30. In particular, Mr. Picardi points to "baggage" associated with Chatzky in
the form of a conflict of interest and his having testified before the Senate

72

Permanent Subcommittee on Investigations in hearings concerning tax haven abuses. Mr. Picardi particularly faults Ms. Culotta, who handled Chatzky's direct testimony at trial, for not bringing out these unfavorable issues during Chatzky's direct examination, thereby allowing the government to reveal the "baggage" for the first time to the jury on cross-examination. Id.

Factually, Mr. Picardi's characterization of events at trial is wrong. Culotta *did* bring out on direct examination the fact that Chatzky had previously testified before the Senate Subcommittee on investigations dealing with international taxation matters. See JT, CR Docket No. 227 at p. 868. So that subject was not a government "gotcha" moment on cross-examination. Furthermore, the "conflict of interest" Mr. Picardi alleges Culotta should have brought out on direct was extremely minor in the whole scope of all of Chatzky's testimony. As the government brought out on cross-examination, the "conflict" consisted in a billing statement for $240 sent by Chatzky's firm to Blenheim for review of Mr. Picardi's program documents. See id. at p. 928-35.

Most of the government's cross-examination of Chatzky was focused—as was the whole of the government's case—on establishing that Mr. Picardi's employee leasing program did not work in actual practice as it was described in the written documents. For example, the government described the South African transaction and asked a hypothetical of Chatzky: *if* Mr. Picardi's program worked like that in practice, would not Picardi have exercised control over the money in the E & S trust? Chatzky's persistently evasive responses, especially the response "define 'if' for me," were devastating to his credibility.

73

The conflict of interest weighed but little in Chatzky's overall destruction before the jury. Thus, the court finds Mr. Picardi has not established prejudice.

He also fails to establish Ms. Culotta's conduct of the Chatzky direct examination was substandard constitutionally. Ms. Culotta stated affirmatively that she made a tactical decision not to go into the conflict of interest during her direct examination. See Docket No. 12 at p. 4. She asserts that Chatzky was selected as the defense expert at Mr. Picardi's urging. Id. Knowing about Chatzky's "baggage," Ms. Culotta ultimately agreed with Mr. Picardi's choice because Chatzky was the most knowledgeable and competent expert to testify for Mr. Picardi. Id. Ms. Culotta's tactical decision concerning Chatzky and his "baggage," was to limit her direct examination of him so as to minimize the damage to Mr. Picardi's case from Chatzky. Id. That minimalist approach is what led Ms. Culotta to refrain from inquiring into Chatzky's Blenheim conflict of interest during his direct examination.

"There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." Luebbers, 296 F.3d at 692. It is the petitioner's burden to overcome this presumption, and a "petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." Id. Judicial scrutiny of attorney performance is highly deferential, with a strong presumption that counsel's conduct falls within the range of reasonable professional conduct. Strickland, 466 U.S. at 698.

74

Here, we have not only the presumption that Ms. Culotta's direct examination of Chatzky was trial strategy, we have her affirmative statement that she made the decision to limit his direct examination for tactical reasons. Applying the highly deferential judicial scrutiny required under Strickland, the court finds Ms. Culotta's decision not to inquire into Chatzky's conflict of interest on direct examination did not constitute ineffective assistance of counsel. Mr. Picardi has failed to show "that counsel's performance was deficient"; he has not shown counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. Thus, this court recommends no remedy be granted Mr. Picardi on this ground. He failed to establish both prongs of the Strickland test.

## 5. Failure to Present Evidence of Lack of Control

Mr. Picardi asserts trial counsel was ineffective because there was evidence that showed he did not have control over the offshore funds and his counsel did not present this evidence. Specifically, Mr. Picardi claims he made a suggestion that the trust should invest in Kuwait and the trust ignored his recommendation. See Docket No. 1 at p. 15. In addition, he claims that both the IRS and his own trial counsel tried to repatriate the offshore funds and that neither party was able to compel the overseas entities to return the money in the trust to the United States.[7] Id.

---

[7] This is denied by Van Norman. See Docket No. 11 at p. 7, ¶ 10.

