UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| EDWARD J.S. PICARDI, M.D, <br><br> Petitioner, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Respondent. | CIV. 15-5050-JLV <br><br><br> ORDER |

## INTRODUCTION

Petitioner Edward J.S. Picardi, M.D.,[1] filed a petition (Docket 1) pursuant to 28 U.S.C. § 2255 to vacate or set aside his criminal conviction in United States v. Edward J.S. Picardi, M.D., CR.10-50092 (D.S.D. 2013).   Based on the standing order of October 16, 2014, the matter was referred to United States Magistrate Judge Veronica L. Duffy pursuant to 28 U.S.C. § 636(b)(1)(B).   The government moved to dismiss the petition.   (Docket 23).   The magistrate judge issued a report recommending the court grant the government's motion to dismiss.   (Docket 28).   Petitioner timely filed objections to the report and

---

[1]Prior to sentencing Dr. Picardi's license to practice medicine was revoked. (CR.10-50092, Docket 242 at p. 11) ("CR. Docket ____").   See also Docket 28 at p. 3 n.2.   In the § 2255 proceeding, in a *pro se* filing on January 18, 2018, Picardi asserts he is "a licensed physician," but has "been unable to obtain employment as a result of the conviction[s]."   (Docket 36 at p. 1 n.1 & n.2).   The website for the South Dakota Board of Medical & Osteopathic Examiners does not show his license to practice medicine in the State of South Dakota has been reinstated.   https://login.sdbmoe.gov/Public/BoardAction/Search/Picardi (last visited September 25, 2018).   Because of the uncertainty of his professional status, the court will simply refer him as "Picardi."

recommendation. (Docket 34). For the reasons stated below, petitioner's objections are overruled and the report and recommendation is adopted as modified by this order.

## PROCEDURAL HISTORY

Picardi was charged on September 21, 2010, in a multi-count indictment. (CR. Docket 1). On October 12, 2011, a superseding indictment was filed. (CR. Docket 75). A second superseding indictment was filed on August 29, 2012. (CR. Docket 141). The second superseding indictment charged Picardi with counts 1-5: income tax evasion for the years 1999 through 2003, inclusive, in violation 26 U.S.C. § 7201; counts 6-10: making and subscribing to a false Form 1040 Schedule B for the years 2005 through 2009, inclusive, in violation of 26 U.S.C. § 7206(1); and counts 11-13: failing to disclose a financial interest in a foreign financial account with an aggregate value in excess of $10,000 for the years 2007 through 2009, inclusive, in violation of 31 U.S.C. §§ 5314 and 5322 and 31 CFR §§ 103.24 and 103.27(c). Id.

Attorney Robert W. Van Norman of Rapid City, South Dakota, and Attorney Jennifer Hinkebein Culotta, who appeared *pro hac vice* from New Albany, Indiana, represented Picardi throughout the criminal trial. (Docket 28 at pp. 3-4).[2] On September 17, 2012, the jury trial commenced and took 12 days to complete. (CR. Docket 197). On October 5, 2012, the jury found

---

[2]The court cites to the particular page of a document as it appears in the CM/ECF header as opposed to the page number indicated at the bottom of the document.

Picardi guilty of all 13 counts of the second superseding indictment.[3]   (CR.

Docket 196).   Post-trial, Attorney Culotta withdrew and Attorney John R.

Murphy of Rapid City joined Attorney Van Norman to represent Picardi at

sentencing.   (Docket 28 at p. 15; see also CR. Dockets 202 & 206).

On May 7, 2013, the court sentenced Picardi to "60 months on Counts 1-5;

36 months on Counts 6-10; and 60 months on Counts 11-13.   All counts to run

concurrently for a total sentence of 60 months."   (CR. Docket 250 at p. 2).   The

defendant was placed on one year of supervised release on each count to run

concurrently.   Id. at p. 3.   On January 10, 2014, the United States Court of

Appeals for the Eighth Circuit affirmed the convictions.   (CR. Docket 264; see

also United States v. Picardi, 739 F.3d 1118 (8th Cir. 2014)).

On June 22, 2015, Picardi timely filed a petition pursuant to 28 U.S.C.

§ 2255 ("§ 2255 Petition") to vacate or set aside his criminal conviction.

(Docket 1).   Attorney Murphy represented Picardi during his direct appeal to the

United States Court of Appeals for the Eighth Circuit and through the filing of

petitioner's objections to the report and recommendation in this § 2255

proceeding.[4]   (Docket 28 at p. 32; see also Docket 37).

Attached to the § 2255 Petition was a 33-page opinion letter dated June

15, 2015, of Attorney John Colvin ("Colvin Letter").   (Docket 1-1).   The

---

[3]All jury instructions and the verdict simply refer to "the indictment."   (CR.
Dockets 175, 191 & 196).

[4]Picardi acknowledged "that none of my claims of ineffective assistance of
counsel concern Mr. Murphy's handling of my Direct Appeal."   (Docket 7).

government filed a motion to exclude the Colvin Letter.   (Dockets 14 & 15).   The government filed a motion to dismiss the § 2255 Petition pursuant to Fed. R. Civ. P. 12(b)(6) and 12(h)(3).   (Docket 23).   Petitioner filed briefs in opposition to both of the government's motions.   (Dockets 25 & 27).

The magistrate judge filed a report and recommendation ("R&R").   (Docket 28).   The magistrate judge denied the government's motion to strike, indicating the Colvin Letter would be considered as "a brief from a lawyer representing a client—it merely sets forth the law and the facts upon which Mr. Picardi relies in support of his grounds for relief . . . ."   Id. at p. 25.   The R&R recommended the government's motion to dismiss be granted and Picardi's § 2255 Petition be denied.   Id. at p. 95.   Picardi timely filed his objections to the report and recommendation.   (Docket 34).

MOOTNESS

Picardi completed the period of incarceration imposed in the judgment and on September 15, 2017, his period of supervised release expired.   (CR. Docket 270).   Picardi is no longer subject to the jurisdiction of the court in the criminal case.

"A petition for habeas corpus must be filed while the petitioner is in custody."   Leonard v. Nix, 55 F.3d 370, 372-73 (8th Cir. 1995) (referencing Maleng v. Cook, 490 U.S. 488 (1989)).   "If a petitioner, though released from custody, faces sufficient repercussions from his allegedly unlawful punishment, the case is not moot."   Id. (referencing Carafas v. LaVallee, 391 U.S. 234, 239-40

4

(1968) (a habeas petitioner "should not be . . . required to bear the consequences of [an] assertedly unlawful conviction simply because the path has been so long that he has served his sentence").   "Collateral consequences are presumed to stem from a criminal conviction even after release."   Id.

"[I]n Pollard v. United States, 352 U.S. 354 (1957), the [Supreme] Court abandoned all inquiry into the actual existence of specific collateral consequences and in effect presumed that they existed."   Sibron v. New York, 392 U.S. 40, 55 (1968).   "[T]he Court concluded that '(t)he possibility of consequences collateral to the imposition of sentence is sufficiently substantial to justify our dealing with the merits.' "   Id. (citing Pollard, 352 U.S. at 358). "The Court thus acknowledged the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences.   The mere 'possibility' that this will be the case is enough to preserve a criminal case from ending 'ignominiously in the limbo of mootness.' "   Id. (citing Parker v. Ellis, 362 U.S. 574, 577 (1960) (dissenting opinion)).

Picardi's § 2255 petition was filed on June 22, 2015, while he was in custody under the criminal judgment.   (Docket 1 ¶ 24).   Although Picardi completed his imprisonment and supervised release prior to the court's adjudication of his § 2255 petition, "[t]he case is nevertheless not moot, because the federal conviction could have collateral consequences in the future, and [Picardi] was still in federal custody when he instituted these § 2255 proceedings . . . ."   Nguyen v. United States, 114 F.3d 699, 703 (8th Cir. 1997) (citing

<u>Clemmons v. United States</u>, 721 F.2d 235, 237 n.3 (8th Cir. 1983)). It was Picardi's conviction which resulted in the revocation of his license to practice medicine. This collateral consequence "is sufficiently substantial to justify [the court] dealing with the merits" of his § 2255 petition. <u>Sibron</u>, 392 U.S. at 55 (internal citation omitted).

The court finds Picardi's § 2255 Petition is not moot.

## PETITIONER'S OBJECTIONS

Petitioner's objections are broken down into six principal categories. Those categories are:

1. The magistrate judge was unduly prejudiced against petitioner by referring to him as Mr. Picardi as opposed to Dr. Picardi.

2. The magistrate judge erred by discounting the credibility of the § 2255 Petition as an unsworn document and because the petition was not supported by documentation.

3. The magistrate judge erred by confusing the identity of the entities engaged in the financial transactions evidenced at trial.

4. The magistrate judge erred by finding petitioner's challenge to the tax laws as void-for-vagueness was procedurally defaulted.

5. The magistrate judge erred by failing to find petitioner received ineffective assistance of counsel at trial.

6. The magistrate judge erred by recommending that no evidentiary hearing be held on the § 2255 Petition.

(Docket 34).

The court reviews *de novo* those portions of the report and recommendation which are the subject of objections.   Thompson v. Nix, 897 F.2d 356, 357-58 (8th Cir. 1990); 28 U.S.C. § 636(b)(l).   The court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."   28 U.S.C. § 636(b)(1).

Each of petitioner's objections will be separately analyzed.

## ANALYSIS

1.   THE MAGISTRATE JUDGE WAS UNDULY PREJUDICED AGAINST PETITIONER BY REFERRING TO HIM AS MR. PICARDI AS OPPOSED TO DR. PICARDI

Petitioner objects to the magistrate judge's decision to refer to him as Mr. Picardi as opposed to Dr. Picardi.   (Docket 34 at pp. 1-3).   He argues the magistrate judge engaged in "over-reaching" by not referring to him as Dr. Picardi.   Id. at p. 2.   Picardi acknowledges the South Dakota Board of Medical and Osteopathic Examiners revoked his license to practice medicine but claims "it did not require Dr. Picardi to cease using the term."   Id.   Picardi claims "[t]he magistrate appears to have gone out of its way to demote Petitioner in status . . . . It was improper for the magistrate to make this an issue and it was inappropriate to find against Dr. Picardi on the matter in the absence of clear authority justifying its position."   Id. at p. 2-3.

In footnote 1, the court addressed its finding about how to address petitioner throughout this order.   The magistrate judge went through the same process in developing the R&R.   (Docket 28 at p. 3 n.2).   The designation of a

7

title to petitioner throughout the report and this order does not suggest either the magistrate judge or the court is minimizing petitioner's right to have the content of his § 2255 Petition evaluated under the same criteria afforded to every other defendant who files a petition under § 2255. The court finds the magistrate judge gave petitioner the proper level of consideration of his § 2255 Petition.

Picardi's objection on this basis is overruled.

2.  THE MAGISTRATE JUDGE ERRED BY DISCOUNTING THE
    CREDIBILITY OF THE § 2255 PETITION AS AN UNSWORN
    DOCUMENT AND BECAUSE THE PETITION WAS NOT SUPPORTED
    BY DOCUMENTATION

The R&R "note[d] that Mr. Picardi's § 2255 motion is signed by him, but not under penalty of perjury. . . . Instead, he says the statements in the motion are true 'to the best of his knowledge and belief.' " (Docket 28 at pp. 83-84) (referencing Docket 1 at p. 31). Particularly addressing Picardi's claim of ineffective assistance of counsel regarding plea offers, which will be analyzed later in this order, the R&R observed Picardi's declaration was "a far cry from establishing the truth of the allegations concerning the plea offers. . . . It is curious to the court that Mr. Picardi provides none of these supporting documents to prove his claim." Id. at p. 84.

Petitioner objects to the magistrate judge's statement that the petition was signed by him, but not notarized. (Docket 34 at p. 3). He claims "[t]he magistrate notes this in such a way to cast doubt on the credibility of Dr. Picardi's allegations, particularly in regard to his ineffective assistance of counsel claims relating to the plea bargaining process. . . . The magistrate does not, in its

discussion of this matter, point to any claims made by Dr. Picardi that are demonstrably false or where the absence of a notary signature would have changed the court's analysis." Id. (referencing Docket 28 at pp. 83-84). He asserts "[t]o the extent the failure to notarize the Motion to Vacate is treated as an error by the district court, it should be treated as an error by habeas counsel, not Petitioner himself." Id. at p. 4.

Picardi contends he "did not err in failing to attach more documentation to his Motion to Vacate." Id. at p. 5. He submits "[t]he magistrate insinuates that Dr. Picardi fabricated the claim that he was offered a misdemeanor cooperation deal." Id. (referencing Docket 28 at 83-84). Petitioner argues "[t]he magistrate appears to be taking the position that it is a movant's burden to support his § 2255 claims with documentary evidence. Further, the tone of the magistrate's comments on the matter . . . suggests that it will determine a claim is false and subject to dismissal if documentary proof is not provided." Id. at p. 6 (referencing Docket 28 at p. 84). Petitioner argues whether he "was permitted to attach anything to his Motion to Vacate was only resolved conclusively by the magistrate a few pages before . . . fault[ing] Picardi for not attaching more." Id. (referencing Docket 28 at pp. 24-25). Petitioner claims he "met his burden . . . [and] provided a detailed recitation of facts supporting his claims in regard to the issue of plea negotiations, plea bargaining, and cooperation." Id. at p. 7.