As to the Kuwait investment suggestion, Mr. Picardi is again wrong factually. Trial counsel *did* present this evidence to the jury. See, e.g. JT, CR Docket No. 224 at pp. 694-95, 715-16, 724-27 (trial testimony and Exhibit 188). Mr. Picardi is simply wrong when he claims trial counsel neglected to present this evidence. The jury was aware that Mr. Picardi had suggested to the trust that it invest in Kuwait and that the trust ignored that suggestion.

Mr. Picardi also states in his motion defense counsel should have presented evidence that once Mr. Picardi committed his funds overseas, there was no guaranty he would get them back, even when he retired. See Docket No. 1 at p. 10. Counsel did present this evidence to the jury. See CR Docket No. 227 at pp. 885-87 (Chatzky's testimony), and p. 843 (Anthony McLoughlin's testimony).

The court is not aware of any evidence presented that trial counsel and the IRS attempted to get the funds in the trust repatriated. This evidence, even if trial counsel had attempted to present it, would have had questionable relevance. Whether a third party could compel the trust to disgorge the money once criminal charges had been brought is a far different question than whether Mr. Picardi, before the advent of criminal charges, could himself exercise control over the funds. How would the evidence have been presented to the jury? Trial counsel could not have testified about their efforts to lay hands on the money without creating grounds for their disqualification to further represent Mr. Picardi (a lawyer cannot represent a client in a matter in which the lawyer is expected to be called as a witness). The prejudicial effect of

76

evidence of this nature would have to be considered too—would the jury be prejudiced against Mr. Picardi by knowing that the IRS had the civil right to take Mr. Picardi's money? Would the jury be prejudiced by evidence that Mr. Picardi's lawyers needed the money? Was Mr. Picardi not paying his debts to his lawyers?

Furthermore, even if the district court had considered the evidence to have had some marginal relevance at the trial, it was merely cumulative of the evidence of the Kuwait investment suggestion. Both pieces of evidence would tend to show Mr. Picardi lacked control over the money in the trust. Mr. Picardi makes no attempt to show that this small sniglet of data had the potential to reverse the overwhelming tide of evidence presented by the government that he *did* have control over the trust funds through the South African transaction, the AEL loans, and Kritt's explanation before the program was begun that Mr. Picardi could control the E & S trust because he could control its trustee.

Aside from the evidence that Mr. Picardi exercised control over the money discussed already in this opinion, Agent Wright testified about Exhibit 62, a letter Mr. Picardi wrote in June, 1997, inquiring even before the employee leasing scheme was set up about how he would be able to access the funds in the trust. See JT, Docket No. 220 at pp. 155-56. Another letter written by Mr. Picardi 18 months after the scheme began expressed a desire to access funds in the offshore trust to build a house. Id. at pp. 189-91 (discussing Exhibit 95). In the letter Mr. Picardi wrote, "[c]reating this line of credit and

77

obtaining the funds is the first time that monies have actually been utilized.  I feel this is the acid test to confirm the funds and the entire system is safe."  Id. at p. 191.

The government also showed the jury evidence that the trust documents did not, by their written terms, allow Mr. Picardi to take out loans against the trust money.  See JT, CR Docket No. 220 at p. 151.  But despite the written terms of the trust to the contrary, Mr. Picardi did in fact take out three such loans totaling $400,000 beginning in August, 1998, and made only perfunctory payments thereon, contrary to the payments required by the written loan documents.[8]  See JT, CR Docket No. 220 at pp. 164-203.  One of the written loan agreements was drawn up years *after* the loans had already been made, and *after* Mr. Picardi received notice that he was being audited by the IRS.  Id. at pp. 73, 203-08.  The post hoc loan agreement recited an interest rate of 9%, but Mr. Picardi was able to reset even this largely illusory interest rate to 5%. Id. at p. 196, 201.  By 2008 (10 years after the first loan), Mr. Picardi had paid only approximately $7,000 on the principal of these loans.  See JT, Docket No. 221 at pp. 270-71.  The majority of these loan payments were made after the IRS notified Mr. Picardi he was being audited.  Id. at pp. 275-77.