Picardi submits the magistrate judge's demand "for documentary proof is also unnecessary in light of the facts . . . in this case . . . ." Id. Petitioner refers

to an October 27, 2011, motion hearing and an affidavit by Attorney Culotta in the criminal case.  Id. at p. 8 (referencing Dockets 34-11 and CR. Docket 130 ¶ 14).  According to Picardi, substantiation of his claim is bolstered by Attorney Van Norman's affidavit in this habeas proceeding.  Id. (referencing Docket 11 at p. 11).

What Picardi fails to acknowledge is that the magistrate judge appeared to be perplexed by his failure to produce any documentary evidence of a proffer agreement, plea discussions between his attorneys and government counsel, or a proposed plea agreement in response to the affidavits of Attorney Culotta and Attorney Van Norman.  See Dockets 11, 12, 25 and 28 at p. 84-86.  While supporting documentation was not necessary at the time the § 2255 Petition was filed, it was appropriate to expect petitioner to file plea offer documentation in response to the attorneys' affidavits and the government's brief.  The R&R addressed this deficiency:

> The court notes it is customary for the government to make all plea offers in writing, including queen-for-a-day proffer offers.  Here, Ms. Culotta was in Indiana and the prosecutor was in South Dakota, making it even more likely that any offers made were reduced to writing.  Furthermore, it is highly likely that Ms. Culotta's responses to the government and to Mr. Picardi, both of whom were in South Dakota, would also likely have been written responses.  It is curious to the court that Mr. Picardi provides none of these supporting documents to prove his claim. . . .

(Docket 28 at p. 84).

As the R&R points out, Picardi's § 2255 Petition asserted Attorney Culotta advised the trial court there was never a plea offer made to him.   Id.   The R&R expresses the frustration of the magistrate judge:

> Mr. Picardi does not enlighten this court as to which of the many hearings in his case this statement was made or even the date of the hearing.   He also stated that in a previously filed affidavit, Ms. Culotta stated the government had offered Picardi a misdemeanor plea that Picardi declined.   Again, Mr. Picardi does not tell the court the date of the affidavit or its location within the court's docket.

Id.   The R&R specifically discusses Attorney Culotta's August 8, 2012, affidavit. (Docket 28 at pp. 84-85) (referencing CR. Docket 130).   After incorporating a portion of Attorney Culotta's affidavit in the R&R, the magistrate judge expressed a final frustration with Picardi's presentation.   "This court is unable to verify that Ms. Culotta at some other time made a conflicting statement to the trial court in a hearing because of the lack of detail provided by Mr. Picardi."   Id. at p. 85.

In neither his § 2255 Petition nor his response to the government's motion to dismiss did Picardi disclose to the magistrate judge the date of Attorney Culotta's affidavit or its location in the CM/ECF index.   Id.   It was not until petitioner's objections to the R&R that Picardi clarified his earlier references were to the October 27, 2011, hearing and Attorney Culotta's August 8, 2012, affidavit.   See Docket 34-11[5] and CR. Docket 130.   Only as an exhibit to petitioner's objections to the R&R did Picardi disclose the existence of a proffer

---

[5]The complete transcript of the October 27, 2011, hearing attended by Picardi was filed on October 31, 2011, in the criminal case.   See CR. Docket 89.

agreement proposed by Assistant United States Attorney Robert Mandel. <u>See</u>
Docket 34-1. The proffer agreement was conveyed to Attorney Culotta on June
11, 2010, by Assistant United States Attorney Anna Forbes of the United States
Attorney's Office in the District of West Virginia.[6]  (Docket 34 at pp. 9-10)
(referencing Docket 34-2). The proffer agreement was not utilized by the
government and Picardi.

E-mails attached to Picardi's objections to the R&R addressed discussions
between AUSA Forbes and Attorney Culotta and her discussions with Picardi
regarding the proffer agreement and plea negotiations. (Dockets 34-2 through
34-7 & 34-9). These e-mails were not presented to the magistrate judge for
consideration in evaluating Picardi's § 2255 petition and the government's
motion to dismiss.

While Picardi was not required to attach documentary evidence in support
of his § 2255 petition, it is customary in the District of South Dakota to permit
petitioners to attach documents to their petition and to provide the court with
specific references as to where significant evidence can be located in response to
the government's submission. The R&R discusses the rules regarding the
attachment of exhibits in § 2255 proceedings. (Docket 28 at pp. 23-24). "The
court believes Mr. Picardi's reading of 2255 Rule 4(b) is correct: that rule
contemplates that exhibits may be submitted with a 2255 motion to explain the

---

[6]AUSA Forbes prosecuted Anthony Kritt, the attorney who developed the
employee-leasing plan used by Picardi, and Dr. Randy Brodnik, another of
Attorney Kritt's clients. <u>See</u> <u>United States v. Brodnik and Kritt</u>, Crim. No.
01:09-0067 (S.D.W.V. 2009).

movant's claims for relief and the court may consider those exhibits in its initial review of the motion." Id. at p. 24 (emphasis omitted).

Picardi specifically argued for consideration of the Colvin Letter and a United States Senate subcommittee report, *Tax Haven Abuses: The Enablers, The Tools and Secrecy*, which were attached to his initial § 2255 submission. See Dockets 1-1 and 1-2 (some capitalization omitted). It would have been beneficial to the analysis of the § 2255 petition had Picardi provided to the magistrate judge the documents attached to his objections. The court finds the magistrate judge's comments do not constitute error and do not impact the ultimate conclusion of the R&R. Petitioner's second objection to the R&R is overruled.

  3.  THE MAGISTRATE JUDGE ERRED BY CONFUSING THE IDENTITY
      OF THE ENTITIES ENGAGED IN THE FINANCIAL TRANSACTIONS
      EVIDENCED AT TRIAL

Petitioner objects to the R&R on the basis the magistrate judge erroneously "meld[ed] . . . entities and . . . this mistake incorrectly led [the magistrate judge] to conclude that there was overwhelming evidence of guilt established at trial." (Docket 34 at p. 24) (referencing Docket 28 at p. 77). Picardi contends that "although the indictment refers to E & S International, Limited, the magistrate summarizes the charges as being based on Dr. Picardi routing income through various entities, with the bulk of the funds ending up in the 'E & S Trust.'. . . This is not the case and not supported by the record. The funds remained in other entities; there is no evidence that they were ever

13

transferred to the E & S Trust." Id. (referencing Docket 28 at p. 3) (referencing CR. Docket 141).

Picardi argues "[w]hen identifying evidence of Dr. Picardi's control over assets, the magistrate asserts that: the E & S Trust was where deferred income was deposited after being channeled through intermediate entities; that a $1,200,000.00 line of credit was tied or secured by the E & S Trust; that Picardi transferred $200,000.00 out of the E & S Trust and then deposited it back into the trust; and, that Picardi had access to information about the trust's investments." (Docket 34 at pp. 24-25) (referencing Docket 28 at pp. 6-7, 13-14, 60 & 81). Petitioner submits "[t]hose assertions — which the magistrate identifies as overwhelming evidence of control . . . — are not accurate. The government never presented evidence that Picardi took loans, secured lines of credit, or transferred money in and out of the E & S Trust." Id. at p. 25 (referencing Docket 28 at pp. 70, 79, 83-84 & 94; further referencing by way of example, CR. Docket 220 at p. 166) (discussing loan arrangements between E & S International, Limited, and Associated Enterprises, Ltd. ("AEL")). He argues "[w]hat the government did, in order to confuse and deceive the jury, was talk about transfers of money and loans and lines of credit in and out of AEL, the Royal Bank of Scotland, and E & S International, Limited. Then, the government talked about Dr. Picardi's control over the E & S Trust. It did this so the jury would infer that these were all one and the same, and that control over the trust equated with control over the other entities." Id. at p. 26. Picardi

contends "[t]his appears to be the erroneous inference also drawn by the magistrate."  Id.  Picardi argues this was "not a harmless mistake.  It led the magistrate to impute evidence of Dr. Picardi's control over the E & S Trust to transactions involving E & S International, Limited, and other organizations." Id.

TRIAL EVIDENCE

IRS Special Agent Christopher Wright described the employment contract between Picardi and Montrain Services, Limited, ("Montrain") of Dublin, Ireland. See CR. Docket 222 at pp. 120:14-127:15 and Trial Exhibit 75.  One provision of the employment agreement was that Picardi could not "encumber, commute, borrow against, dispose of, or [as]sign the right to receive . . . payments" from any funds received by Montrain.  (CR. Docket 220 at p. 126:13-20) (referencing Trial Exhibit 75, Appendix A ¶ 10(F)).

Agent Wright explained that after funds were received by Montrain the money passed through a number of foreign entities before ending up in an account in E & S International, Ltd.  Id. at pp. 109:4-110:9.  E & S International, Ltd., was created on the Caribbean island of Nevis.  Id. at p. 110:8-11.  E & S International Trust is a separate company formed in New Zealand.  Id. at p. 110:12-14.  Picardi and his wife are the sole stockholders and principal beneficiaries of E & S International Trust which owns the stock of E & S International, Ltd.  Id. at p. 110:12-25; see also Trial Exhibit 224.  Elfin

Trust Company Limited was the trustee of E & S International Trust.[7]   (CR.

Docket 220 at p. 158:8-10; Trial Exhibits 224 at p. 2 and 239 at pp. 4505 &

4511-12).

Agent Wright testified that in June 1996, before funds began to flow to

Montrain, Picardi was asking Attorney Kritt about gaining access to the money

through E & S International Trust.   (CR. Docket 220 at pp. 130:11-132:9)

(referencing Trial Exhibit 62).   In the letter Picardi confirmed receiving $2,500

from Morne' deVilliers to be delivered to the trustee of E & S International Trust

and used as the initial corpus of the trust.   (Trial Exhibit 62 at p. 1).   Picardi

also expresses reservations to Attorney Kritt about Picardi's relationship to the

"IBC and no specifics on how access is gained to the funds in the IBC."[8]   Id. at

p. 2.   In a June 11, 1996, letter marked "CONFIDENTIAL ATTORNEY/CLIENT

PRIVILEGED COMMUNICATION" Attorney Kritt cautioned Picardi about being

directly involved in the creation of the trust:

> I would not recommend that you use the statement that you drew
> up.   The reason a foreign grantor is used is to avoid the Controlled
> Foreign Corporation rules.   The only way that the IRS can attack
> the Foreign Trust is to attack the legitimacy of the grantor.   If
> questioned, we will be required to demonstrate that this trust was
> created by Morne's independent act.   It is crucial that there is a
> source document that verifies that the trust was funded by Morne'.
> Rightly or wrongly, the IRS would contend that the note you drafted
> is self serving.

---

[7]Elfin Trust Company later became Blenheim Fiduciary Group Limited.
(CR. Docket 220 at pp.157:24-158:14; see also Trial Exhibit 176 at p. 1).

[8]IBC stands for "International Business Corporation," in this case E & S
International, Ltd.   (CR. Docket 220 at p. 105:13-18).

(Trial Exhibit 313 at p. 1) (capitalization in original). In the end, Mr. deVilliers did not set up E & S International Trust, but rather Picardi established the trust through Shane Quinn, a friend in New Zealand. (CR. Docket 220 at pp. 132:12-134:13; Trial Exhibit 224).

In his June 11, 1996, letter Attorney Kritt advised Picardi:

Montrain will invest the money however you like (within reason), including putting the funds in an IBC whose stock is owned by the E & S International Trust. . . .

I caution you about referring to these funds as yours. Because of tax laws, these funds are yours only when you are entitled to withdraw them according to your employment agreement with Montrain. You will be able to borrow these funds prior to the withdrawal date contained in the employment agreement if you so desire. . . .

The IBC's stock is owned by the E & S International Trust. You, of course, are the primary beneficiary of the E & S International Trust, you have the right to remove and replace its trustees and the power to appoint the property of the trust upon your death. Consequently, you have control of the trust, and being in control of the trust, you have control of any corporation in which the trust owns the equity.

(Trial Exhibit 313 at p. 3) (parenthesis in original). Agent Wright considered Attorney Kritt's explanation as confirmation that Picardi controlled the corporation which owned the accounts. (CR. Docket 220 at p. 160:14-16).

The trust agreement between Elfin Trust Company and E & S International Trust established on November 18, 1996, specifically provided that "for so long as he is alive, the named Beneficiary, Edward J. Picardi, is empowered to remove, and replace any Trustee with or without cause at any time in his sole and absolute discretion without the consent of the Trustee or of any court of law or of

17

any other person or entity." (Trial Exhibit 224, Article VI(C)(3)) (bold omitted). In the event of Picardi's death, his wife Sandra retained the same rights of removal and replacement of the trustee. Id. The trust agreement authorized the trustee to "enter into financial transactions with . . . [and] may loan Trust assets to any Beneficiary, with or without security and with or without interest, or at below-market interest rates, for a period not to exceed the term of the Trust." Id. at Article V(B).

Agent Wright explained that once Picardi's money found its way into the account of E & S International it would create a loan with AEL on the Isle of Man, which in turn set up a line of credit for Picardi and Oak Ridge Ranch, LLC, which is owned by Picardi. (CR. Docket 220 at pp. 112:16-113:6). Picardi's line of credit was for $700,000 and the line of credit for Oak Ridge Ranch, LLC, was $500,000. Id. at p. 113:22-25. Picardi drew $250,000 from his line of credit and Oak Ridge Ranch, LLC, drew $150,000 from its line of credit. Id. at p. 114:14-21.