Mr. Picardi made one "loan interest payment," the proceeds of which were funneled back into E & S, in March 2000, but he back-dated the check with a date of December 23, 1999.  See JT, CR Docket No. 221, at pp. 243-46.

---

[8] Mr. Picardi claims the government never showed his actions deviated from the written contracts.  See Docket No. 25 at pp. 8-9.  Of course, the loans Mr. Picardi took are one such example of a deviation in Mr. Picardi's conduct from the terms of the contracts.

He then took a mortgage interest deduction for the amount of the interest payment on his 1999 federal income tax return. Id. In other words, the money he "borrowed" was his own income, the money he repaid on the "loan" went back into the same "pot" of income at E & S which he controlled, and he then took a tax deduction for the "loan payment," lying about even the year in which he made the payment. Id.

Another event the government introduced into evidence showing Mr. Picardi's control over the funds in the offshore trust was that in 2000, Mr. Picardi caused approximately $200,000 in the E & S trust to be transferred out to him, through an intermediary company, so that he could purchase some property in South Africa. See JT, Docket No. 221 at pp. 246-54. When Mr. Picardi decided against purchasing the South African property, the money was funneled right back into the E & S trust. Id. at pp. 254-59. As to this transaction, there were not even any illusory "loan" documents that were ever created.

The government introduced testimony from an orthopedic surgeon who shared office space with Mr. Picardi for approximately six years, after Mr. Picardi had entered into his employee leasing scheme. See JT, Docket No. 222 at pp. 334-42. Although this surgeon and Mr. Picardi negotiated a lease agreement, the surgeon never heard of the entities that supposedly employed Mr. Picardi and controlled the time, place, and manner of his work. Id.

Furthermore, none of these entities supplied the tools and machines Mr. Picardi needed to perform his work; instead the surgeon provided all

necessary tools to Mr. Picardi including everything from copier machines to blood pressure cuffs. Id. at 342-45. The surgeon also supplied the staff who did Mr. Picardi's billing and set up his patients' appointments. Id. at p. 346. Mr. Picardi was responsible for paying a portion of the surgeon's overhead expenses each month as compensation for using the surgeon's staff, office, and tools. Id. at pp. 342-45. Mr. Picardi personally wrote the surgeon a check each month for the payment—the payment did not come from any of the corporate entities involved in Mr. Picardi's employee leasing arrangement. Id.

Lastly, Mr. Picardi alleges there were loans he tried to obtain but for which he was turned down. He alleges counsel was ineffective for failing to present this evidence of lack of control. Of course, since the written contracts themselves said no loans could be made, it would have been prejudicial for defense counsel to tell the jury that Mr. Picardi had an *expectation* that he would receive such loans. Defense counsel cannot be faulted for strategically leaving the subject of loans well enough alone.

Strickland requires Mr. Picardi to show prejudice as a result of counsel's alleged ineffectiveness. Here, the only allegation of ineffectiveness backed up by a review of the record is the allegation that, after the advent of criminal charges, neither the IRS nor defense counsel were able to repatriate Mr. Picardi's funds from the overseas accounts. This "fact" is of questionable relevance and carried with it the possibility of great prejudice to Mr. Picardi. But most saliently, it would not have offset in any significant way the tidal wave of evidence presented by the government showing that Mr. Picardi did

80

have control over the money. The court therefore recommends that Mr. Picardi's motion for relief on this ground be denied.

## 6. Ineffective Advice Regarding Plea Agreement Offers

### a. Rejected Plea Offers Made by the Government

Mr. Picardi claims Ms. Culotta provided him ineffective assistance of counsel in regard to plea offers made by the government. He alleges the government offered him a chance before he was ever charged with any crime to resolve his case with a plea to a misdemeanor. See Docket No. 1 at p. 19. He also alleges the government offered him, post-indictment, a chance to plead guilty to a misdemeanor if he debriefed with the government pursuant to a "queen-for-a-day" grant of immunity that would have prevented the government from using Mr. Picardi's statements during the debrief to bring new charges against him. Id. at p. 17. He claims Ms. Culotta advised him repeatedly to reject all such plea offers by the government. Id. at pp. 17-19. He also claims Ms. Culotta never advised Mr. Picardi of the civil ramifications of a felony conviction as opposed to a misdemeanor conviction on his right to practice medicine and to possess firearms. Id. He also claims Ms. Culotta made conflicting statements to the trial court about whether the government had made any plea offers. Id. He claims Culotta misrepresented to him her level of experience and expertise. Mr. Colvin's report does not touch on this issue at all. See Docket No. 1-1.