The first of Picardi's draws on his line of credit occurred before E & S International Trust was established. Id. at pp. 163:23-164:9; see also Trial Exhibits 95-98. The funds were directed into Picardi's US Bank account in Rapid City, South Dakota. (CR. Docket 220 at pp. 166:21-166:25 (referencing Trial Exhibits 98 & 99) and pp. 173:4-174:22 and 175:1-21) (referencing Trial Exhibits 314 & 202). Picardi thanked Attorney Kritt for expediting the line of credit and asked for confirmation that any interest payments, after deducting

AEL's fee, would be placed in E & S International.   (Trial Exhibit 100) (Picardi's inquiry did not specifically reference E & S International, Ltd., or E & S International Trust).

Picardi executed the certificate of organization of Oak Ridge Ranch, LLC, on July 16, 2002.   (Trial Exhibit 168).   The draw on the line of credit for Oak Ridge Ranch occurred on July 16, 2002, but the paperwork for the transaction was not completed until December 2007.   (CR. Docket 220 at pp. 181:8-182:16 and 183:5-25) (referencing Trial Exhibits 217 & 251).

Agent Wright confirmed that Picardi's interest payments went back into E & S International, Ltd.   Id. at p. 176:12-177:13 (referencing Trial Exhibit 256). Picardi took an IRS mortgage interest deduction for these payments on his tax returns.   (CR. Docket 221 at p. 20:1-14).   See also Exhibits 6 (1998 tax return, Schedule A ¶ 11); 7 (1999 tax return, Schedule A ¶ 11); and 8 (2000 tax return, Schedule A ¶ 11).   Because Picardi was not paying principal and interest payments on the loans, the year-end loan balances in AEL's accounts were higher than at the beginning of the year.   (CR. Docket 221 at p. 45:13-46:9) (referencing Trial Exhibit 161).   AEL originally borrowed the money from E & S International, Ltd., and then lent the money back to it, so that as of December 31, 2002, E & S International, Ltd., had $389,036 in loans receivables on its balance sheet.   Id. at p. 50:21-25 (referencing Trial Exhibit 245 at p. 6786).   Of the $400,000 in loans to Picardi and Oak Ridge Ranch, LLC, as of December 31, 2002, he had only paid back principal of approximately $11,000.   Id. at

p. 51:1-9.   Agent Wright prepared a graph to illustrate of the balances due to E & S International, Ltd., from 1997 through 2007.   (Trial Exhibit 316).

Another example of Picardi's control over the funds in E & S International, Ltd., involved a plan to protect his property in South Africa.   In February 2000, Picardi wrote Attorney Kritt advising him of the plan to liquidate Picardi's hunting reserve, Onbedacht.   (Trial Exhibit 147).   In the event no bidders showed up for the property auction, Picardi wanted a representative at the auction.   Id.   If successful, Picardi planned to take the property as a purchaser, as opposed to remaining only the liquating owner whose money would be subject to creditors' claims.   Id.   To accomplish this plan, Picardi intended to take out a $150,000 to $200,000 loan from E & S International and have the money wired to a Republic of South Africa bank account.   Id.   On May 6, 2000, Picardi directed Charles Freeman, one of the directors of E & S International, Ltd., to transfer $200,000 to set up his bid.   (Trial Exhibit 148).   In the same letter, Picardi stated to his bidder that "E and S International Limited wants to purchase [the real estate in the Province of the West Cape of South Africa]" under specific terms and conditions.   Id.

Agent Wright explained the money trail from E & S International, Ltd., to a Royal Bank of Scotland account in South Africa.   (CR. Docket 221 at pp. 34:10-36:19 (referencing Trial Exhibit 149).   AEL was not used as an intermediary in this transaction.   Id. at p. 37:1-3.   When the purchase of the property fell through, Picardi's South African agent deducted the fees and

expenses incurred for communicating with Picardi and traveling to the auction site.   (Trial Exhibit 149).   The remaining funds were redeposited to the Royal Bank of Scotland account of E & S International, Ltd.   Id. at p. 36:13-25 (referencing Trial Exhibit 149).

During the trial government counsel and Agent Wright used "E & S" as a phrase for E & S International, Ltd., or E & S International Trust depending on the context of the questions posed.   See CR. Docket 222 at pp. 106:3-25; Id. at pp. 110:12-111:6; Id. at pp. 171:14-172:19; Id. at p. 178:4-19 (referencing Trial Exhibit 218); Id. at pp. 179:13-180:9 (referencing Trial Exhibit 223); 193:2-194:1 (referencing Trial Exhibit 76); CR. Docket 221 at p. 20:11-13; Id. at p. 26:14-25; Id. at p. 31:11-16; Id. at pp. 32:23-33:4; Id. at p. 43:16-19 (referencing Trial Exhibit 151); Id. at p. 44:21-23; Id. at p. 46:10-16; Id. at p. 47:10-23; Id. at p. 48:9-12; Id. at p. 49:4-13; Id. at pp. 50:23-51:4; CR. Docket 222 at p. 146:21-24; CR. Docket 223 at p. 110:9-12; Id., at p. 111:13-17; Id. at p. 113:5-7; Id. at p. 115:12-7 & 20-22; Id. at p. 116:12-16; Id. at p. 118:3-10; CR. Docket 224 at pp. 137:22-138:2; Id. at p. 139:7-16; Id. at p. 140:11-21 (referencing Trial Exhibit 293); Id. at p. 141:6-8 (referencing Trial Exhibit 293); Id. at pp. 142:9-143:10; Id. at p. 146:6-13; CR. Docket 229 at p. 113:14-25; Id. at p. 114:12-13; Id. at p. 117:12-14.

 Government counsel continued this phrasing with IRS Senior Revenue Agent Marie Allen.   (CR. Docket 224 at pp. 58:19-59:7 (referencing Trial Exhibit 188); Id. at p. 60:12-18 (referencing Trial Exhibit 188); Id. at p.71:1-22

(referencing Trial Exhibit 69); Id. at pp. 72:12-73:14 (referencing Trial Exhibit 69); Id. at p. 126:11-13.   The government also used this phrasing in its cross-examination of Mr. Brennan, Ms. Lecy and Picardi.   (CR. Docket 228 at p. 88:7-11; Id at p. 152:6-8; CR. Docket 229 at p. 96:1-17; Id. at p. 97:8-11; Id. at p. 109:18-19).

Attorney Culotta used E & S Trust as a reference to E & S International Trust.   See CR. Docket 223 at p. 3:17-19 (referencing Trial Exhibit 224).   She used E & S as a reference to E & S International, Ltd.   (CR. Docket 222 at p. 156:17-19 (referencing Trial Exhibit 218); CR. Docket 224 at p.71:1-22 (referencing Trial Exhibit 69); Id. at pp. 72:12-73:14 (referencing Trial Exhibit 69); CR. Docket 228 at p. 59:15-20; Docket 228 at pp. 74:24-75:4; Id. at p. 77:14-16.   Defense witness John Brennan used E & S as a reference to E & S International, Ltd.   (CR. Docket 228 at p. 74:1-9; Id. at p. 102:5-8).   Picardi used E & S Trust as a reference to E & S International Trust.   (CR. Docket 221 at p. 43:16-19) (referencing Trial Exhibit 151); CR. Docket 222 at p. 150:8-15 (referencing Trial Exhibit 613); CR. Docket 224 at p. 59:4-7 (referencing Trial Exhibit 188).

Against the more detailed summary of the trial evidence described above, it is somewhat confusing that the magistrate judge used an even more general designation of E & S Trust to explain the trail of Picardi's money.   It is clear from the overall content of the R&R that the magistrate judge grasped the relationship between E & S International, Ltd., E & S International Trust and Picardi.

Petitioner objects to the statement of the magistrate judge "that 'Picardi testified he knew the money funding his loans would come from the E & S trust and, when he repaid the loans, all but 1% of the repayments would go back into E & S.'" (Docket 34 at p. 28) (referencing Docket 28 at pp. 96-97). In response to government counsel's question about money coming back to the E & S [International, Ltd.] accounts, Picardi's testimony was vague: "[i]t was my understanding that there was funds from the pension would be placed in escrow into a pool by this company [AEL] . . . and that loans would be available through the agreements that were made . . . . At the seminar they explained the loan interest, some of it, would go back into the International Business Corporation [E & S International, Ltd.]." (CR. Docket 229 at p. 96:1-14). Picardi denied owning E & S International, Ltd. "[T]hat's not mine, it's the business—it's the international corporation that they set up. . . . they set up the business corporation; I only found it afterwards because they used the same letters I did in my trust." Id. at p. 96:16-22. Picardi claimed "[i]t's always been a blur to me . . . ." Id. at p. 96:24.

Petitioner also objects to the magistrate judge's statement that "Picardi 'testified that wiring the money to South Africa from the E & S Trust was Mr. Kritt's plan.'" (Docket 34 at p. 28) (referencing Docket 28 at p. 13). Picardi claims he did not say this as he testified "the money used to facilitate the South African transaction came from Elfin, an overseas bank." Id. (referencing CR. Docket 229 at pp. 51-52). Picardi did testify the money would go through Elfin

to the South African bank account.   Id. at p. 51:21-25.   The objection to the

R&R is disingenuous as Elfin Trust Company Limited was the trustee of E & S

International Trust.   (Trial Exhibit 224).   Picardi knew he and his wife were the

only shareholders in E & S International, Ltd., that they were the primary

beneficiaries of E & S International Trust and that he ultimately controlled the

trust.   (Trial Exhibit 313 at p. 3).

While E & S International Trust and E & S International, Ltd., are not one

and the same entity, they are closely-held companies because Picardi and his

wife owned all the stock in both, they were the principal beneficiaries of the trust

and they were to receive all financial benefit derived from both companies.   The

trial evidence proved Picardi had authority over and exercised control of E & S

International Trust and E & S International, Ltd.   Contrary to petitioner's

assertion, the government did not confuse or deceive the jury.   The

overwhelming weight of the evidence established beyond a reasonable doubt

Picardi's guilt as to all 13 counts of conviction.

For clarity, the factual references in the R&R are modified to be consistent

with the factual summary above.   Petitioner's third objection to the R&R is

overruled.

4.     THE MAGISTRATE JUDGE ERRED BY FINDING PETITIONER'S
       CHALLENGE TO THE TAX LAWS AS VOID FOR VAGUENESS WAS
       PROCEDURALLY DEFAULTED

The magistrate judge found Picardi did not raise the issue "that the tax

laws he was convicted under violated his Due Process rights under the Fifth

Amendment because they were void for vagueness. Mr. Picardi did not raise this issue before the district court, nor did he raise it on direct appeal to the Eighth Circuit." (Docket 28 at p. 26). The magistrate judge found Picardi raised a "related issue of whether the jury should have been instructed on the void for vagueness theory, but that is different from affirmatively arguing that a law is unconstitutional because it is void for vagueness." Id. Because he failed to raise the constitutional challenge in the direct appeal, the magistrate judge found "Picardi procedurally defaulted this issue . . . ." Id.

Picardi contends "he did not procedurally default on this issue because the issue was fairly presented to the district court and Court of Appeals during the pendency of the criminal case." (Docket 34 at p. 31). He asserts that during trial he "alleged that the tax laws at issue in his case were vague." Id. (referencing CR. Dockets 154 at p. 15 and 230 at p. 37). Petitioner claims "he presented the issue through a proposed jury instruction, which was rejected by the district court." Id. (referencing CR. Docket 230 at p. 37). Picardi submits his argument is strengthened because he "appeal[ed] the district court's denial of his [proposed] instruction." Id. at p. 32. Petitioner acknowledges the United States Court of Appeals for the Eighth Circuit "rejected this approach. . . . The Court held that this matter should have been brought up as a legal argument prior to trial, presumably in the form of a motion to dismiss." Id. at p. 33 (citing Picardi, 739 F.3d at 1126).

Picardi argues "[a] claim has been fairly presented if the operative facts and legal theories upon which a habeas claim is based were previously presented to the underlying courts." Id. (referencing Tamapua v. Shimoda, 796 F.2d 261, 262 (9th Cir. 1986); Peltier v. Henman, 997 F.2d 461, 473 (8th Cir. 1993)). Petitioner submits he "presented the operative facts and legal theories on direct appeal by challenging the district court's denial of his jury instruction. This was the only preserved manner in which the substance of Picardi's claim could be addressed. The substance of the issue was presented to the Court of Appeals." Id.

Petitioner's citation to Peltier as authority for raising the void-for-vagueness constitutional claim is misplaced. Peltier dealt with a successive federal habeas petition. "Insofar as Peltier's section 2255 motion raises . . . four issues, it constituted an abuse of the proceedings because Peltier could and should have raised those issues in his first section 2255 proceeding. Thus, under [McCleskey v. Zant, 499 U.S. 467 (1991)], his failure to do so there justified the district court's refusal to consider those issues in the present proceeding." Peltier, 997 F.2d at 473. Peltier offers no guidance for analyzing a procedural default claim of the nature presented in Picardi's case. If anything, Peltier supports the court's conclusion that Picardi's failure to raise the void-for-vagueness claim is procedurally defaulted.

Petitioner's reliance on Tamapua suffers an even worse fate. The decision was first abrogated on other grounds by Duncan v. Henry, 513 U.S. 364 (1995)

26

(*per curiam*), and then abrogated by the United States Court of Appeals for the Ninth Circuit in <u>McMonagle v. Meyer</u>, 802 F.3d 1093, 1098 (9th Cir. 2015).