First, the court notes that Mr. Picardi's § 2255 motion is signed by him, but not under penalty of perjury. See Docket No. 1 at p. 31. Instead, he says

81

the statements in the motion are true "to the best of his knowledge and belief." Id. This is a far cry from establishing the truth of the allegations concerning the plea offers. The court notes it is customary for the government to make all plea offers in writing, including queen-for-a-day proffer offers. Here, Ms. Culotta was in Indiana and the prosecutor was in South Dakota, making it even more likely that any offers made were reduced to writing. Furthermore, it is highly likely that Ms. Culotta's responses to the government and to Mr. Picardi, both of whom were in South Dakota, would also likely have been written responses. It is curious to the court that Mr. Picardi provides none of these supporting documents to prove his claim.

Furthermore, even the allegations themselves are highly generalized. Mr. Picardi claims Ms. Culotta "advised the [trial] Court at a hearing that no plea offer was ever made to Picardi." Mr. Picardi does not enlighten this court as to which of the many hearings in his case this statement was made or even the date of the hearing. He also stated that in a previously filed affidavit, Ms. Culotta stated the government had offered Picardi a misdemeanor plea that Picardi declined. Again, Mr. Picardi does not tell the court the date of the affidavit or its location within the court's docket.

At CR Docket No. 130 is an affidavit filed by Ms. Culotta stating at paragraph 14: "In April 2010, your affiant, Attorney Jennifer Culotta, contacted [Assistant United States Attorney Robert] Mandel and informed him that she had been retained by Picardi. Mandel offered Picardi a misdemeanor plea in return for his testimony against Kritt. Picardi declined the

82

government's offer." See CR Docket No. 130, p. 4, ¶ 14. This would have occurred pre-indictment as the indictment issued in September, 2010. This court is unable to verify that Ms. Culotta at some other time made a conflicting statement to the trial court in a hearing because of the lack of detail provided by Mr. Picardi.

In response to Mr. Picardi's § 2255 motion, Ms. Culotta filed an affidavit in this matter. See Docket No. 12. She (and co-counsel Mr. Van Norman) characterized Mr. Picardi's personality as "forceful" and state that Picardi insisted on testifying at trial against counsel's advice. Id. at p. 5. Ms. Culotta avers she never advised Mr. Picardi to reject all plea offers made by the government nor did she characterize those offers as "shams" or "farces." Id. She states—under oath—that she fully explained to Mr. Picardi the difference between a misdemeanor and a felony conviction and even researched the effect a conviction would have on Picardi's medical license. Id. at pp. 5-6. She states she has 27 years' experience as a lawyer and has tried several hundred jury trials. Id. at p. 2, ¶ 3.

Ms. Culotta avers it was Mr. Picardi's decision to reject all plea offers. Id. at pp. 5-6. He insisted on extracting a promise of complete immunity in return for assistance with the prosecution of Kritt, refused to enter a plea of guilty to any criminal charge, and wanted to sue the government for the investigation. Id. Ms. Culotta denies, under oath, that she ever advised Mr. Picardi that he would not be charged, that he would not be convicted at trial, that the government was bluffing, or that there was no evidence against him. Id. at p.

83

6. Mr. Van Norman knew nothing of the pre-charge plea offer, but agreed with Ms. Culotta it was Mr. Picardi's decision to reject the post-indictment plea offer to a felony charge because he would have lost his gun rights, he would likely lose his medical license, and he was uncertain he could repatriate his overseas money and, if he did, might incur substantial penalties in doing so. See Docket No. 11, at pp. 10-11.

Although Mr. Picardi's "statement of belief" conflicts with Ms. Culotta's sworn testimony under oath, there is no need for an evidentiary hearing to resolve the conflict. That is because Mr. Picardi has not even alleged, let alone supported, the necessary ingredients for relief under Strickland.