The magistrate judge analyzed the issue under the proper legal standard. "Section 2255 movants are generally precluded from asserting claims that they failed to raise on direct appeal." (Docket 28 at p. 26) (referencing <u>United States v. Frady</u>, 456 U.S. 152, 167-68 (1982); <u>McNeal v. United States</u>, 249 F.3d 747, 749 (8th Cir. 2001)). "When a § 2255 petitioner asserts a claim that is procedurally defaulted because it was not raised on direct appeal, the claim can only proceed after the petitioner has shown either: (1) actual innocence or (2) that the procedural default should be excused because there was both cause for the default and actual prejudice to the petitioner." <u>Id.</u> at p. 21 (referencing <u>Bousley v. United States</u>, 523 U.S. 614, 621-22 (1998); <u>McNeal</u>, 249 F.3d at 749). "The requirement of cause . . . is based on the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief . . . ." <u>Id.</u> at p. 27 (citing <u>Cornman v. Armontrout</u>, 959 F.2d 727, 729 (8th Cir. 1992)). "A demonstration of the 'cause' element of the cause and prejudice test 'must be something external to the petitioner' that 'impeded' the petitioner's efforts." <u>Id.</u> (citing <u>Coleman v. Thompson</u>, 501 U.S. 722, 753 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986)). The magistrate judge found Picardi did not demonstrate the "cause" element, so "prejudice need not be analyzed." <u>Id.</u> at p. 27.

Gleaning the fair representation standard from a review of petitions filed under 28 U.S.C. § 2254, courts are very particular as to what a petitioner must have raised in the earlier proceeding in order to preserve an issue for consideration in a federal habeas proceeding. In order to present a federal habeas petition "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts . . . . In addition, the habeas petitioner must have 'fairly presented' . . . the 'substance' of his federal habeas corpus claim." Anderson v. Harless, 459 U.S. 4, 6 (1982) (*per curiam*) (internal citations omitted). Presenting a claim to the district court that is merely similar to the federal habeas claim is insufficient to meet the fairly presented requirement. Duncan, 513 U.S. at 365-66 ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.") (referencing Harless, 459 U.S. 4). "Both [Picard v. Connor, 404 U.S. 270 (1971)] and Harless emphasized that mere similarity of claims is insufficient to exhaust." Id. at 366 (referencing Picard, 404 U.S. at 276; Harless, 459 U.S. at 6). "[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." Gray v. Netherland, 518 U.S. 152, 163 (1996).

"To avoid a procedural default, the habeas petitioner must fairly present his claim to the [lower] court, that is, he must 'present the same facts and legal theories to the state court that he later presents to the federal [habeas] court[].'" Morris v. Norris, 83 F.3d 268, 270 (8th Cir. 1996) (citing Jones v. Jerrison, 20 F.3d 849, 854 (8th Cir. 1994)). "[H]abeas petitioners must have explicitly cited to the United States Constitution or federal case law in their direct appeal to preserve federal [habeas] review." Id. (citing Luton v. Grandison, 44 F.3d 626, 628 (8th Cir. 1994); referencing Duncan, 513 U.S. 364).

"In this circuit, to satisfy the 'fairly presented' requirement, [a habeas petitioner is] required to 'refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a . . . case raising a pertinent federal constitutional issue' in the [lower] court." Abdullah v. Groose, 75 F.3d 408, 411-12 (8th Cir. 1996) (citing Ashker v. Leapley, 5 F.3d 1178, 1179 (8th Cir. 1993) (internal quotation and citation omitted). "[P]resenting a claim to the [lower] court[] that is merely similar to the federal habeas claim is insufficient to satisfy the fairly presented requirement." Id. (referencing Duncan, 513 U.S. 364). "The legal basis for a claim presented in [lower] court must be 'the substantial equivalent' of that relied upon in the federal petition." Satter v. Class, 976 F. Supp. 879, 887 (D.S.D. 1997) (referencing Picard, 404 U.S. at 278; Schneider v. Delo, 85 F.3d 335, 339 (8th Cir. 1996)).

Picardi's assertion that his proposed jury instruction number nine fairly presented the issue now before the court on a void-for-vagueness constitutional claim is misplaced. The proposed instruction read in its entirety as follows:

DEFINITION OF UNSETTLED LAW

Where the tax law is vague or highly debatable, a defendant lacks the requisite intent to violate it. Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal.

A defendant cannot be guilty of willfully evading and defeating income tax when the law surrounding the deductibility of certain expenses is unsettled and there is no direct authority pointing to a ready answer. The tax law is "unsettled" where individuals could plausibly reach directly opposing, reasonable and well-supported, conclusions regarding the law's interpretation.

See CR. Dockets 154 at p. 15. Picardi's presentation to the trial court during the settlement of instructions conference made no mention of a constitutional claim.

MR. VAN NORMAN: The only instruction that we would still ask the Court to consider is our proposed jury instruction 9, definition of unsettled law.
. . .
MR. VAN NORMAN: Your Honor, I think that part of what we have done this morning exemplifies that, and I think it helps the jury to understand that there is a huge deal of confusion and difficulty with common citizens dealing with the tax code, including CPAs and attorneys who hold themselves out as experts. That's the basis for our request.
. . .
THE COURT: I did look at this instruction; we studied it. It's not a pattern instruction, but it's drawn from case law. As long as it's drawn from cases that defense counsel cited, there's not in any of those cases that I could see an approved instruction. I understand

30

the source and I understand the request.   I am going to refuse
defense's proposed instruction 9.

(CR. Docket 230 at pp. 36:20-23, 37:3-9 & 13-19).

In the direct appeal, the Eighth Circuit addressed Picardi's appeal of the

trial court's refusal to incorporate proposed instruction number nine in the

court's instructions to the jury.

> Picardi argues that the district court abused its discretion by
> refusing to give his proposed theory-of-defense instruction, which
> stated that a defendant could not form the requisite intent to violate
> a vague or highly debatable tax law. . . .   Picardi's proposed
> theory-of-defense instruction presents an issue reserved for the
> court because the question of whether a tax law is void for
> vagueness is a question of law for the court to decide, not the jury.
> United States v. Mallas, 762 F.2d 361, 364 n.4 (4th Cir. 1985); see
> id. ("The uncertainty of a tax law, like all questions of vagueness, is
> decided by the court as an issue of law."); see also Hiland [v.
> Carter-Glogau Laboratories, Inc.], 909 F.2d [1114,] 1127 n.17 [(8th
> Cir. 1990)] ("The issue whether the vagueness doctrine precluded
> conviction of [the defendant] . . . presented a question of law for the
> court to decide, not the jury.").   Therefore, the district court did not
> abuse its discretion by refusing to give Picardi's proposed
> instruction.   See United States v. House, 684 F.3d 1173,
> 1207 (11th Cir. 2012) (finding no abuse of discretion where the
> district court refused to give the defendant's instruction because
> "the issue of whether a [law] is void for vagueness is a question of law
> for the court to determine" (alteration in original) (quoting United
> States v. Paradies, 98 F.3d 1266, 1284 (11th Cir. 1996)).

Picardi, 739 F.3d at 1126-27.

The fact that the appellate court referenced a process by which a potential

constitutional claim must be handled does not satisfy the requirement that the

defendant, now petitioner, must have "refer[red] to a specific federal

constitutional right, a particular constitutional provision, a federal

constitutional case, or a . . . case raising a pertinent federal constitutional issue"

31

at the trial court level. <u>Abdullah</u>, 75 F.3d at 411-12 (internal citation and quotation marks omitted). Picardi's proposed jury instruction on unsettled law does not "satisfy the fairly presented requirement." <u>Id.</u> "The legal basis for [the] claim presented" to the trial court was not "the substantial equivalent of that relied upon in the federal petition." <u>Satter</u>, 976 F. Supp. at 887 (internal citation and quotation marks omitted).

Picardi procedurally defaulted on the void-for-vagueness claim by failing to raise it in the direct appeal. Picardi did not object to the magistrate judge's analysis of his failure to show cause and prejudice to overcome the procedural default bar. <u>Compare</u> Dockets 28 at pp. 26-27 and 34 at pp. 31-34. Picardi does not claim actual innocence as an alternative basis for asking the court to excuse his default. <u>Compare</u> Dockets 28 at pp. 28-29 and 34 at pp. 31-34.

Even if the court were to find that the proposed jury instruction fairly represented the void-for-vagueness claim, Picardi's claim for relief must be denied. The R&R analyzed the law applicable to such a constitutional challenge. (Docket 28 at pp. 31-43). The R&R concluded that "[n]either in general terms, nor in specific arguments tied to each statute [of conviction], . . . has Mr. Picardi demonstrated that such an argument . . . could have been successful." Picardi did not challenge this finding. (Docket 34).

Petitioner's fourth objection to the R&R is overruled.

5. THE MAGISTRATE JUDGE ERRED BY FAILING TO FIND
   PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL
   AT TRIAL

Before Picardi's § 2255 Petition claims of ineffective assistance of counsel could be evaluated, the magistrate judge required him to execute waivers of the attorney-client privilege in order to permit counsel to respond by affidavit to the allegations of the petition. (Docket 6 at p. 5 ¶ B). Picardi filed the attorney-client privilege waivers. (Dockets 8-9). Attorneys Robert Van Norman and Jennifer Culotta filed affidavits in response to Picardi's § 2255 Petition. (Dockets 11-12).

Petitioner does not challenge the magistrate judge's recitation of the standard by which a court is required to judge a § 2255 Petition claim of ineffective assistance of counsel. (Docket 34). The court incorporates the Strickland v. Washington, 466 U.S. 668 (1984), standard and related case authority developed in the R&R. (Docket 28 at pp. 29-31).

The R&R analyzed and denied Picardi's 14 claims of ineffective assistance of counsel. (Docket 28 at pp. 29-96). Picardi's objection challenges six of those findings. (Docket 34 at pp. 3-21 and 34-63). His objections center around two main issues: (1) the testimony of IRS Agent Marie Allen and (2) the plea agreement offers of the government. Picardi's objections will be individually addressed under these two topics.

1.    IRS AGENT MARIE ALLEN

Picardi's objections assert the magistrate judge erred in recommending dismissal of his ineffective assistance of counsel claims.   Petitioner argues he did not receive effective assistance from his attorneys in their handling of the testimony of the government's witness, IRS Agent Marie Allen.   (Docket 34 at pp. 34-63).   Picardi's objections focus on his belief counsel failed to file a pretrial motion *in limine* to restrict Agent Allen's testimony and failed to effectively cross-examine the agent regarding state of mind testimony and the interlocking issues of constructive receipt of income and control of the trust.

A.    Failure to File a Motion *in Limine*

In advance of trial, the government filed a notice of its intention to use expert witnesses.   (CR. Docket 77).   The government's three intended expert witnesses were Marie Allen, Christopher Wright and Kristy Morgan.   Id.   Ms. Allen is an Internal Revenue Agent with the IRS.   Id. at p. 1.   The government's notice indicated that "[i]n the process of conducting audits of offshore employee leasing arrangements, [Agent Allen] has issued treaty requests from different countries, including Ireland.   Her expertise of offshore employee leasing arrangements is based on the investigations she has conducted as an Abusive Tax Avoidance Transaction Agent with the Internal Revenue Service, as well as her knowledge, training, and experience . . . ."   Id.   Agent Allen's areas of testimony were anticipated to include:

1.    Ms. Allen will testify regarding offshore employee leasing programs and the structure of a legitimate arrangement.   Her

testimony will include an explanation of the rules for a legitimate offshore employee leasing program. Ms. Allen will testify as to how the arrangement by the Defendant does not abide by the rules of a legitimate offshore employee leasing program.

2.     Ms. Allen will testify as to the lack of economic substance to a transaction when, before and after the event, there is no change in how one party has control over his or her money.

3.     Ms. Allen will testify as to the lack of business reality to a transaction when there is no compliance with business dealings and rules, such as contracts and employer-employee relations.

4.     Ms. Allen will testify regarding the concept of cash-basis taxpayers, and regarding the occurrence of a "taxable event." She will also testify as to the concept of constructive receipt.

5.     Ms. Allen will testify as to the concept of a deferred compensation program, and the proper reporting when the deferred compensation program is legitimate.

6.     Ms. Allen will testify regarding aspects of trusts, including the general purposes for forming a trust. She will also testify as to the legal protection that helps a trust achieve these purposes. Finally, she will testify to certain legal requirements of a proper trust, including that the trust have a settlor, a trustee, and a beneficiary.

7.     Ms. Allen will testify regarding "true debt," and the five factors of true debt. She will testify as to distinguishing between loan transactions that are true debt and those that are income.

8.     Ms. Allen will testify about reporting requirements, if any, imposed on foreign banks and investment companies to report to the United States Government regarding accounts held by United States citizens.

9.     Ms. Allen will testify to the computation of the amount of taxes owed by the Defendant.

Id. at pp. 2-3.   Agent Allen's curriculum vitae indicated she holds a master's degree in business administration ("MBA"), is a certified public accountant ("CPA") and a certified fraud examiner.   (CR. Docket 77-1).   Ten days prior to trial the government filed a brief "to assist the Court with issues that may arise during trial."   (CR. Docket 162 at p. 1).   The trial brief discussed the anticipated testimony of Agent Allen under Fed. R. Evid. 702.   Id. at pp. 16-17.