In Lafler v. Cooper, 566 U.S. ___, 132 S. Ct. 1376, ___ (2012), the Supreme Court held where counsel's ineffective advice led a habeas petitioner to reject a plea offer, and where he alleged the Strickland prejudice was having to stand trial, petitioner must show but for the ineffective advice, there is a reasonable probability that the plea offer would have been accepted by both the petitioner and the trial court and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the actual sentence received. Id. at 1385, 1391. Twice Cooper, the habeas petitioner, had appeared before the trial court and admitted his guilt, expressing a willingness to accept the plea offers, though he later rejected the offers. Id. at 1383. The parties agreed Cooper's counsel's advice about the plea offer fell below accepted standards and was ineffective, so the only issue was whether Cooper could show prejudice under Strickland. Id. at 1384. The state argued, because the

trial itself was fair, the sole purpose of the Sixth Amendment–to provide a fair trial–was satisfied and there could be no prejudice. Id. at 1385.

The Court rejected that narrow view of the Sixth Amendment, holding its purpose is to ensure effective assistance at critical stages of a criminal proceeding, including pretrial stages, sentencing, and appeal. Id. The fact a trial occurred did not, by itself, obviate a constitutional error–rather, the Court's inquiry in the past had always been whether the advent of a fair trial after the error cured the particular error. Id. at 1386. Although a criminal defendant has no right to have a plea offer made to him, if one is offered, he has a right to effective assistance of counsel in deciding whether to accept or reject that offer. Id. at 1387. If he did not receive effective assistance in evaluating a plea offer, he can show Strickland prejudice by showing he would have pleaded guilty but for counsel's ineffectiveness and, by not pleading guilty, he received a less favorable sentence. Id. at 1386-87.

Even if a petitioner makes the Strickland showing outlined in Lafler, the remedy is to order the government to reoffer the plea agreement. Id. at 1391. If the habeas petitioner accepts the plea offer, the trial court has the discretion to: (1) vacate the trial convictions and resentence the petitioner pursuant to the plea agreement, (2) vacate only some of the trial convictions and resentence the petitioner accordingly, or (3) leave the trial convictions and corresponding sentences undisturbed. Id. See also Missouri v.Frye, 132 S. Ct. 1399 (2012) (a companion case issued the same day).

In Garcia v. United States, 679 F.3d 1013, 1014 (8th Cir. 2012), the Eighth Circuit affirmed a district court's denial of habeas relief without an evidentiary hearing under § 2255 for ineffective assistance under a rejected plea offer scenario. In that case, the habeas petitioner claimed his lawyer had failed to tell him how the United States Sentencing Guidelines would work in a plea situation versus how the Guidelines would be applied after a trial. Id. The petitioner was charged with both a conspiracy count and a distribution count. Id.

The Eighth Circuit said the petitioner could not show he would have accepted the plea agreement but for counsel's ineffectiveness. Id. The petitioner rejected the government's plea offer because he was adamant that, while he may have participated in the conspiracy by using drugs, he was never responsible for bringing drugs into South Dakota. Id. at 1014-15. Petitioner testified under oath to this at trial and at sentencing. Id.

The Eighth Circuit noted both of the government's plea offers would have required defendant to admit that he brought a pound of methamphetamine to Rapid City on two occasions. Id. Also, the defendant could not have entered an open plea without benefit of a plea agreement with the government because he would have been required to admit to both the conspiracy charge and the distribution charge in order to get credit for acceptance of responsibility. Id. The transcripts of the trial and the sentencing demonstrated defendant was not willing to admit this. Id. (citing Chesney v. United States, 367 F.3d 1055,

86

1059-60 (8th Cir. 2004); <u>Sanders v. United States</u>, 341 F.3d 720, 722-23 (8th Cir. 2003)).