The R&R concluded the government's "brief accurately set forth the applicable law."   (Docket 28 at p. 64) (referencing United States v. Stadtmauer, 620 F.3d 238, 269 (3d Cir. 2010) (citing United States v. Mikutowicz, 365 F.3d 65, 72 (1st Cir. 2004); (referencing United States v. Bedford, 536 F.3d 1148, 1158 (10th Cir. 2008); United States v. Duncan, 42 F.3d 97, 101-02 (2d Cir. 1994); United States v. Pree, 408 F.3d 855, 869-70 (7th Cir. 2005); and United States v. Moore, 997 F.2d 55, 58 (5th Cir. 1993) (referencing United States v. Mohney, 949 F.2d 1397, 1406 (6th Cir. 1992); United States v. Bosch, 914 F.2d 1239 (9th Cir.1990); United States v. Barnette, 800 F.2d 1558 (11th Cir. 1986)). The magistrate judge concluded that based on the applicable case law "there was nothing to object to pretrial concerning the government's proposed use of Agent Allen at trial."   Even if Agent Allen's testimony was "objectionable . . . it did not prejudice Mr. Picardi."   Id.

Picardi objects to the magistrate judge's conclusion.   He claims that while "[t]here is no dispute that Rule 702 allows for expert testimony in matters of specialized knowledge. . . . [T]here is no rule of evidence that allows an expert

witness like an IRS agent to usurp the role of the judge in defining a legal term [constructive receipt], then rendering an opinion that the defendant's conduct met that definition." (Docket 34 at p. 40). Picardi argues his trial counsel "should have been prepared to prevent Allen from stating a legal definition and then declaring that [his] conduct satisfied that definition." Id. Petitioner asserts the magistrate judge's view the case law provided " 'unanimous authority . . . to the effect that IRS agents may give expert testimony along the lines that Agent Allen testified to in Mr. Picardi's case.' . . . substantially overstates the existence of authority on the point." Id. at p. 41 (citing Docket 28 at p. 52). Picardi argues "[a] close analysis of the cases cited by the magistrate show that none of them support the proposition alleged by the magistrate, and they do not support the admission of Allen's testimony." Id.

The admissibility of expert testimony is governed by Fed. R. Evid. 702. Fed. R. Evid. 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

Relevant to this case, Rule 704 provides "an expert witness must not state an opinion about whether the defendant did or did not have a mental state . . . that constitutes an element of the crime charged . . . . Those are matters for the trier of fact alone." Fed. R. Evid. 704(b).

An IRS agent's expert testimony "express[ing] an opinion as to the proper tax consequence of a transaction is admissible evidence." Stadtmauer, 620 F.3d at 269 (citing Mikutowicz, 365 F.3d at 72). See also Bedford, 536 F.3d at 1158 ("a properly qualified IRS agent may analyze a transaction and give expert testimony about its tax consequences."); Pree, 408 F.3d at 870 (same); Moore, 997 F.2d 58 ("an IRS agent may testify as to the agent's analysis of the transaction which may necessarily stem from the testimony of other witnesses. The agent may also explain his analysis of the facts based on his special expertise."). "Similarly, . . . an IRS expert's analysis of the transaction itself, which necessarily precedes . . . her evaluation of the tax consequences, is also admissible evidence." Pree, 408 F.3d at 870. See also Mohney, 949 F.2d at 1406 (same); United States v. Windfelder, 790 F.2d 576, 581 (7th Cir. 1986) (same).

"[A]ll expert testimony as to the 'proper tax consequences of a transaction' is bound to touch on the law to some extent . . . .' " Stadtmauer, 620 F.3d at 270 (citing Mikutowicz, 365 F.3d at 72). See also Moore, 997 F.2d at 58-59 (In a tax case "it was permissible for the IRS expert to summarize and analyze the facts indicating willful tax evasion so long as he did not directly embrace the

ultimate question of whether the defendant did in fact intend to evade income taxes.") (internal citation, quotation marks and brackets omitted). "The 'primary limitation' on such testimony is that the expert 'may not testify about the defendant's state of mind . . . .' " Stadtmauer, 620 F.3d at 269 (citing Mikutowicz, 365 F.3d at 72; referencing Fed. R. Evid. 704(b)).

Picardi's evaluation of the cases cited by the magistrate judge and outlined above is misplaced. The R&R properly acknowledged there is "unanimous authority . . . to the effect that IRS agents may give expert testimony along the lines that Agent Allen testified to in Mr. Picardi's case." (Docket 28 at p. 52). Every tax case ultimately comes down to the issue of whether a defendant paid the appropriate income tax based on the transaction analyzed. The areas of anticipated testimony identified by the government for Agent Allen were topics appropriately permitted by the trial court. Agent Allen's anticipated areas of testimony would not have been excluded by a defense pretrial motion *in limine*.

Picardi has not shown that counsel's representation "fell below an objective standard of reasonableness," or that he was prejudiced by the decision of counsel not to file a motion *in limine* seeking to exclude or limit Agent Allen's anticipated testimony. Strickland, 466 U.S. at 687-88 and 691.

Picardi objects to the magistrate judge's decision to resolve in Attorney Culotta's favor a conflict between a statement by Picardi that Attorney Culotta refused to file motions in limine because they were a "waste of time," and the attorney's denial of that statement. (Docket 34 at pp. 58-59) (referencing

39

Dockets 12 at p. 3 & 28 at p. 63). Picardi claims the magistrate judge inappropriately made a credibility determination, which should only be resolved at an evidentiary hearing. <u>Id.</u> at p. 59. Because of the court's resolution of the principal issue, this collateral matter is moot.

Petitioner's objection to the R&R on this issue is overruled.

B. <u>Failure to Object to the Testimony of Agent Allen</u>

Picardi objects to the conclusions of the R&R that he received effective assistance of counsel in three areas of Agent Allen's trial testimony regarding Picardi's: (1) state of mind; (2) constructive receipt of income; and (3) control of the trust. (Docket 34 at pp. 34-58).

1. STATE OF MIND TESTIMONY

Prior to trial defense counsel filed a motion *in limine* captioned "re: Attorney-Client Communications." (CR. Docket 134). The motion *in limine* sought to prohibit the government from using 18 exhibits, consisting of 66 pages of documents. (<u>Id.</u>, Docket 134-2). The documents included a number of communications between Picardi, Attorney Kritt and several individuals associated with the financial institutions discussed above. <u>Id.</u> Among other things, the motion *in limine* sought to prohibit the government from using what would be admitted as Trial Exhibit 151. (CR. Docket 134; <u>see</u> <u>also</u> CR. Docket 134-2 at p. 34).

On November 21, 2000, Picardi wrote to Attorney Kritt marking the letter as "CONFIDENTIAL CLIENT-ATTORNEY INFORMATION." (Trial Exhibit 151) (capitalization in original). The letter stated:

> I'm writing regarding the issue of these two overseas loans. I am writing this to avoid any electronic record of this letter.
>
> You made a suggestion last month . . . that I obtain a loan in the US to pay off the overseas loans.
>
> I think we need to go back to the beginning and remember why we set all this up. My main interest is to minimize my tax payments. Asset protection is a close second interest.
>
> In keeping with my desire to minimize my tax payments we set up the deferred compensation program. In setting up the PLS,[9] we wanted me to obtain, by taxable salary, the minimum amount of income upon which I could live. The remainder was to go through the PLS and be placed offshore, minus 9% fees.
>
> We also agreed that the best option to bring back some of the money was by loans. The loans prevent the money from being declared as income, and the interest payment could be declared as a business deduction. Although these were to have an arms-length papertrail so that they were sniff-proof, payment of these loans was to come from additional loans.
>
> Your recent suggestion was that I either obtain a loan in the US to pay for these loans, which creates an additional 9% cost or attempt to pay off the loans from the minimal amount of salary I receive from PLS.
>
> None of this makes any sense as it would never be possible to pay off these loans easily with the funds I receive from the PLS. Obtaining a loan in the US negates the value of the offshore loans and increasing the amount I receive in salary would simply increase my taxable income.

---

[9]Montrain later agreed to transfer the employment contract providing for Picardi's services performed in the United States to Professional Leasing Services, Inc., ("PLS"). (Trial Exhibit 116).

I am afraid that you and I have gotten into this without the understanding of the costs involved to maintain these loans. I would like to hear your opinion on this as it appears that the concept that you and I advocate in believing these loans were easy loans to myself may not be as valid a point as you and I have touted.

Please don't forget that my intermediate term plans are to build my house which may be around $500,000 and my long term plans are to spend all my money and die comfortably but poor. . . .

While you mull this all over, is there any advantage to E&S Trust purchasing my ranch. It would give me asset protection and would bring in enough money to pay off the two loans plus an opportunity of bringing in some more money into the USA not being declared as income. . . .

Id. Picardi closed with a post script: "[t]here will be no record of this letter in my computer nor files." Id.

During an initial pretrial hearing the trial court reserved ruling on defendant's motion *in limine*. (CR. Docket 146 ¶ 3). During a second pretrial hearing the court received evidence concerning Trial Exhibit 151. (CR. Docket 234 at pp. 46:19-25; 47:12-48:23; 49:2-22 & 50:1-9). After considering the evidence and arguments of counsel, the court denied Picardi's motion *in limine* as to Trial Exhibit 151 and ruled the exhibit was admissible at trial. Id. at pp. 53:4-54:4 & 54:16-55:3.

The relevant content of Agent Allen's colloquy with government counsel about Trial Exhibit 151 was as follows:

Q: So the tax—the lowering taxes was the main goal, according to this?

A: That's what Dr. Picardi says. . . .
. . .

Q:  I am not going to read the whole thing here.  Want to reference to you this part. . . .  The minimum amount of income upon which I could live.  I want to ask you about that.  Again, that refers to salary that Dr. Picardi was earning or listing in this arrangement.  Does this seem like it's a fair market value base salary?

A:  It does not.  To me—I am not from this area—I do not know what other surgeons of Dr. Picardi's operable skill might earn.  I would have to believe it's more than the 39,000 figure that we saw in the prior audit; it would be substantially more.  It certainly was substantially more in 1996.

. . .

Q:  From your viewpoint in the IRS, how would you view the loans prevented from being declared as income?

A:  Well, I would look at it that Dr. Picardi understands that the loans—let me rephrase that.  I would understand that Dr. Picardi knows these transactions characterized as loans were not; that they were in fact income.

Q:  Based on constructive receipt you talked about?

A:  The transaction was in fact mischaracterized.  This implies to me that Dr. Picardi knows that they were.  I can't get into his head on all those other things.  This document appears to say that to me.

(CR. Docket 224 at p. 34:19-21; p. 35:7-18; p. 36:1-11).

The magistrate judge held that because Agent Allen was being questioned about what Picardi's letter said to Attorney Kritt, "she did not testify impermissibly about Mr. Picardi's state of mind.  She testified to her understanding of what Mr. Picardi was communicating in his letter."  (Docket 28 at p. 47).  "For Agent Allen to testify, based on Mr. Picardi's own words, 'that Dr. Picardi knows these transactions characterized as loans were not' is fair commentary on Exhibit 151."  Id. (referencing CR. Docket 224 at p. 36:5-6).

Picardi objects to the magistrate judge's conclusion, suggesting he never said in Trial Exhibit 151 "that [he] knew, believed, guessed, or speculated that the loans were income." (Docket 34 at p. 35). He contends the magistrate judge erroneously concluded "any objection to Allen's testimony would have been overruled because 'Mr. Picardi's "state of mind" as expressed in Exhibit 151 could not have been more clear—the loans were a sham and he was reminding Kritt of that fact.'" Id. at pp. 35-36 (referencing Docket 28 at pp. 47-48). Picardi argues "Allen's testimony was objectionable and Ms. Culotta should have objected." Id. at p. 36. In support of his argument, Picardi submits:

> It was up to the jury to decide Picardi's state of mind from this exhibit and other evidence. The jury could have inferred from this statement that he believed that the loans were a legitimate way of getting money without having deferred funds declared as income. The jury could have believed that Dr. Picardi relied on Kritt's advice to that effect. However, Allen's expert testimony invaded the province of the jury to make this critical determination as to Picardi's state of mind.

Id. (referencing Stadtmauer, 620 F.3d at 269). Picardi objects to the magistrate judge's conclusion that no prejudice occurred to him because Trial Exhibit 151 and other referenced but not identified exhibits spoke for themselves "and told the jury quite clearly what Mr. Picardi's 'state of mind was.'" Id. (referencing Docket 28 at p. 46).

One of those other trial exhibits not mentioned by the magistrate judge or Picardi is Trial Exhibit 173. After the IRS opened an audit, Picardi provided Attorney Kritt with a proposed explanation for the employment agreement with Montrain and the transfer of money to the other entities discussed above. (CR.

44

Docket 221 at pp. 56:20-57-18) (referencing Trial Exhibit 173). The June 5,
2003, letter stated in part:

> I believe I have determined an appropriate solution for PLS and an
> argument which supports our position validating function over
> form.
>
> As an individual running a solo practice, with absolutely zero
> background in any aspect of business management or accounting,
> maintaining a leasing agreement with a company, such as PLS,
> which can do the business management and accounting matters, is
> really the only viable means for me to operate a solo business.
>
>> The PLS leasing agreement is quite analogous to the
>> associate membership agreements I signed when
>> joining either the Rapid City Medical Center or Queen
>> City Medical Center. As an associate member, all of
>> my production was provided into the group which then
>> paid me a monthly salary. The monthly salary may or
>> may not be related to the actual production income.
>>
>> In turn for providing the services to the group, the group
>> in turn provides the associate member with the
>> necessary accounting services, provides business
>> management and retirement benefits.
>
> I feel we have a valid argument in that my complete absence of any
> formal training in accounting or business management, combined
> with the fact that I had no prior experience in solo practice or
> running a business, necessitated me to contract with a leasing
> entity which could fulfill the accounting requirements of running a
> business. The fact this leasing agreement provided for a Deferred
> Compensation was actually only a secondary benefit, the primary
> benefit being the accounting and management requirements.