Here, likewise, Mr. Picardi testified at trial and maintained his innocence throughout. <u>See</u> JT, CR Docket No. 228 at pp. 1213-35; CR Docket No. 229 at pp. 1264-1336. He also testified at his sentencing and continued his trial themes of innocence and good faith reliance on the advice of his attorney, Anthony Kritt. <u>See</u> CR Docket No. 256 at pp. 53-70 (sentencing hearing transcript). He explained the reason he granted Kritt a power of attorney over his financial and tax affairs was because he was hunting on a camping trip on his honeymoon. <u>Id.</u> at p. 63. He continued to emphasize that he at all times trusted Kritt. <u>Id.</u> at p. 64. He also said he "never dreamed we'd actually lose the trial" "because I thought the truth was always on my side." <u>Id.</u> at p. 66, lines 9-11. He stated his attorney was confident of obtaining a reversal of his verdict on appeal. <u>Id.</u> at p. 68, lines 21-22.

Nowhere in Mr. Picardi's § 2255 motion does he admit his guilt. Nowhere does he state affirmatively that he would have pleaded guilty had his lawyer told him about the plea offers and explained the ramifications of accepting those offers versus going to trial. All we have in the record concerning Mr. Picardi's response to the government plea offers is Ms. Culotta's statement, under oath, that Mr. Picardi rejected those offers. <u>See</u> CR Docket No. 130 at p.4, ¶ 14. That sworn testimony is entirely consistent with the sworn testimony Mr. Picardi gave at trial and at his sentencing hearing. He was adamant about his innocence. He has not made the showing required under

Lafler and Garcia to prove Strickland prejudice for a missed opportunity to accept a plea offer because he has not shown that he would have accepted the plea offers had counsel performed effectively.

Mr. Picardi acknowledged in his § 2255 motion that he denies—still—that he ever willfully evaded paying taxes. See Docket No. 25 at p. 5. He points out there are misdemeanor tax crimes that do not require, as an element, showing willfully evasive behavior. Id. This is true. But Mr. Picardi has not shown he would have pleaded guilty to even such a misdemeanor. The court recommends this ground for relief be denied.

### b.   Failure to Seek a Mistrial

Tossed into the mix of Mr. Picardi's ineffective assistance claim regarding the plea offers is a statement that Ms. Culotta was also ineffective for failing to seek a mistrial during the jury trial. See Docket No. 1 at p. 19. He alleges Ms. Culotta advised Mr. Picardi against making a motion for mistrial. Id.

Ms. Culotta denies this in her affidavit, stating it was her advice to seek a mistrial. See Docket No. 12 at p. 6. Ms. Culotta avers that Mr. Van Norman, on the other hand, recommended they agree to proceeding with the rest of the trial with eleven jurors and not seek a mistrial. Id. The subject of whether to seek a mistrial came about because Mr. Van Norman's legal assistant discovered that a deliberating juror had been posting comments on social media. See Docket No. 11 at p. 12. The social media postings were made after the case had been submitted to the jury for decision. See CR Docket No. 231

at p. 3 (sealed). Mr. Van Norman avers that it *was* Ms. Culotta's advice to Mr. Picardi not to seek a mistrial. See Docket No. 11 at p. 12.

The social media posts were to the effect that the posting juror was tired of the trial and wanted it to be over. See CR Docket No. 231 at pp. 4-5. Also that he/she wanted fellow jurors to agree to a unanimous verdict quickly. Id.

Whether or not Ms. Culotta or Mr. Van Norman advised against seeking a mistrial, it is clear no motion for a mistrial was made on behalf of Mr. Picardi. See CR Docket No. 231 at p. 18 (sealed). Mr. Van Norman stated to the court he believed Mr. Picardi had two options: (1) to ask for a mistrial or (2) to ask that the offending juror be dismissed and that the jury be allowed to continue to deliberate with 11 jurors. Id. at p. 17. Mr. Van Norman requested the court dismiss the offending juror and continue with 11 jurors. Id. at 18. He stated Mr. Picardi "simply doesn't want to go through this again [i.e. another trial]." Id. The court, citing FED. R. CRIM. P. 23(b)(2), agreed to do so with the government's concurrence. Id. at pp. 18-19.