(Trial Exhibit 173 at p. 1). Picardi suggested a number of changes in the
financial arrangement, but wanted to continue the PLS at a reduced fee to
provide, among other things, "a retainer for legal services arising from IRS issues
related to the leasing program, such as the audit." Id. The letter concluded:

"By continuing the program in this manner, at least until the other issues are resolved, we show the leasing program definitely has function and the deferred compensation aspect is only a secondary issue." Id. at p. 2.

Agent Allen's analysis of Picardi's statements in the November 2000 letter was admissible testimony. Stadtmauer, 620 F.3d at 269. It is clear from Agent Allen's testimony she was not declaring what Picardi's state of mind was, but rather only giving her interpretation of the contents of Trial Exhibit 151. Agent Allen's testimony left room for the jury to make up their own minds as to whether Trial Exhibit 151 or the other exhibits, including Trial Exhibit 173, substantiated the government's claim Picardi "in fact intend[ed] to evade income taxes." Moore, 997 F.2d at 59. Picardi's state of mind remained an issue for the jury to resolve. Stadtmauer, supra.

Petitioner's claim of ineffective assistance of counsel on this issue is denied. Picardi has not shown counsel's representation "fell below an objective standard of reasonableness," or that he was prejudiced by the decision of Attorney Culotta not to object to this portion of Agent Allen's testimony. Strickland, 466 U.S. at 687-88 and 691.

Petitioner's objection to the R&R on this issue is overruled.

2.    CONSTRUCTIVE RECEIPT OF INCOME TESTIMONY

Agent Allen twice gave her explanation of the term "constructive receipt" to the jury.

Constructive receipt is really nothing more than the ability to access money. You don't have to access it, you simply have to have the

46

ability to access it. It doesn't matter if you do or not; and it doesn't matter if you do, that you repay it at some later point in time. It's simply and solely the ability to access, whether you do or not. That is constructive receipt. . . . Constructive receipt is income and it is income when you receive it. So, for example, the mere ability to access funds is constructive receipt and the ability to access funds is income. (CR. Docket 224 at p. 22:1-13).

Constructive receipt is when you have access to money that you have earned. If you have earned it and you have access to it, you have constructive receipt. You have constructive receipt. When you have constructive receipt, that is income. Income is reportable when there is constructive receipt. It's not when you get physical possession of the dollar, it's when you could get possession of the dollar. Id. at p. 45:15-22.

As an illustration of constructive receipt, the government asked Agent Allen about a check in an individual's possession but which they do not cash. Her answer explained in layman's terms the concept this way: "You could hold that check for as long as you wanted to. You could hold it for 6 months or up to the point the bank would honor it. If you have it, if you have access to it, you have constructive receipt and constructive receipt is reportable in the year of constructive receipt." Id. at p. 46:8-13. Agent Allen's testimony was summarized for the jury.

Q: How does control fit in when you are looking at it like you have control, then access, then constructive receipt; are they interrelated?

A: Absolutely. And the structure is you have control—if you have control over the money, then you have access. And that kind of takes us back to control is access is constructive receipt is income. You get one to the other to the other down to income that's reportable at the time of constructive receipt.

Id. at p. 57:4-12.

Applying this principle to Picardi's financial arrangement and activities, Agent Allen testified that the ownership of the stock of E & S International, Ltd., by E & S International Trust, whose stock is owned by Picardi and he is its primary beneficiary, created a unique situation.

Q:    [Trial Exhibit 313] says that Dr. Picardi can remove the trustee of the trust?

A:    Yes.

Q:    And by so doing he controls the trust?

A:    He controls the trustee.

Q.    He controls the trustee.  But doesn't that mean he controls the trust if you can remove the trustee at will?

A.    Yes.

Q.    By controlling the trust he controls what's in the trust?

A.    Correct.

Q.    And the IBC [E & S International, Ltd.] is in the trust; the corporation is owned by the trust?

A.    That's what this says.

Q.    And by controlling that, he controls the assets in the corporation, the funds in the corporation?

A:    Yes, he would.

(CR. Docket 224 at pp. 19:10-20:1).   Because of the principle of constructive receipt, Agent Allen testified Picardi had an obligation to report the money going into Montrain, through the various international companies, and ultimately to

48

E & S International, Ltd., as income in the year the funds are deposited with

Montrain.  <u>Id.</u> at p. 23:10-13.

> It comes back to it's true that if Dr. Picardi borrowed all of the funds, yes, that's constructive receipt, absolutely.   If he borrowed only one dollar of those funds, he still had constructive receipt.   What is also true is he didn't have to borrow a dollar, he didn't have to borrow all of it.   His mere ability to borrow, whether he did or did not, gave him constructive receipt and is income reportable in the year that he had access to the money.

<u>Id.</u> at p. 30:14-22.

Agent Allen explained the discrepancy between the written documents and

the reality of the financial arrangement.

> [Y]ou can't discount the paperwork; paperwork is real important. It's just that the substance, what really happens, the reality and the paperwork, both of them are supposed to say and do the same thing. If you say in your paperwork that you cannot borrow, then you can't borrow.   You cannot in fact borrow.   If the paperwork says you can't borrow, but you do, then you've got a discrepancy.   And the IRS does not audit paper because paper can be made to say anything.   We try to audit the substance.   And if the substance is there, that's what we look for.   If I can just take a minute.   I have audited situations where the paper said one thing, the substance of the transaction said something else.   What the paperwork said would be legal or would not be appropriate, but the substance of the transaction was.   In that kind of case I really don't have a problem. If the paperwork doesn't agree with the substance, with the reality, I am looking at the reality.   If the reality is good, I've got no problem. If the reality is not good, I got a problem.

<u>Id.</u> at pp. 37:13-38:6.   Agent Allen summarized the IRS's view of Picardi's

arrangement: "There is control by Dr. Picardi, there is access by Dr. Picardi.   It

does not matter that Dr. Picardi did or did not actually borrow the money; it does

not matter that Dr. Picardi did or did not repay them the money; he had access,

so there's control and it's [sic] access." Id. at pp. 63:24-64:3. This lead to constructive receipt and reportable income to Picardi. Id. at p. 64:4-6.

The magistrate judge found Picardi's counsel did not err by not objecting to the testimony of Agent Allen because under Rule 702 the agent was permitted to testify to the definition of constructive receipt. (Docket 28 at p. 51). In addition, the magistrate judge concluded Attorney Culotta committed no error because the definition of constructive receipt used by Agent Allen "paralleled the definition given by the district judge to the jury . . . ." Id. at p. 50 (referencing CR. Docket 191 at p. 20).

Picardi claims Ms. Culotta was ineffective because she failed to object to the testimony of Agent Allen. He claims "there is no rule of evidence that allows an expert witness like an IRS agent to usurp the role of the judge in defining a legal term, then rendering an opinion that the defendant's conduct met that definition. Nothing in Rule 702 suggests that a witness should be allowed to testify as Allen did." (Docket 34 at p. 40). Picardi asserts "[Agent] Allen repeatedly used judicially defined terms in her testimony. Allen gave protracted testimony regarding constructive receipt and how, in her opinion, the mere possibility of Picardi taking out a loan constituted constructive receipt. And, Allen did not have personal knowledge of the facts in this case: She relied on Agent Wright's investigation as the foundation for her opinions." Id. at p. 45.

Picardi argues Attorney Culotta was ineffective because she failed to cross-examine Agent Allen about the fact that "AEL refused Dr. Picardi's request

50

for a $100,000.00 loan until such time as he complied with the provisions of the existing loans' repayment schedule."  (Docket 34 at p. 50) (referencing Docket 34-8).  He asserts the e-mails of this discussion were in his attorney's file and would have contradicted the agent's "testimony that Picardi had unfettered control over his offshore retirement account through loans.  They rebut the government and magistrate's position that the loans Dr. Picardi took were not actually loans at all."  Id.

Attorney Van Norman articulated the concern of defense counsel about Picardi's loans and efforts to acquire more loans.  "The frequency and intensity with which Picardi inquired in writing and insisted on responses from representatives of the offshore entities, and from Kritt, about where 'his' monies were and what returns his monies were receiving, suggested his involvement as a person with, at least, intermittent control of the monies.  Picardi's forceful personality and anxiety about control over the future of his monies were almost palpable in his many writings that were trial exhibits."  (Docket 11 at p. 9). Attorney Culotta agreed with her co-counsel's observations.  (Docket 12 at p. 5). Defense counsel "were aware that Picardi had made investment suggestions and that, at least, some of his suggestions apparently had been ignored within the offshore program."  (Docket 11 at p. 10).

Attorney Culotta's cross-examination of Agent Allen included a discussion of Picardi's intervention in the investment portfolios of Elfin Trust Company to purchase both EcoTyre and Gateway stocks.  See CR. Docket 224 at

pp. 75:11-79:8 (referencing Trial Exhibit 185).    It was apparent from those communications that Picardi was frustrated his purchase suggestions and stop-loss instructions were not being closely applied and Elfin Trust was losing money in his account.    (Trial Exhibit 185; see also Trial Exhibit 187 (Picardi upset with the reported losses by one of the portfolio investors and directed Elfin Trust close out the accounts.)).    Defense counsel also pointed out through Agent Allen that Picardi's desire for his financial portfolios to be invested in the Kuwait stock market went unheeded.    Id. at pp. 79:9-80:7 (referencing Trial Exhibit 188).

Merely because AEL expected an interest payment on the first loan before a second loan would be advanced does not diminish the fact that the second loan was obtained.    (Docket 34-8 at p. 2).    Picardi's own testimony acknowledged the second loan.    (CR. Docket 229 at p. 14:13-20) (referencing Trial Exhibit 318).

Attorney Culotta's error, if any, in not presenting evidence AEL's refusal to advance further loans until an interest payment was made did not prejudice Picardi as the other evidence counsel presented disclosed that Picardi may not have had 100% unfettered control over the funds.    But the prosecution evidence proved beyond a reasonable doubt Picardi had significant control over the entities and his overseas money and that proof supports the jury's verdict.

Picardi further objects to the magistrate judge's conclusion Attorney Culotta's own questions to Agent Wright waived any error or prejudice which

may have befallen Picardi by his attorney's failure to object to Agent Allen's testimony.   (Docket 34 at p. 52).   During the cross-examination of Agent Wright, Attorney Culotta engaged him in a colloquy about constructive receipt being a civil concept.   (CR. Docket 223 at pp. 39:9-40:14).   The court overruled the government's objection to the inquiry and permitted Agent Wright to explain the term.   Id. at p. 39:18-22.   Agent Wright testified:

> Generally constructive receipt gets to whether income has been set aside, put in an account, or generally made available to someone whether they choose to use it or not, or draw from it, or whatever. Generally that's the concept of constructive receipt as I relate it to income. . . . You don't have to take the money to have constructive receipt; it just has to be set aside for you or made available for you to use.

Id. at pp. 39:23-40:2 & 40:8-10.   Attorney Culotta got the agent to acknowledge constructive receipt was not a criminal term.   Id. at p. 40:3-6.   While the attorney may not have intended to ask the agent to define constructive receipt, the R&R found her question prompted the definition allowed by the trial court.

Picardi argues his attorney "not only sat silent while Allen testified as to the definition of constructive receipt and how Dr. Picardi's conduct fit that definition, but also elicited the same damaging testimony from Agent Wright." (Docket 34 at p. 51).   Picardi has the sequence of the questioning of Agent Allen and Agent Wright backward.   There was no error in Attorney Culotta's questioning of Agent Wright and there was then no error in not objecting to Agent Allen's testimony.

During a conference outside the presence of the jury the court asked defense counsel if the government's trial brief on the admissibility of the IRS agent's testimony was an accurate statement of the law.   (CR. Docket 224 at pp. 147:21-148:17).   Defense counsel acknowledged the government's case authorities were correct.   Id. at p. 148:16-18.

Agent Allen's expert opinion testimony as to the "tax consequence of a transaction is admissible evidence."   Stadtmauer, 620 F.3d at 269.   She was permitted to rely on the investigative activities and testimony of Agent Wright in arriving at her conclusions as to the validity of Picardi's case under the IRS rules and regulations.   Moore, 997 F.2d 58.   See also Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.").

Agent Allen's analysis of Picardi's financial arrangement and transactions was admissible as "all expert testimony as to the proper tax consequences of a transaction is bound to touch on the law to some extent . . . .' "   Stadtmauer, 620 F.3d at 270 (internal quotation marks and citation omitted).   Agent Allen's testimony did not "tell the jury what result to reach," but rather "provid[ed] the groundwork in the form of an opinion to enable the jury to make its own informed determination."   Duncan, 42 F.3d 97, 101 (2d Cir. 1994).   She "merely posited factual conclusions which are not prohibited even if they embrace an ultimate issue to be decided by the jury."   Id. at 103 (internal quotation marks and citation omitted).   Agent Allen did not cross the line and did not "directly

embrace the ultimate question of whether the defendant did in fact intend to evade income taxes."  Moore, 997 F.2d at 59.