The court set forth the law applicable to juror misconduct. Id. at pp. 19-20. Of course, Mr. Picardi was in the courtroom during this discussion. Id. at pp. 1-37. There is no presumption of prejudice to a defendant if a juror has contact with outside parties unless the contact relayed facts or related factual evidence not received at trial. Id. at p. 19 (citing United States v. Blumeyer, 62 F.3d 1013, 1015-16 (8th Cir. 1995)). The court examined the offending juror to determine if his/her social media posts had been read by any other juror on the jury. Id. at pp. 24-34. The juror indicated his/her posts had not been

viewed by any other juror. Id. Also, he/she testified he/she had not contacted

any other juror outside of contact within the jury room. Id. The juror also

testified he/she had not brought outside information of any kind into the jury

room or to any juror. Id. The juror gave defense counsel his/her password

and email to be able to access his/her social media account and verify for

themselves the persons who had viewed the posts were not jurors. Id.

After this discussion concluded and the court determined to dismiss the

offending juror and proceed with 11 jurors for the remaining deliberations, the

court requested the parties reduce their stipulation to 11 jurors to writing and

that not only defense counsel, but also Mr. Picardi personally, should sign the

stipulation. Id. at p. 34. A written stipulation, signed by Ms. Culotta, Mr. Van

Norman, government counsel, and Mr. Picardi personally, was later executed

and filed with the court. See CR Docket No. 194 (sealed).

Here, the record reveals there was no prejudice to Mr. Picardi by not

seeking a mistrial. The offending juror was examined thoroughly and the juror

had no contact with any other juror and did not bring outside facts into the

jury room. Furthermore, Mr. Picardi personally stipulated to proceeding with

11 jurors. Even if he had not so stipulated, once the jury began deliberations,

the trial court had the discretion to excuse the offending juror without

Mr. Picardi's consent and to order the remaining 11 jurors to continue

deliberating. See FED. R. CRIM. P. 23(c).

Here, there was clearly good cause to dismiss the offending juror and no

prejudice to Mr. Picardi as a result of the juror's actions. If defense counsel

had made a motion for a mistrial, it is extremely unlikely such a motion would
have been granted: there were no facts supporting a conclusion that the
juror's actions created prejudice and much time, effort and expense had been
invested in this three-week trial.

This court concludes Mr. Picardi has failed to demonstrate Strickland
prejudice as a result of defense counsel's failure to move for a mistrial.
Accordingly, the court recommends dismissal of this ground for relief in
Mr. Picardi's § 2255 motion.

### 7.    Ineffective Presentation of Expert Accounting Testimony

Mr. Picardi alleges defense counsel was deficient in hiring Jeannine
Eagan Lecy to testify on his behalf.  He argues she was not qualified to testify,
characterizing her as a "local bookkeeper and business consultant."[9] See
Docket No. 1 at p.22.  He also argues counsel did not prepare Egan Lecy to
provide an opinion because they did not provide her enough time and
documents to do a comprehensive analysis.  Id.

The first allegation is not accurate.  Ms. Egan Lecy was essentially hired
to conduct a fraud investigation—to substantiate a defense theory that Kritt
had embezzled money from Mr. Picardi.  She was well-qualified to conduct
fraud investigations and had ample experience in those endeavors.  See JT, CR
Docket No. 228 at pp. 1139-43.

_____

[9] Culotta states in her affidavit she suggested hiring Luke Steadman, an
international forensic accountant, but Mr. Picardi rejected her suggestion
based on cost.  See Docket No. 12 at p. 7, ¶ 13.  This conflict need not be
resolved.

91

However, it is clear that Ms. Egan Lecy was not provided all of the information and documents she should have received in order to conduct an accurate accounting of the money that flowed into Kritt's PLS account. Specifically, defense counsel never appears to have alerted Ms. Egan Lecy that PLS was allowed, under the employee leasing program, to take a fee of 4% from Picardi's funds that passed through PLS. Id. at pp. 1192-93. Also, she was not told to account for payroll taxes PLS paid on account of Mr. Picardi. Id. Nevertheless, even with these omissions, Ms. Egan Lecy was firm in her testimony that there was between $800,000 and $1 million in funds that were unaccounted for. Id. at p. 1211.