In the final jury instructions, the court included the following language in its definition of income:

> Money or property received from any source constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it, in other words, when he has freedom to dispose of it or use it at will. It is the dominion and control over property, and not documentary title, that determines to whom the income from that property is taxable. This concept is also known as constructive receipt.
>
> A loan that the parties to the loan agree is to be repaid does not constitute income.  However, merely calling a transaction a loan is not sufficient to make it a loan.   When money is acquired and there is no good faith intent on the part of the borrower to repay the funds advanced, the funds are income and are taxable as such.

(CR. Docket 191 at p. 20).   It is nonsensical to argue Agent Allen should not have been allowed to testify as to her opinion of Picardi's situation under the IRS regulations.   The fact her explanation in layman terms closely aligned with the court's instruction to the jury was not improper.   Her testimony would only be improper and subject to challenge if it did not align with the ultimate instructions of the court.   It was the jury's function to judge Agent Allen's credibility and decide whether her testimony was material in arriving at their verdict.   It was the court's instructions on the law which the jury was obligated to follow and did follow.

Petitioner's claim of ineffective assistance of counsel on this matter is denied.   He has not shown that counsel's representation "fell below an objective

standard of reasonableness," or that he was prejudiced by the decision of Attorney Culotta to not object to this portion of Agent Allen's testimony. <u>Strickland</u>, 466 U.S. at 687-88 and 691.

Petitioner's objection to the R&R on this issue is overruled.

3.    PLEA AGREEMENT OFFERS

Picardi asserts 16 specific claims of ineffective assistance of counsel against Attorney Culotta on the issue of plea agreement offers from the government.    (Docket 1 at pp. 16-18).    The magistrate judge recommends rejection of the claims.    "Mr. Picardi has not even alleged, let alone supported, the necessary ingredients for relief under <u>Strickland</u>."    (Docket 28 at p. 86) (referencing <u>Lafler v. Cooper</u>, 566 U.S. 156, 164 & 174 (2012) (Petitioner must show that but for the ineffective advice there was a reasonable probability the plea offer would have been accepted by both the petitioner and the trial court and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the actual sentence received.)    "Nowhere does [Picardi] state affirmatively that he would have pleaded guilty had his lawyer told him about the plea offers and explained the ramifications of accepting those offers versus going to trial."    (Docket 28 at p. 89).

Picardi objects to the conclusion of the magistrate judge that he "[w]ould not have accepted a plea offer because he maintained his innocence at trial." (Docket 34 at p. 18).    He asserts this conclusion is faulty because "it presumes that the magistrate knows what charge for which Dr. Picardi was expected to

56

plead guilty.   The magistrate does not know what the charge was, so it cannot assert with any certainty that Dr. Picardi was unable to provide a factual basis for a guilty plea."   Id.   While the specific misdemeanor plea offer was not known, Picardi asserts that instead of willful knowledge and intent to evade taxes, the discussion with the government centered on "willful blindness rather than evasion."   Id. at p. 19 (referencing Docket 34-2).   Picardi argues he "may have testified he didn't know that what he was doing was wrong.   However, that does not foreclose the possibility of him entering a plea to any crime.   It leaves open the possibility of him acknowledging that he may have been willfully blind to certain facts, which can be the basis of criminal liability."   Id.

Picardi further objects to the magistrate judge's conclusion because it "fails to put these discussions and Dr. Picardi's allegations in context.   Had his counsel not mis-advised him about immunity, and had his counsel acknowledged that Dr. Picardi's intent from the beginning was to work a plea agreement, Dr. Picardi would have been in a position to propose a multitude of possible misdemeanor resolutions that met the facts of his case and the state of his knowledge or belief."   Id.   He argues "[t]he discussion could have led to a plea to a charge involving the propriety of deductions on his tax returns, failing to file, obstruction, or misprision of felony."   Id.   In addition, Picardi asserts "he had information of value regarding this criminal investigation that the IRS needed" and "[t]his assertion alone proves two things: he was interested in a plea; and he could provide a factual basis for misprision of felony for withholding

information about another person's felonious behavior." Id. at p. 20 (referencing Docket 34-4).

Because Attorney Culotta placed the word "offer" in quotation marks when writing to him, Picardi claims she "believed that the only acceptable offer was for no prosecution, and that he should reject any offer (even one's [sic] she hadn't read) if it involved a guilty plea. She was affirmatively mis-advising him. And, it led to grave consequences for Dr. Picardi." Id. (parenthesis in original).

Picardi objects to the magistrate judge's conclusion that he would have rejected a misdemeanor plea offer from the government. Id. He claims that conclusion "removes that decision from the context of the case . . . . To the extent the magistrate is correct in asserting that Dr. Picardi would have rejected a misdemeanor offer, that determination pre-supposes that Dr. Picardi got sound advice from counsel and acted contrary to that advice. In reality, the opposite is true." Id. at pp. 20-21. He claims being "misadvised that if he gave a proffer, his statements would 'guarantee' that he would be prosecuted 'BY YOUR OWN WORDS.'" Id. at p. 21 (referencing Docket 34-7) (capitalization in original).

The court incorporates the summary of facts associated with the issue of plea agreements set out on pages 10-13 above. To make sense of Picardi's claim of ineffective assistance of counsel, it is necessary to put the attorneys' plea discussions in chronological order.

On April 7, 2010, or shortly thereafter, Picardi retained Attorney Culotta to represent him regarding an investigation of Attorney Kritt and related IRS

matters. (Docket 34-3). On April 24, 2010, Picardi e-mailed Attorney Culotta

apparently in response to a prior discussion about a potential offer from the

IRS.[10] (Docket 34-4).

> What the IRS is offering for me to testify on their behalf is not a carrot but an onion. I would believe, that without full immunity from both criminal and civil suit, it is reasonable for me to be concerned that any testimony might be used against me.

> I will be sending you a copy of the "smoking gun" letter.[11] What I would like to know is whether there are any other letters/emails which they consider inflammatory.

> In your communication with them, if possible, I would ask you to request from them a copy of any such letters/emails, etc. which "might help me make up my mind."

> Also, if you feel it appropriate, you might communicate with them my above concerns. Also, if you feel it appropriate, you might communicate that I believe that I might have pertinent information that they do not have.

> Finally, what is clear, is that if Tony Kritt wins his case, then any criminal action against me becomes very weak. The IRS must realize that.

(Docket 34-4). Attorney Culotta responded on April 26, 2010, with the

following: "Agreed on all accounts. I will speak with them over the next day—

and get back with you. Keep in mind that I completely agree that without total

immunity—there is no 'offer.' " Id.

---

[10]Documentation or a summary of any prior communications between Attorney Culotta and Picardi have not been disclosed to the court.

[11]A copy of the "smoking gun" letter was not disclosed to the court. If either Trial Exhibit 151 or 173 are perceived by Picardi as the "smoking gun" letter, he never acknowledges that association.

On June 11, 2010, Picardi e-mailed Attorney Culotta asking: "Have you been in contact with either the West Virginia or South Dakota US Attorney?" (Docket 34-5). In the e-mail chain is the response of Attorney Culotta of the same day to Picardi.

> Short answer is Yes—but nothing of substance.
>
> Anna Forbes (AUSA in WVa) and I spoke via email—she has 'offered' a Rule 11 proffer. I have requested a copy of the 'offer'—I have not reviewed the offer—but my experience dictates that it is not an offer that we will accept.
>
> I will forward the email to you with this caveat—I am preparing for a tax evasion trial which shall begin on Monday next week (June 21)—soooo [sic]—my response to her will be 'we shall talk after my trial.'
>
> I will call you first thing Monday morning (June 14) to discuss. Have a good weekend.

Id. (parenthesis in original).

In a separate e-mail chain of earlier the same day, AUSA Forbes e-mailed Attorney Culotta. (Docket 34-2).

> Attached is our proffer agreement. I am going to be hard to reach for much of the remainder of June so I prepared a signature block for Bob Mandel. That makes sense since he will be the one speaking with Dr. Picardi, if Dr. Picardi agrees to the interview. If your client agrees to the proffer session, please execute the agreement and email it to Bob Mandel so he can sign it.
>
> In the interest of full disclosure, the attorney for Dr. Brodnik called me yesterday. We discussed a possible plea. I advised him that I was also working on a deal with Dr. Picardi, but that there was no agreement yet. If Dr. Brodnik decides to cooperate, the deal for Dr. Picardi will be off the table. To be clear, I don't know if Brodnik will come in or not, but based on a recent development in my case, he has a new incentive to do so. His attorney promised to let me know soon.

I remain hopeful that your client will decide to sign up. I think that if he sits down with AUSA Mandel and Special Agent Chris Wright, he will understand the strength of the evidence against him. I can't speak for Bob Mandel, but I suspect he would be open to a willful blindness factual basis.

Finally, for what it is worth, Brodnik's attorney indicated during our plea discussions yesterday that he did not believe that a felony tax conviction would adversely affect his client's ability to continue to participate in the Medicaid/Medicare programs. Based on my experience in prosecuting many physicians over the years, that has been my understanding as well.

Please let us know ASAP where we are. I know you are busy, but I need to move fast on this. My trial begins the second week of July and if Dr. Picardi signs up, there will be a lot of work to do. Perhaps someone else in your office can step in to help on this.

Id. at pp. 1-2. Attorney Culotta forwarded AUSA Forbes' e-mail to Picardi.

Id. at p. 1. The forward portion of the e-mail is not dated and it is not clear whether the proffer agreement was forwarded to Picardi. See Docket 34-1. In her explanation, Attorney Culotta tells Picardi: "Here is the email from the government—this 'offer' entails a plea on your part, just as I suspected. We need to discuss this. Can we talk Monday June 14th?" Id. On June 29, 2010, Picardi e-mailed Attorney Culotta.

A couple weeks ago you mentioned that you wanted to talk to me about the so-called 'offer' by the West Virginia agent. I knew you would be busy at trial so I figured that, since you have not needed to call me, that things have been quiet. I also know the Brodnick [sic]—Kritt trial has been moved to October. If you would like to speak with me, feel free to give me a call at my house today. I will be home all day. As always, you can also page me on my pager [***-***]-1750.

(Docket 34-6). The next day, Attorney Culotta responds by e-mail: "I am sorry for my delay—I have been playing catch up from a tax trial that was

slated to begin on Monday of this week (the government filed a superseding indictment at the last minute—so everything was continued!)   I will be in my car most of the day tomorrow driving to Indianapolis for a hearing—I will try to touch base with you during the drive." Id. (parenthesis in original).

On August 5, 2010, Attorney Culotta e-mailed Picardi a lengthy explanation of her recent discussion with government counsel:

> I paged you earlier today—and wanted to update you—I am leaving for Michigan in a few minutes—and will be out of the office (witness interviews) until Monday, August 9th.   Clay will be in the office tomorrow if you have any questions.
>
> I spoke with Anna Forbes-AUSA in West Virginia- regarding your matter—here is the synopsis:
>
> 1. She has been informed that Bob Mandel (AUSA in South Dakota) has been "authorized to prosecute" the case against you—which means-they will likely be filing charges—BUT she "wasn't sure" about that—which makes me beleive [sic] that she is just fishing.   I have not heard from Mr. Mandel lately.
>
> 2. She stated that she would REALLY like to talk with you about Kritt—and kept going over the "letter"—she said that you could have "use immunity" if you would speak with her.   What that means is they will still prosecute you—but what you say to Ms. Forbes would not be held against you—I do not favor such an agreement.
>
> 3. Even IF you decided to talk to the government about Kritt—and they gave you "use immunity" Ms. Forbes would not be willing to do ANYTHING for you—so you would still potentially face your own charges.   I am all about doing "favors" for friends—but I could NEVER advise doing such a "favor" for the federal government and get NOTHING in return for that "favor."

> So I suggest that we just sit tight. They want you to talk to them—but they are unwilling to give you FULL IMMUNITY. Without such, you are just guaranteeing that you will be prosecuted—BY YOUR OWN WORDS.
>
> If Mr. Mandel really WANTED to charge you—he could have already done so.

(Docket 34-7) (capitalization and parenthesis in original).

On November 24, 2010, Picardi e-mailed Attorney Culotta: "Given statements made by Mandel withholding documents in prior cases . . . snip . . . about Rapid City. Thank you." (Docket 34-9). Again, in an undated portion of the same e-mail chain, Attorney Culotta states: "I will be available on either Saturday or Sunday (after church). As to Mandel, I think his case is very weak—and when all is said and done—we will have seen ALL the documents." Id. (capitalization and parenthesis in original).

During an October 27, 2011, pretrial hearing, AUSA Britt Haxton said that pre-indictment discussions of a plea agreement would have required Picardi "to plead to a lower charge or a misdemeanor in exchange for any testimony against Anthony Kritt." (Docket 34-11 at p. 21:21-23). AUSA Haxton indicated this offer was made prior to September 21, 2010, the date the indictment was filed against Picardi. Id. at p. 22:6-22. AUSA Kevin Koliner stated he had plea discussions with Attorneys Van Norman and Culotta on October 10, 2011 and October 11, 2011, respectively, during which Attorney Culotta asked if Picardi paid his taxes would the government dismiss the indictment. Id. at pp. 19:23-21:8. During the hearing Attorney

Culotta acknowledged there were discussions of an "offer to proffer and my client repeatedly told the government he had nothing to provide to them as to any nefarious activity on the part of Mr. Kritt that he [Picardi] was aware of, and so . . . it never went anywhere." Id. at p.24:12-15.