Clearly, the efficacy of Ms. Egan Lecy's testimony was dimmed because she was not provided accurate information from which to draw her conclusions and analysis. However, the overall impact of this testimony was negligible, as was the defense embezzlement theory itself. As discussed above, the evidence of Mr. Picardi's control over the money in the overseas accounts was overwhelming. Most of that evidence came from Mr. Picardi's own writings. The suggestion that Mr. Picardi was innocent of tax evasion because Kritt embezzled some money from him did not negate the larger picture presented by the government's case. Even if Ms. Egan Lecy's testimony and opinions had been flawless and accurate, it is very doubtful that her testimony would have impacted the jury's verdict. In addition, the government's case agent, Chris Wright, essentially confirmed Ms. Egan Lecy's conclusion that Kritt embezzled from Mr. Picardi, albeit to a far lesser degree according to Agent Wright. See

92

JT, CR Docket No. 229 at pp. 1343-49. No Strickland prejudice having been demonstrated, this court recommends denying this ground for relief put forth by Mr. Picardi.

## 8.   Failure to Object to Testimony of Randy Brodnik

As noted above, on cross-examination, Randy Brodnik was allowed to testify without a defense objection that he had repatriated his funds from his employee leasing program in order to pay his back taxes. Mr. Picardi argues this was constitutionally deficient.

Ms. Culotta states in her affidavit in response to Mr. Picardi's § 2255 motion that she made a tactical decision not to object. See Docket No. 12 at p. 7. As can be surmised from the trial transcript discussed at length in the FACTS section above, defense counsel badly wanted to get before the jury the fact that Brodnik was in the same program as Mr. Picardi, that Kritt was the architect of both programs, that Brodnik had been indicted on identical counts, and that a West Virginia jury had acquitted Brodnik. The obvious advantage to getting this information before Mr. Picardi's jury would be to suggest that the Picardi jury should also acquit because the circumstances of the two men were identical. Before Brodnik began testifying, the trial court also made clear that he would not allow defense counsel to put the information about Brodnik's criminal case and acquittal before the Picardi jury.

When government counsel inquired about Brodnik's repatriation of funds, it was a logical and calculated decision Ms. Culotta made not to object. As can be seen, again from the jury trial transcript, Ms. Culotta asserted that

93

the government had opened the door to presentation of testimony about Brodnik's criminal case. That the trial court disagreed with Ms. Culotta does not mean it was constitutionally deficient performance on Ms. Culotta's part to gamble and try to get this favorable evidence before the Picardi jury.

"There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." Luebbers, 296 F.3d at 692. Here, Ms. Culotta expressly avers her decision was a calculated trial strategy. It is Mr. Picardi's burden to overcome the presumption, and a "petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." Id. Judicial scrutiny of attorney performance is highly deferential, with a strong presumption that counsel's conduct falls within the range of reasonable professional conduct. Strickland, 466 U.S. at 698. Here, the court concludes Mr. Picardi has not shown Ms. Culotta's failure to object was not sound trial strategy, though her strategy did not work out in the end.

## E. No Evidentiary Hearing is Warranted

"While '[a] petitioner is entitled to an evidentiary hearing on a section 2255 motion unless the motion and the files and the records of the case conclusively show that [he] is entitled to no relief,' no hearing is required 'where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based.' " New v. United States, 652 F.3d 949, 954 (8th Cir. 2011) (quoting Anjulo-Lopez v. United States, 541 F.3d 814,

94

817 (8th Cir. 2008)). Based on a review of the pleadings in Mr. Picardi's habeas case and the record from his criminal case, this court concludes that the facts shown conclusively establish that he is not entitled to relief on any of his claims. Accordingly, the court recommends that no evidentiary hearing be held.

## CONCLUSION

Based on the foregoing law, facts, and analysis, this magistrate judge respectfully recommends that Mr. Picardi's motion to vacate, set aside, or correct his sentence [Docket No. 1] be denied and that the government's motion to dismiss [Docket No. 23] be granted. Further, the government's motion to strike [Docket No. 14] should be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED April 6, 2016.

BY THE COURT:

*Veronica L. Duffy*

VERONICA L. DUFFY
United States Magistrate Judge

95