On August 8, 2012, in support of Picardi's discovery request in the criminal case, Attorney Culotta submitted an affidavit containing the following declaration: "In April 2010, your affiant . . . contacted [AUSA] Mandel and informed him that she had been retained by Picardi. Mandel offered Picardi a misdemeanor plea in return for his testimony against Kritt. Picardi declined the government's offer." (CR. Docket 130 ¶ 14).

In his habeas proceeding affidavit, Attorney Van Norman indicates he became involved in plea negotiations with the government only after Picardi was indicted. (Docket 11 at p. 10). He states "[t]he offer was a felony tax evasion charge and repatriation of an amount of money." Id. Attorney Van Norman explains Picardi's response.

> Picardi rejected the post—indictment plea offer because (a) he would have lost his gun rights due to a felony conviction, (b) he would have lost his medical license, in my opinion, based on my experience with and knowledge of the South Dakota Board of Medical and Osteopathic Examiners, and (c) he was uncertain that he could repatriate money, as I understood it at that time. He also was concerned about whether or not a substantial penalty would be levied by the offshore entity if repatriation were accomplished.

Id. at pp. 10-11. Regarding pre-indictment plea discussions, Attorney Van Norman states "Culotta told me early in my participation in the case that

Picardi had rejected a pre-charge plea deal which had included a misdemeanor, repatriation of money and cooperation against Kritt." Id. at p. 11.

Post-conviction but pre-sentencing, Picardi gave Attorney Van Norman copies of several e-mail exchanges Picardi and Attorney Culotta had about a potential misdemeanor plea offer.[12] Id. Attorney Van Norman found that "[s]everal emails from Culotta to Picardi seemed odd regarding her advice that Picardi's words from a proffer would be used against him at a subsequent trial. I thought at the time that Culotta's advice in the emails was deficient or incomplete." Id.

Attorney Culotta prepared her habeas proceeding affidavit after Attorney Van Norman's affidavit was shown to her. (Docket 12 at p. 3). As part of her response to Picardi's § 2255 Petition, she declares: "I never advised Dr. Picardi to 'reject any plea offers made by the government.'. . . Further, I never 'characterized the plea offers made by the government as shams and farces.' " Id. at p. 5 (referencing Docket 1 at p. 17). Attorney Culotta states she "never advised Dr. Picardi that he 'would not be charged, that the government was bluffing, and it had no evidence against him.' . . . Further, I never 'advised him not to take any plea offer because he would not be convicted.' " Id. at p. 6 (referencing Docket 1 at p. 19). Attorney Culotta asserts she "fully explained the difference between a misdemeanor and a

---

[12]It is unknown whether those e-mails were the same documents Picardi attached to his objections to the R&R.

felony to Dr. Picardi." Id. at p. 5. She contends "[i]n fact, I conducted research on the issue of Dr. Picardi's medical license if he were to plea [sic] guilty to either a misdemeanor or a felony." Id. No plea agreement was reached with the government in Attorney Culotta's opinion because "Dr. Picardi insisted on receiving immunity without pleading to any charges. Further, he was concerned as to whether he could repatriate the money and pay the fines that would be associated with a plea. Lastly, Dr. Picardi wanted to sue the government for the investigation, and that drove his refusal of any plea offer." Id. at pp. 5-6.

Picardi was present in court on October 27, 2011, when government counsel and Attorney Culotta reported the status of plea negotiations. (CR. Docket 89 at p. 3:14-18). The purpose of those representations was to assist the court in determining how to resolve the government's motion *in limine* to exclude plea negotiations. Id. at p. 15:9-12). In her presentation to the court, Attorney Culotta acknowledged the plea negotiations were not relevant at trial:

> Your Honor, as much as I would like to say my client would be able to get up there and say, "I was offered a misdemeanor and I turned it down," I just don't see that the plea negotiations or any of these things—the fact that he's going to trial, I think if he takes the stand he can say that he's maintained his innocence from the beginning; I don't see anything wrong with that. But I don't know necessarily how that has any relevance.

Id. at p. 25:10-18. Attorney Van Norman joined in with his perception of the issue of relevancy. "[O]ur argument is as to relevance isn't that he said I

won't take a misdemeanor as much as—and could see that being excluded

obviously—but it's his statement of—continuous statement of preindictment

of denial of wrongdoing, and I think that does go to his state of mind that has

persisted for some time." Id. at p. 26:6-11. After the court explained the

function of a not guilty plea, Attorney Culotta stated:

> Your Honor, I tend to agree with the Court. You know, and I
> agree with what Mr. Van Norman said. He's [Picardi] professed
> his innocence and if he decides to take the stand, obviously, that
> would be something that he could decide if he wants to testify;
> but I don't think that the fact he may have been -- and I don't
> know that he was actually offered a misdemeanor; I think it was
> more thinking about it, but I don't see that's relevant.

Id. at pp. 27:20-28:2.

"[T]he negotiation of a plea bargain is a critical phase of litigation for

purposes of the Sixth Amendment right to effective assistance of counsel."

Missouri v. Frye, 566 U.S. 134, 141 (2012) (citing Padilla v. Kentucky,

559 U.S. 356. 373 (2010)). "[A]s a general rule, defense counsel has the

duty to communicate formal offers from the prosecution to accept a plea on

terms and conditions that may be favorable to the accused." Id. at 145. "In

the plea negotiation context, in order to establish prejudice, a petitioner must

show that the outcome of the plea process would have been different had

competent counsel represented him during the plea process . . . . If a

defendant turns down a legitimate plea offer due to incompetent advice, and

is later convicted on more serious counts after trial and receives a more

severe sentence, his claim for ineffective assistance of counsel will be

successful." Barnes v. Hammer, 765 F.3d 810, 814 (8th Cir. 2014) (referencing Lafler, 556 U.S. at 163 & 166).

The magistrate judge evaluated Picardi's claim of ineffective assistance of counsel in plea negotiations in light of Lafler. (Docket 28 at p. 86). If a defendant is offered a plea agreement, "he has a right to effective assistance of counsel in deciding whether to accept or reject that offer." (Docket 28 at p. 87) (referencing Lafler, 566 U.S. at 167-68). If a defendant "did not receive effective assistance in evaluating a plea offer, he can show Strickland prejudice by showing he would have pleaded guilty but for counsel's ineffectiveness, and by not pleading guilty, he received a less favorable sentence." Id. (referencing Lafler, 566 U.S. at 165-68).

While the record is less than crystal clear as to the specific terms of the government's pre-indictment misdemeanor plea offer, the court finds that a misdemeanor plea offer was made to Picardi. See Docket 34 at p. 8. Post-indictment the government's offer would have required Picardi to plead guilty to a felony tax evasion charge. See Docket 11 at p. 10.

Picardi's claim that his goal from the beginning was to work out a plea agreement is disingenuous. His pre-indictment statement to Attorney Culotta bears this out. "What the IRS is offering for me to testify on their behalf is not a carrot but an onion. I would believe, that without full

68

immunity from both criminal and civil suit, it is reasonable for me to be concerned that any testimony might be used against me." (Docket 34-4). Picardi argues it was Attorney Culotta who insisted that any arrangement with the government would require total immunity—both civil and criminal. (Docket 34 at p. 11). Yet, it was early into their attorney-client relationship that Picardi insisted on total immunity. (Docket 34-4).

Picardi's attitude is borne out by the sworn testimony of both Attorney Van Norman and Attorney Culotta. <u>See</u> Dockets 11 at pp. 10-11 & 12 at pp. 5-6. In response to the government's motion to dismiss, Picardi never specifically denied the sworn testimony of his attorneys. <u>See</u> Docket 24 at pp. 4-5. Rather, he simply asserted "that he has been misadvised regarding misdemeanor plea offers." (Docket 25 at p. 5). In his objections to the R&R, Picardi did not deny Attorney Van Norman's testimony regarding Picardi's rejection of the felony plea offer. <u>See</u> Docket 34 at pp. 8-10.

At no time during the presentations of government counsel, his own attorneys or the court's summary of the plea negotiations in the October 2011 hearing did Picardi voice any apprehension or objection to what had occurred during or prior to the October 2011 hearing. Most defendants would not interject themselves into counsels' discussions with the court. However, from the court's observations of Picardi throughout the criminal case, the court is confident that if counsel had misrepresented the status of

the plea negotiations, Picardi would have interjected with his perception of the plea discussions.

Picardi acknowledges a misdemeanor plea offer was made but does not deny he rejected the offer.   See id. at p. 8; see also Dockets 11 at p. 11; 12 at p. 6 & CR. Docket 130 ¶ 14.   Picardi's pretrial position was he did not violate any of the IRS statutes or regulations and he had no information regarding Mr. Kritt which would be of benefit to the government as part of a misdemeanor plea and proffer.   At trial, Picardi adamantly denied he was guilty.   (CR. Docket 229 at pp. 54:9-11 & 60:22-61:8).

Picardi turned down a misdemeanor plea offer because (1) he believed he was not guilty of any criminal conduct; (2) he believed his use of the offshore financial setup and loan plan was legal; (3) he thought he might not have been able to make full repatriation of his funds in order to pay any income tax, interest and penalty which might be assessed; and (4) he believed his prosecution was simply an extension of the government's dissatisfaction with its inability to successfully prosecute Attorney Kritt. Picardi turned down the felony plea offer for those same reasons, plus (5) he would lose his right of gun ownership, and (6) he would lose his medical license.

Post-conviction, Picardi has defendant's remorse.   After his conviction and sentence he finally realized it would have been far better to have taken a misdemeanor plea agreement and attempt to pay the full balance of the

70

income tax, interest and penalties which were due as the result of his criminal behavior.

The court finds Attorney Culotta provided Picardi with effective representation. Picardi fails to satisfy the first prong of the <u>Stickland</u> and <u>Lafler</u> test.

Even if the court were to presume that the first prong was met, Picardi must show prejudice, that is, "but for counsel's deficient performance there is a reasonable probability [Picardi] and the trial court would have accepted the guilty plea." <u>Lafler</u>, 566 U.S. at 174. If the prejudice prong of <u>Strickland</u> is satisfied, the proper remedy dictated by <u>Lafler</u> is:

> [T]o order the [government] to reoffer the plea agreement. Presuming [Picardi] accepts the offer, the . . . court can then exercise its discretion in determining whether to vacate the convictions and resentence [Picardi] pursuant to the plea agreement, to vacate only some of the convictions and resentence [Picardi] accordingly, or to leave the convictions and sentence from trial undisturbed.

<u>Id.</u>

The court has discretion to vacate a conviction or leave it undisturbed in light of the "defendant's earlier expressed . . . unwillingness[] to accept responsibility for his . . . actions." <u>Lafler</u>, 556 U.S. at 171. Even if Picardi could show that ineffective assistance of counsel caused him to reject a plea agreement, the court in exercising its discretion would not vacate the convictions, but rather would leave the verdict and sentence undisturbed. <u>Garcia v. United States</u>, 679 F.3d 1013, 1015 (8th Cir. 2012).

Petitioner's claim of ineffective assistance of counsel on this matter is denied. He has not shown that counsel's representation "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88 and 691; Lafler, 566 U.S. at 174.

Picardi's objection to the R&R on this issue is overruled.

6.    THE MAGISTRATE JUDGE ERRED BY RECOMMENDING THAT NO EVIDENTIARY HEARING BE HELD ON THE § 2255 PETITION

"An evidentiary hearing is required unless the motion, files, and records of the case conclusively show the defendant is not entitled to relief. . . . A petitioner's allegations must be accepted as true and a hearing should be held unless they are contradicted by the record, inherently incredible, merely conclusions, or would not entitle the petitioner to relief." Garcia, 679 F.3d at 1014 (internal citations omitted). Based on the findings above, the court concludes no evidentiary hearing is necessary because Picardi's claims "are contradicted by the record, inherently incredible . . . [and] would not entitle [him] to relief." Id.

Picardi's objection to the R&R on this issue is overruled.

**ORDER**

Based on the above analysis, it is

ORDERED that petitioner's objections (Docket 34) are overruled.

IT IS FURTHER ORDERED that the report and recommendation (Docket 28) is adopted as modified by this order.

IT IS FURTHER ORDERED that the government's motion to exclude expert evidence (Docket 14) is denied.

IT IS FURTHER ORDERED that the government motion to dismiss (Docket 23) is granted.

IT IS FURTHER ORDERED that the petition (Docket 1) is dismissed with prejudice.

IT IS FURTHER ORDERED that, pursuant to 28 U.S.C. § 2253(c) and Rule 11 of the Rules Governing Section 2255 Cases in the United States District Courts, the court declines to issue a certificate of appealability. A certificate may issue "only if the applicant has made a *substantial showing* of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (emphasis added). A "substantial showing" under this section is a showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). In other words, a "substantial showing" is made if a "court could resolve the issues differently, or the issues deserve further proceedings." Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997). Petitioner has not made a substantial showing of the denial of a constitutional right.

Although the court declines to issue a certificate of appealability, Petitioner may timely seek a certificate of appealability from the United States Court of Appeals for the Eighth Circuit under Fed. R. App. P. 22. See Rule 11(a) of the

Rules Governing Section 2255 Cases in the United States District Courts and

Fed. R. App. P. 22.

      Dated September 25, 2018.

                    BY THE COURT:

                    /s/ *Jeffrey L. Viken*
                    JEFFREY L. VIKEN
                    CHIEF JUDGE